

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
HERN DISTRICT OF T
**FILED**

SEP 1 6 2005

CLERK, U.S. DISTRICT
By _____
        **Deputy**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | NO. 3:04-CR- 240-G |
| | § | |
| HOLY LAND FOUNDATION FOR | § | |
| RELIEF AND DEVELOPMENT (1) | § | |
| also known as the "HLF" | § | |
| SHUKRI ABU BAKER (2) | § | **TO BE FILED UNDER SEAL** |
| MOHAMMAD EL-MEZAIN (3) | § | |
| GHASSAN ELASHI (4) | § | |
| HAITHAM MAGHAWRI (5) | § | |
| AKRAM MISHAL (6) | § | |
| MUFID ABDULQADER (7) | § | |
| ABDULRAHAM ODEH (8) | § | |

## MOTION FOR RETURN OF CLASSIFIED
## MATERIAL AND MEMORANDUM IN SUPPORT

The United States of America, by and through the United States Attorney for the

Northern District of Texas, respectfully moves this court for an order requiring the return

of classified material, including applications submitted to, and orders issued by, the

Foreign Intelligence Surveillance Court ("FISC")[1] and related material, that was

inadvertently provided to defense counsel on April 5, 2005.

---

[1]The Foreign Intelligence Surveillance Act of 1978 (FISA), as amended, 50 U.S.C. §§ 1801-1811, authorizes the government, through application to the FISC, to conduct physical searches and electronic surveillance, including telephonic and other medium intercepts, in intelligence investigations of foreign powers or agents of foreign powers. See *infra* at 7-10.

# I. **INTRODUCTION**

Due to a copying and production error, on April 5, 2005, defense counsel in this case came into possession of highly sensitive and classified documents that should not have been produced, and that the government would never have knowingly and voluntarily agreed to disclose. Immediately upon discovering the error, the government requested that defense counsel return the mistakenly disclosed documents. Defense counsel have refused.

The government is entitled to the return of the inadvertently and mistakenly produced classified documents because the defense is not authorized to have them and should never have received them. These non-discoverable documents include highly sensitive and classified intelligence documents that the defense has no "need to know" within the meaning of the applicable Executive Orders. These documents have never been disclosed to the public nor declassified. Thus, as a matter of law, the government owns ands controls the classified information, and the right to their return has not and cannot be "waived" by mistake. Defense counsel's contention that they are entitled to keep the inadvertently disclosed documents because they contain *Brady* or otherwise discoverable information is wholly without merit. The documents at issue were not produced because they contained information that would exculpate any defendant. They were disclosed by mistake, and their return to the government will not result in the violation of any due process right of any defendant. The government is, of course, aware

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 2**

of its discovery obligations, and will provide any materially favorable information in its possession to the defendants in time for effective use at trial.

Finally, to the extent defense counsel believe they are entitled to the material because it furthers any motion they may file to suppress the fruits of electronic surveillance, they are still not entitled to retain the inadvertently produced documents. To the contrary, any challenge to electronic surveillance authorized by the FISC pursuant to FISA is governed by the provisions of that statute, which provides for *in camera*, *ex parte* review of the classified applications, orders and related materials at issue. The discovery of such materials is governed solely by FISA and the Protective Order to which defense counsel have already agreed, and not by the inadvertent mistake of the government. Accordingly, and in accordance with procedures discussed herein, as well as any other appropriate procedures the Court may choose to employ, the government respectfully requests return of the mistakenly produced classified documents.

## II. <u>SUMMARY OF THE FACTS</u>

On July 26, 2004, the defendants in this matter were indicted on a variety of charges stemming from their involvement with the Holy Land Foundation for Relief and Development ("HLF") and its alleged financial support of the terrorist organization Hamas. Docket Entry No. 1. Several months after the indictment, the Court issued a discovery and motions schedule, which required the government to provide defense

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 3**

counsel with discovery by March 31, 2005. *Id.*, at 100. Upon joint motion of the parties, that date was extended to April 30, 2005. *Id.*, at 142.

The discovery in this matter, which numbers in the millions of pages and in the hundreds of thousands of documents, includes both classified and unclassified information. The classified information consists primarily of telephonic communications of the defendants that were intercepted by the government pursuant to FISA. The conversations, which were in Arabic, were listened to by a language specialist after they were initially acquired and were categorized as either "pertinent" or "non-pertinent" for purposes of the national security investigation then being conducted, and not for purposes of this criminal case. The pertinent calls were summarized in English for an FBI agent to review.

In this particular case, the government decided to produce to the defense audio copies of all of the intercepted communications, both pertinent and non-pertinent, per FISA subject, by way of digital computer disks (and cassette tape where applicable).[2] In addition, in order to assist the defense counsel in reviewing the communications, the government has decided to produce written summaries of the pertinent communications in English for the approximately nine identified FISA subjects. The government will also provide the English written summaries of discoverable pertinent communications of

---

[2]The government has identified approximately nine FISA subjects whose intercepts may contain material that will be used as evidence by the government in this case. A FISA subject may include an individual or an organization.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 4**

additional FISA subjects (separate from the approximately nine discussed above) that contain conversations on which the defendants may have been captured but which do not contain any conversation intended to be used by the prosecution. Finally, the government is further culling from the translated summaries those communications the government believes are most relevant to the case – so called "hot documents." As this Court is aware, the government's commitment to these procedures is significantly beyond what is required by law, and is being undertaken to assist defense counsel's review in light of the extraordinary volume of material.[3]

Due to the enormous volume of the FISA material and its sensitive nature, the government determined that it would produce the discoverable information in its classified form. This required the defense counsel to obtain security clearances and the government to obtain a Protective Order pursuant to Section 3 of the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3 §§ 1-16. The Protective Order was approved and entered by the Court on April 5, 2005. Docket Entry No. 146. The Protective Order severely restricts defense counsel's ability to use the information. In addition, as required by the Protective Order, each defense counsel was required to sign a Memorandum of Understanding acknowledging his or her commitment to abide by the

---

[3]The government is taking a similar approach with respect to the unclassified paper documents. The government is converting all of the unclassified paper documents to computer format in a manner more easily usable by the defense, in addition to further identifying "hot documents" within the universe of paper material. The government already has a proprietary database containing all the scanned material, and thus its effort to digitize the paper documents is being done solely to assist the defense and not for the government's own use.

MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 5

terms of the Order and not reveal any information learned through review of the classified information.[4] The signing of the Memorandum of Understanding was a condition precedent to authorization to review the material.

On April 5, 2005, the government provided to the defense a large number, but not all, of the electronic communications from three of the approximately nine FISA subjects. The materials, consisting of sixteen boxes of classified information, were delivered to a secure room in the Courthouse set up for defense counsel by a court appointed Court Security Officer, in accordance with the Protective Order. The material provided included numerous electronic disks of the communications and approximately 80 volumes of translated paper summaries of pertinent communications. All the FISA communications in the April 5 production remain classified pursuant to the appropriate Executive Order at the SECRET level. The only items that were intended to be produced and thus should have been included in the April 5th production were audio copies of intercepted conversations (either on cassette tapes or compact discs depending upon when they were intercepted) and the paper copies of written summaries of those or other conversations. The April 5 production has been the only classified production to date.

---

[4]The docket reflects that only Ms. Hollander and Mr. Dratel (and a translator whose security clearance has been suspended) have signed the Memorandum of Understanding. See Docket Entries Nos. 143-145. Per the terms of the Protective Order, those persons who have not executed the Memorandum of Understanding are not authorized to see any classified information in this case. It is the government's understanding that all defense counsel as well as certain of their support personnel have been in the secured room and have had access to the classified materials.

On Friday, August 12, 2005, in response to claims by defense counsel that the documents were not provided in an orderly, coherent fashion, the FBI conducted a review of its records of the produced volumes. During that review, the FBI discovered that they had inadvertently and mistakenly produced certain volumes of non-discoverable information and materials among the discoverable information, including FISA applications, orders, and other related material that should not have been provided to defense counsel.[5] The government immediately contacted defense counsel to discuss the situation and request the return of the property. Defense counsel refused to return the documents, and on Tuesday, August 16, the government moved this Court for an order to seal the room until the matter could be resolved. On August 18, 2005, Nancy Hollander, on behalf of all defense counsel, sent the Court a letter protesting the government's efforts to retrieve the inadvertently produced documents. See Letter from Nancy Hollander to the Honorable A. Joe Fish, Aug. 18, 2005 ("Hollander Letter") (attached as Exhibit A). The government sent a letter to all defense counsel on August 22, 2005, reiterating the government's demand for return of the documents. See Letter from James T. Jacks to John W. Boyd and Nancy Hollander, Tim Evans, Joshua L. Dratel, Marlo P. Cadeddu and Greg Westfall, Aug. 22, 2005 ("Jacks Letter") (attached as Exhibit B). Defense counsel responded by letter on August 31, 2005. See Letter from Joshua L.

---

[5]The classified Declaration of Special Agent Robert Miranda, attaching a classified inventory of the inadvertently produced documents, is being provided to the Court *in camera*, and will be provided to the defense once arrangements have been made for a secure room separate from the room that currently contains the disputed documents.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 7**

Dratel to James T. Jacks, Aug. 31, 2005 ("Dratel Letter") (attached as Exhibit C).  The

Court conducted a status conference on September 2 to determine a procedural

framework and briefing schedule for resolving the issue.  In accordance with that

schedule, the government now moves the Court for an order requiring that the

inadvertently and mistakenly produced information be immediately returned to the

government, in accordance with the procedures outlined below, or any other appropriate

procedure approved by the Court.

## III.  SUMMARY OF THE APPLICABLE LAW

A.      Foreign Intelligence Surveillance Act

Congress enacted FISA to "provide a procedure under which the Attorney General

can obtain a judicial warrant authorizing the use of electronic surveillance in the United

States for foreign intelligence purposes."  S. Rep. No. 95-604, 95th Cong. 2d Sess. 5,

*reprinted at* 1978 U.S.C.C.A.N. 3906.  In 1994, the statute was amended to permit

applications for orders authorizing physical searches as well as electronic surveillance.

50 U.S.C. §§ 1821-1829.   FISA established two special courts:  The FISC, which is

comprised of eleven district court judges appointed by the Chief Justice, and the Foreign

Intelligence Surveillance Court of Review (FISC of Review), which is comprised of three

district court or court of appeals judges appointed by the Chief Justice.[6] 50 U.S.C. §

---

[6]As enacted in 1978, FISA provided for a FISC comprised of seven district court judges.  The United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), raised the number of judges from seven to eleven.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 8**

1803(a) and (b).  The FISC has jurisdiction to grant or deny applications for orders authorizing electronic surveillance and physical searches under the procedures set forth in FISA, and the FISC of Review has jurisdiction to review the denial of any application made under FISA.  *Ibid.*, 50 U.S.C. § 1822(b)-(d).

Applications for court orders authorizing searches or electronic surveillance under FISA are made to the FISC under oath by a federal officer with the approval of the Attorney General, the Acting Attorney General, or the Deputy Attorney General.  50 U.S.C. §§ 1801(g), 1804, 1823.  The application must identify or describe the target of the search or surveillance, and establish that the target is either a "foreign power" or an "agent of a foreign power."  50 U.S.C. §§ 1804(a)(3), 1804(a)(4)(A), 1823(a)(3), 1823(a)(4)(A).  Applications, and the affidavits that support them, commonly include highly sensitive and classified information from a variety of United States intelligence agencies, foreign intelligence services, and confidential sources.

FISA authorizes the use, in a criminal prosecution, of information derived from any lawful physical search or electronic surveillance, so long as it is done pursuant to the statute's requirements.  See, *e.g.*, 50 U.S.C. § 1806.  Evidentiary use of FISA-obtained and derived information is permitted in proceedings before federal, state and local courts, provided that proper notice is given to the "aggrieved person." See, *e.g.*,  50 U.S.C. §§ 1806© & (d) (notification provisions).[7]  Upon receiving notice, the "aggrieved person"

---

[7]Notice of the intended use of FISA-obtained and derived information in this case was provided to the defendants on May 31, 2005.  Docket Entry No. 161.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 9**

may then seek to suppress the fruits of the FISA collection. See, e.g., 50 U.S.C. §

1806(e) (permitting motions to suppress fruits of surveillance "on the grounds that...the

information was unlawfully acquired...[or] the surveillance was not made in conformity

with an order of authorization or approval.")

When a motion is made by a defendant to suppress the fruits of the FISA collection

or to obtain discovery or disclosure of the FISA applications, orders and related materials,

the Congressionally mandated procedures set forth in FISA "must be followed." H.R.

Rep. No. 95-1283, 95th Cong. 2d Sess., pt. I, at 91 (the *in camera* and *ex parte* procedures

set forth in section 1806 "must be used."); *United States v. Belfield*, 692 F.2d 141, 146

(D.C. Cir. 1982 (the "carefully drawn procedures" in FISA are not to be "bypassed by the

inventive litigant using a new statute, rule, or judicial construction."). Indeed, FISA

specifically states that when such a motion is made, the district court

> shall, notwithstanding any other law, if the Attorney General files an
> affidavit under oath that disclosure or an adversary hearing would harm the
> national security of the United States, review *in camera* and *ex parte* the
> application, order, and such other materials relating to the surveillance as
> may be necessary to determine whether surveillance of the aggrieved person
> was lawfully authorized and conducted.

50 U.S.C. § 1806(f). Upon the filing of such an affidavit by the Attorney General, the

court "may disclose to the aggrieved person, under appropriate security procedures and

protective orders, portions of the application, order, or other materials relating to the

surveillance only where such disclosure is necessary to make an accurate determination of

the legality of the surveillance." *Id.* As the statute and case law make clear, however,

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 10**

disclosure is the "exception and occurs *only* when necessary." *Belfield*, 692 F.2d at 149

(emphasis in original). As one court has stated, "[i]n enacting FISA, Congress intended

to restrict, as much as constitutionally possible, discovery of FISA materials." *United

States v. Spanjol*, 720 F. Supp. 55, 59 (E.D. Pa. 1989).[8]

Since the enactment of FISA every court to reach this issue has determined the

legality of a FISA electronic surveillance or physical search pursuant to *in camera* and *ex

parte* review, and no court has disclosed the underlying materials to the moving party.

See, *e.g.*, *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005); *United States v.

Squillacote*, 221 F.3d 542 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1601 (2001); *United

States v. Johnson*, 952 F.2d 565 (1st Cir. 1991); *United States v. Isa*, 923 F.2d 1300 (8th

Cir. 1991); *United States v. Hamide*, 914 F.2d 1147, 1152 (9th Cir. 1990); *United States

v. Badia*, 827 F.2d 1458 (11th Cir. 1987); *United States v. Ott*, 827 F.2d 473 (9th Cir.

1987); *United States v. Duggan*, 743 F. 2d 59, 78 (2d Cir. 1984); *United States v. Belfield*,

692 F.2d at141; *United States v. Spanjol*, 720 F. Supp. 55 (E.D. Pa. 1989); *United States

v. Falvey*, 540 F. Supp. 1306 (E.D.N.Y. 1982); see also *United States v. Nicholson*, 944

F.Supp. 588, 592 & n.11 (E.D. Va. 1997) *(*"this court knows of no instance in which a

court has required an adversary hearing or disclosure in determining the legality of a

---

[8]Congress was specifically aware that the restrictive discovery practice that governed the
defense's ability to review FISA applications, orders and related materials was different from the practice
that existed with respect to similar criminal wiretap-related materials when a district court is considering
whether that surveillance is lawful. See H.R. Rep. No. 95-1283, 95th Cong. 2d Sess., pt. I, at 94 n.50
("The committee recognizes that this provision alters existing law and is a limitation on existing
discovery practices. It is felt that where the special court has determined that the surveillance is lawful,
security considerations should preclude any disclosure unless due process requires disclosure.")

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 11**

FISA surveillance") (collecting cases); *United States v. Rahman*, 861 F. Supp. 247

(S.D.N.Y. 1994) (no disclosure necessary "to make an accurate determination of whether

the surveillance at issue was lawfully authorized and conducted), *aff'd*, 189 F.3d 88 (2d

Cir. 1999), *cert. denied*, 528 U.S. 1094 (2000); *United States v. Thomson*, 752 F. Supp.

75, 79 (W.D.N.Y. 1990) (same).

B.   Executive Order 12,958

Entitled "Classified National Security Information," Executive Order 12,958, as

amended by Executive Order 13,292, 68 Fed. Reg. 15315 (March 25, 2003), provides a

system for classifying, safeguarding, and declassifying national security information.  It

provides that no person may have access to classified information absent (1) a favorable

determination of eligibility for access; (2) a signed and approved nondisclosure

agreement; and (3) a need-to-know the information.  E.O. 12,958, as amended, § 4.1(a).

"Need-to know" is defined as "a determination made by an authorized holder of classified

information that a prospective recipient requires access to specific classified information

in order to perform or assist in a lawful and authorized governmental function." *Id.*, § 6.1

(z).  In all cases, "[c]lassified information shall remain under the control of the

originating agency or its successor in function." *Id.*, § 4.1©.

C.   Protective Order

Consistent with the provisions of the Classified Information Procedures Act

(CIPA), 18 U.S.C. App. III, and FISA, the Court entered a Protective Order to maintain

the secrecy and confidentiality of classified information provided to the defense. The Order defines classified material to include any documentation that is derived from the FBI or which has an original classification of "Confidential" or higher. Paragraph six of the Protective Order states that all documentation retains its original classification status until there is a clear indication of declassification.

The Protective Order further states that no person, except cleared defense counsel with a need-to-know and their cleared employees and translators, may have access to the classified material. ¶¶ 1, 12-13. In addition, the Protective Order provides that no classified material may be removed from the secure area set up by the Court Security Officer or contents discussed with anybody outside of the secure room. These limitations, along with the general provisions of CIPA, severely restrict the defense attorneys' ability to use the material. To the extent the defense submits any classified information to the court, the provisions of FISA and CIPA shall control notwithstanding any other provision of law. ¶¶ 20 ©, 21. Specifically, the Protective Order states that

> the parties agree that the disclosure and discovery of materials that may be provided to the court pursuant to FISA for legal determinations shall be governed by the provisions of FISA notwithstanding any other provisions of this order.

¶ 20©. The reference in this subparagraph to "materials" means FISA applications, orders and related material, such as the material at issue here. At all times, classified information is and will remain the property of the government. ¶ 23.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 13**

## IV. <u>ARGUMENT</u>

<u>THE GOVERNMENT OWNS AND CONTROLS THE INADVERTENTLY
DISCLOSED CLASSIFIED INFORMATION AND IS ENTITLED TO ITS
RETURN. ANY NOTES THAT DERIVE FROM THAT SAME
INFORMATION SHOULD BE DESTROYED OR SEQUESTERED WITH
THE COURT.</u>

The government's paramount interest in seeking the return of the information at

issue is to protect the integrity of highly sensitive and classified national security

information to which no defense counsel in the instant case is entitled. This information

includes FISA applications, orders and related materials that were submitted to, or issued

by, the FISC, as well as related electronic communications. As Congress and the federal

courts have recognized, these kinds of intelligence materials are treated differently by the

government than the resulting FISA communications. FISA applications, orders and

related materials contain information, including highly sensitive intelligence sources and

methods, which, if revealed, would harm the national security of the United States.[9]

---

[9]The harm to national security is particularly acute with respect to the disclosure of FISA applications and related material, which can contain intelligence from foreign governments and other United States Government intelligence agencies on a variety of investigations unrelated to a particular prosecution. Foreign governments often provide information on the condition that the source of the information never be acknowledged. Disclosure, even to cleared counsel, can chill the willingness of those governments to share information with the United States in the future, thereby harming the United States' overall intelligence gathering capabilities. Moreover, acknowledgment that a foreign country has shared information with the United States could cause political unrest within that country, and cause that country to take retaliatory measures. See *Afshar v. Department of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983) ("most governments do not officially acknowledge the existence of their intelligence services," and acknowledgment can cause "some official action in retaliation"), citing *Phillippi v. CIA*, 655 F.2d 1325, 1332-33 (D.C.Cir.1981) ("In the world of international diplomacy, where face-saving may often be as important as substance, official confirmation ... could have an adverse effect on our relations [with other countries].")

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 14**

While the identity of a source, or the method used to obtain information, may not be always be apparent on the face of the affidavit, it can be determined by foreign agents, spies and terrorists through the context of the information and through bits of information already gathered and then pieced together into a "mosaic." See *U.S. v. Sims*, 471 U.S. 159, 178 (1985); *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980) ("each individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."). See also *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nations's intelligence-gathering capabilities from what these documents revealed about sources and methods."). For this reason and others, Congress has determined that FISA applications, orders and related materials, unlike similar Title III wiretap-related materials, should be withheld from defense counsel – even defense counsel with security clearance – unless their disclosure has been judicially determined to be "necessary" for "an accurate determination" by the court as to the "legality of the surveillance." See *supra* at 7-10. Indeed, in the history of FISA, no court has ever found it necessary to order the production of FISA applications to opposing counsel in litigation, nor has the government ever intentionally done so.[10] *Id.*

---

[10] The sensitivity of FISA applications is well-known among the criminal defense bar, as is their history of non-disclosure. Indeed, defense counsel in this case has written in a published article that,

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 15**

"waived." To the contrary, the Executive Order is clear: "[c]lassified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information." Executive Order No. 12,958, as amended, § 1.1(b).

In only rare instances, unrelated to the instant case, does the concept of waiver intersect with classified information. Under the Freedom of Information Act, 5 U.S.C. § 552(b)(1), an agency may be found to have waived its right to assert a statutory exemption protecting classified information from disclosure if the agency has already officially disclosed to the public the identical information. See *Public Citizen v. Dept. of State,* 11 F.3d 198, 203 (D.C. Cir. 1993) ("an agency will not be held to have waived exemption 1 absent a showing by a FOIA plaintiff that the specific information at issue has been officially disclosed"); *Edmonds v. FBI,* 272 F. Supp. 2d 35, 48 (D.D.C. 2003) (no waiver because identical information was not officially released into the public domain); *Students against Genocide v. Dept. of State*, 50 F. Supp. 2d 20, 24-25, *aff'd* 257 F.3d 828, 835-37 (D.C. Cir. 2001) (same). Similarly, some courts have found that the evidentiary privilege of state secrets in civil litigation can be waived. Even then, however, the standards for waiving a properly asserted claim of state secrets privilege were at least as stringent as that for waiver under FOIA, and require all of the same elements of official confirmation and release into the public of the same information. *Maxwell v. First National Bank of Maryland,* 143 F.R.D. 590, 597-98 (D. Md. 1992).

Inadvertent disclosure does not amount to official confirmation. *Id.* at 597 ("Accidental

disclosure cannot be viewed as an affirmative waiver by the government.").[11]

Here, there has been no public disclosure of any of the classified information, and

there is no question that the information at issue remains classified.[12]  Thus, for "reasons

. . . too obvious to call for enlarged discussion," *CIA v. Sims*, 471 U.S. 159, 170 (1985),

the Executive Branch still controls access to the classified information, and determines

who has a "need to know" the classified information within the meaning of Executive

Order 12,958, as amended.  "[T]he protection of classified information must be

committed to the broad discretion of the agency responsible, and this must include broad

discretion to determine who may have access to it." *Dept. of Navy v. Egan*, 484 U.S. 518,

529 (1988) (granting of security clearance is committed by law to the Executive Branch);

*Perez, et al. v. FBI*, 71 F.3d 513, 515 (5th Cir. 1995) (to review revocation of security

clearance would be "impermissible intrusion by the Judicial Branch into the authority of

the Executive Branch over matters of national security"); *People Mojahedin*

---

[11]For this same reason, the Attorney General cannot through an accidental disclosure "waive" his ability to assert privilege through the filing of an affidavit under 50 U.S.C. § 1806(f).

[12] Many of the documents are also privileged under at least the deliberative process privilege, and in some cases, the attorney-client privilege.  The deliberative process privilege "allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997), quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967). Internal memoranda that recommend or discuss FISA intercepts and seek authorization from government officials, for example, fall squarely within the privilege. The question of privilege, however, is entirely secondary in this case, where all the documents at issue are classified. Even if no privilege attached, the government would still own and control the documents and be entitled to their return.

MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 18

*Organization of Iran v. Dept. of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) ("[U]nder

the separation of powers created by the United States Constitution, the Executive

Branch has control and responsibility over access to classified information....").[13]

It should, moreover, come as no surprise to defense counsel that the classified

information to which they have been granted access on a need-to-know basis is still

owned and controlled by the government.  The government's ownership and control over

classified information is expressly provided by both Executive Order 12,958, as amended,

and the Protective Order entered in this case.  See Executive Order 12,958, as amended, §

4.1© (classified information shall remain under the control of the originating agency);

Protective Order, ¶ 23 (all classified information is, and will remain, the property of the

government).  It is equally clear that the existence of the Protective Order permitting

counsel to review certain classified information does not entitle the defense to documents

for which they have no need -to -know, nor does it alter the ownership of classified

documents.[14]  *United States v. Pollard*, 416 F.3d 48, 57 n.2 ("[T]he existence of the

protective order does not change the custody of classified documents from the Executive

to the Judiciary'); *United States v. Bin Laden, et al.*, 126 F. Supp. 2d 264, 287 n.27

(S.D.N.Y. 2000) (security clearance does not entitle a member of the defense team to see

---

[13]As the Supreme Court repeatedly has stressed, courts should be especially "reluctant to intrude upon the authority of the Executive in military and national security affairs," *Egan*, 484 U.S. at 529-30 (citing cases), including the Executive's judgment as to what constitutes classified information, who should have access to it, and under what conditions.

[14]Defense counsel incorrectly suggest that they have a need-to-know the information because it is (according to them) exculpatory and subject to disclosure under *Brady*.  This point is addressed below.

"all documents within that classification." ). Classified documents that the defense was

not entitled to receive but which were produced to the defense inadvertently and by

mistake must be returned to the government.

 

      B.     DEFENSE COUNSEL ARE NOT ENTITLED TO RETAIN THE
DOCUMENTS AT ISSUE ON THE BASIS OF A "BRADY"
CLAIM

     The government is acutely aware of its discovery obligations, and its obligations

under *Brady, Giglio* and their progeny[15], see Hollander Letter at 3, and has gone to

unprecedented lengths to produce information to assist defense counsel. However, the

government's obligation to produce information tending to exculpate defendants in time

for effective use at trial has no bearing on defense counsel's obligation to return the

mistakenly produced documents. This is true for at least two reasons. First, the

government would not produce to the defense FISA applications, orders and related

documents, even assuming *arguendo* that it contained information materially favorable to

the defendants' guilt or innocence. Rather, the government would produce any

exculpatory information in a different form. *U.S. v. Wooten,* 377 F.3d 1134, 1142 (10th

Cir. 2004) (*Brady* does not require the prosecution to disclose information in a specific

form or manner); *United States v. Hernandez-Muniz,* 170 F.3d 1007, 1011 (10th

---

[15] *Brady* is distinct from Rule 16 discovery, because "whether a *Brady* violation has occurred, indeed whether the government even had a *Brady* obligation, can only be determined after the trial is over." *United States v. Garrett,* 238 F.3d 293, 303-04 (5th Cir. 2000), Fish, J., concurring, footnotes omitted.

Cir.1999) ("[D]ue process does not necessarily require disclosure in a specific form or manner."). It should be evident to the defense that the government, having never intentionally disclosed a FISA application to defense counsel in the history of the statute, see *supra*, n.10, would not produce *Brady* information in the form of FISA applications and orders. Rather, it would provide the defense with any exculpatory information in an unclassified format, or it would submit the information to the Court for a review and determination as to how the information should be disclosed.[16]

Second, to the extent the inadvertently disclosed documents contain information germane to any motion to suppress the defense may file with respect to the FISA collection, the defense is still not entitled to the FISA applications, orders and related materials absent a final judicial determination that the Court is unable to make an accurate determination without disclosure . Pursuant to FISA, in response to a defense motion to suppress, and after the Attorney General files the appropriate affidavit, the government submits the relevant material, both favorable and unfavorable, to the Court *in camera* and *ex parte*. 50 U.S.C. § 1806(f); *supra* at 7-10; see also *United States v. Sattar*, Not Reported in F.Supp.2d, 2003 WL 22137012, * 6 (S.D.N.Y. 2003). Only if the court finds it necessary in order to make an accurate determination of the legality of the surveillance can the court order the information disclosed. *Id.* As the defense is aware,

---

[16]The law "clearly place[s] responsibility on the *prosecutor*, rather than the trial judge, to determine not only whether a given piece of evidence should be produced but also *when* (*i.e.*, 'when the point of 'reasonable probability' [of a different outcome] is reached.')" *Garrett*, 238 F.3d at 304, n.4, citing *Kyles v. Whitley*, 514 U.S. 419 (1995) (emphasis in original).

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 21**

no such order has ever issued. See *supra*, n.10 and 9-11; *Sattar*, *supra* at * 6; *Nicholson*,

955 F. Supp. at 592, n.11 ("this court knows of no instance in which a court has required

an adversary hearing or disclosure in determining the legality of a FISA surveillance.").

Accordingly, for counsel to assert that they believed the inadvertently and mistakenly

produced documents were purposely disclosed, under *Brady* or otherwise, is wholly

disingenuous. See Hollander Letter at 3; Dratel Letter at 2.[17]

C.     A "TAINT TEAM" SHOULD DETERMINE WHICH OF DEFENSE
       COUNSEL'S NOTES DERIVE FROM THE INADVERTENTLY
       PRODUCED DOCUMENTS

To the extent defense counsel took notes (in either paper or electronic form) that

derive from the classified information that was inadvertently produced, those notes must

be identified and destroyed, or sequestered with the Court. The government has proposed

a procedure by which a team of agents and attorneys, walled off from the prosecution and

investigation of this or any related case, would review the documents and notes to

determine which notes derive from the mistakenly produced material. *See* Jacks Letter at

2. The documents that were inadvertently produced would be kept in the possession of

the taint team pending resolution by the Court. *Id.* Defense counsel "categorically reject

---

[17]Once defense counsel saw that they had received FISA applications and related materials, they reasonably should have known that the documents were produced in error. Thus, they were under an ethical obligation to notify the government immediately upon discovery of the inadvertent disclosure. *United States v. Rigas*, 281 F. Supp. 2d 733, 742 (S.D.N.Y. 2003), citing Am. Bar Ass'n Standing Comm. On Ethics and Prof. Resp., Formal Op. 92-368 (1992) ("A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.")

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 22**

the use of any government 'taint team' to review the classified production." Dratel
Letter, n.2.

"The use of a taint team is a proper, fair and acceptable method of protecting
privileged communications when a search involves property of an attorney." *United
States v. Triumph Capital Group, Inc., et al.*, 211 F.R.D. 31, 43 (D.Conn. 2002), citing
U.S. DOJ Guidelines issued Oct. 11, 1995, reprinted in 58 Crim.L.Rep. (BNA) 2007
(Nov. 1, 1995).[18] Contrary to defense counsel's sweeping denunciation of such a
procedure as laden with "intractable problems" and "viewed with disfavor," Dratel Letter
at 2, n.2, numerous courts approve of taint teams, because they "ensure[] that members of
the government Trial Team are not exposed to potentially privileged material." *Sattar,
supra* at *16.[19]

In this case, the use of a taint team is particularly appropriate. The documents that
were inadvertently produced are highly sensitive and classified intelligence documents of
the kind that often contain source information, foreign government information, and
intelligence sources and methods wholly unconnected to the defendants in this case. To
recognize this information, make proper assessments as to the full nature and scope of the

---

[18]See also United States Attorneys' Manual, § 9-13.420(E) (approving use of a "privilege team"
when searching the premises of an attorney.)

[19] *United States v. Stewart*, Not Reported in F.Supp.2d, 2002 WL 1300059 (S.D.N.Y. 2002), is
not to the contrary. There, the court found that the particular issue before it presented "a number of
extraordinary circumstances" which favored the appointment of a special master to conduct the privilege
review. The same court, however, in a matter related to *Stewart*, wrote approvingly of using a taint team
to review prison recordings for attorney client privileged and work product material. See *Sattar, supra* at
*16.

MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 23

harm, and ensure that all of it is recovered, it is essential that attorneys and/or agents familiar with this type of information and the FISA process be able to review any notes or writings that might be derived from the documents at issue. Any notes that do not contain derivative information would be immediately returned to the defense. Any notes that do contain derivative information would be sequestered for the Court, and, if the Court so rules, the notes would be destroyed. No member of the prosecution team would ever see privileged information or defense counsel's work product, and the taint team could be subject to whatever other appropriate procedures the Court would deem necessary to protect such privileged information. In accordance with this principle, the government proposes the following procedure for the return (or destruction) of the inadvertently produced information:

     (1) All the paper material contained in the secure room would be removed by a taint team approved by the Court, consisting of government agents and attorneys who have no relationship to this or any related matter. This would include the complete retrieval of the original documents, any copies made and any notes or writings made regarding the documents, either directly or derivatively.[20] The government would then provide to the defense a fresh, chronologically arranged copy of the summarized intercepted communications that were intended to comprise the April 5,

---

[20]The electronic media that the government produced, which represents the actual intercepted information, does not contain any inadvertently disclosed material and would remain in the room.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 24**

2005 production. At that point, defense counsel would be allowed to re-enter and resume work in the secure area. The taint team would identify the inadvertently disclosed documents and all related notes or writings, and bring them to the attention of the Court. Those notes that are "clean" of derivative information would be returned to the secure room and to the defense. If defense counsel objects to the determination of the taint team with respect to the notes or writings, they could be heard by the Court *ex parte* and *in camera*, outside the presence of the prosecution.

(2) Alternatively, a taint team could go into the room and follow the procedures outlined in point one, above.

The government's proposed remedy for the inadvertent disclosure serves two functions. First, and most importantly, it protects national security by ensuring that highly sensitive intelligence information that the defense was not entitled to see is retrieved and either returned to the government or destroyed. Second, it returns the parties to the position they would be in had the inadvertent production not been made. Requiring the removal of the material from the secure room will neither disadvantage defense counsel nor limit their ability to effectively defend their clients. Indeed, the Protective Order restricts the defense from using any of the inadvertently produced information. See, *e.g.*, Protective Order, April 5, 2005, ¶¶ 19, 22-23. Thus, under current conditions the defense is no better positioned with the inadvertently produced documents than without. *Cf.*,

*United States v. Rigas*, 281 F. Supp. 2d at 742 (S.D.N.Y. 2003). In sum, because

sensitive classified documents were inadvertently produced to the defense that the

defense is not entitled to have, the inadvertently produced material must be returned to the

government.

## V. CONCLUSION

For all the foregoing reasons, the government respectfully requests that its motion

be granted, and that the inadvertently produced material be returned to the government.

Dated: September 16, 2005                      Respectfully submitted,

RICHARD B. ROPER
United States Attorney


JAMES T. JACKS
Assistant United States Attorney
1100 Commerce St., Room 300
Dallas, TX. 75242
214.659.8600 (tel)
214.767.2898 (facsimile)
Texas State Bar No. 10449500


NATHAN F. GARRETT
BARRY JONAS
ELIZABETH J. SHAPIRO
Attorneys for the Government.

**MOTION FOR RETURN OF CLASSIFIED MATERIAL AND MEMORANDUM - Page 26**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Government's Motion for

Return of Classified Material and Memorandum in Support has been served upon counsel

for the defense by transmittal by Federal Express this _16th_ day of September, 2005.

_____

JAMES T. JACKS
Assistant United States Attorney

## CERTIFICATE OF CONFERENCE

This is to certify that the government has previously discussed the nature of this

motion with counsel for the each of the defendants and they have advised that they are

opposed to this motion.

_____

JAMES T. JACKS
Assistant United States Attorney



Exhibit "A"

LAW OFFICES OF
### FREEDMAN BOYD DANIELS HOLLANDER & GOLDBERG P.A.

20 FIRST PLAZA, SUITE 700
ALBUQUERQUE, NEW MEXICO 87102

TELEPHONE
(505) 842-9960
FACSIMILE
(505) 842-0761

MAILING ADDRESS·
P.O. BOX 25326
ALBUQUERQUE, NM 87125-0326

Nancy Hollander
Direct Dial: 505-244-7517
E-mail· nh@fbdlaw.com

August 18, 2005

### TO BE FILED UNDER SEAL

**VIA FACSIMILE (214) 753-2317**

The Honorable A. Joe Fish
Chief United States District Judge
Northern District of Texas
1100 Commerce St., Room 1528
Dallas, Texas 75242

   Re: *United States v. Holy Land Foundation, Shukri Abu Baker, et al.,*
     Case No. 3:04-CR-240-G

Dear Chief Judge Fish:

  This letter is submitted on behalf of all defense counsel in the above-entitled case, and provides an explanation of recent developments. Because events unfolded so quickly on Tuesday, we did not have an opportunity to make our position clear concerning the government's actions. We strongly oppose the government's efforts—successful thus far—to prohibit defense counsel from entering our secure room and continuing to review documents. We also oppose the government's improper attempt to retrieve certain unspecified documents that it previously produced.


**TO BE FILED UNDER SEAL**

The Honorable A. Joe Fish
Chief United States District Judge
Page 2
August 18, 2005

As a threshold matter, counsel uniformly state that we have not violated any rules, procedures, or ethical provisions, nor have we done anything wrong with respect to our handling of the CLASSIFIED discovery produced by the government. Nor, to our knowledge, have we reviewed or read any documents that we are not entitled to view, or which are above the SECRET security level for which all counsel have been cleared.

The genesis of the current controversy lies in the government's request last Friday (of which we learned only Monday afternoon) of CSO Jack Molinard that he provide AUSA James Jacks access to the secure room that has been provided to the defense in the courthouse for the purpose of storing, reviewing, and working with the government's CLASSIFIED discovery in this case. The purpose of AUSA Jacks's request was to retrieve all the documents from the secure room. These are defense documents that contain defense counsels' work-product in the form of notations on the documents that reveal counsels' opinions and analysis of the materials under review.

CSO Molinard correctly informed AUSA Jacks that the secure room is essentially a law office for the defense and that he could not provide access. Subsequently, Mr. Jacks (and, separately, an FBI agent) asked defense counsel for access to the room to see the documents, inventory the documents, and, ultimately, to remove the documents. At one point on Tuesday, Mr. Jacks went to the secure room and demanded to know what the lawyers, who were cleared to be in the room, were doing. Counsel refused to permit the government to invade privileged defense space. Counsel also strongly opposed the government's efforts to pressure individual defense counsel to allow the government to gain unwarranted and improper access to the secure room.

Monday afternoon, AUSA Jacks had contacted, or attempted to contact, several of defense counsel to inquire whether certain documents had been produced as part of the CLASSIFIED discovery. During the course of those conversations, AUSA Jacks identified those documents to Ms. Cadeddu and Mr. Dratel over the telephone. Both defense counsel refused to discuss the documents over the telephone, as we have been instructed that this would violate security protocols.

As an alternative, Mr. Dratel suggested to AUSA Jacks that he write defense counsel (in a CLASSIFIED format), identify the documents about which he was concerned, and deliver that letter to CSO Molinard, who would place it in the secure room and notify defense counsel of its arrival. Mr. Dratel also promised Mr. Jacks that the letter would be reviewed as soon as CSO Molinard informed counsel that it had been placed in the secure room, and that defense counsel would reply immediately in writing.

**TO BE FILED UNDER SEAL**

The Honorable A. Joe Fish
Chief United States District Judge
Page 3
August 18, 2005

AUSA Jacks refused, and instead stated he would proceed to Chambers to seek relief from the Court. Mr. Dratel objected to any *ex parte* contact with the Court, and requested that AUSA Jacks either wait until Tim Evans could be present for any conference or that Mr. Dratel be contacted by telephone in the event AUSA Jacks met with the Court (although Mr. Dratel emphasized that he still would not be able to answer telephonically AUSA Jacks's questions about documents in the secure room). Since the Court was not available, the matter was not resolved Monday.

Mr. Evans was in a meeting all day Monday, but Monday evening he returned AUSA Jacks's telephone call and agreed to meet him at the courthouse on Tuesday to discuss these matters. Before Mr. Evans arrived, AUSA Jacks proceeded to the secure room as set forth above. AUSA Jacks's letter to the Court followed, along with the proposed Orders from the government and defense, and the Court's Order.

Regarding defense counsel's work in the secure room, we have been reviewing documents since they were delivered to the room. We have seen, and all of us have read, parts of a document the government now claims we should not have been provided. While obviously we cannot in this unclassified forum describe or detail the nature or content of that document, we can state without reservation or doubt that the document is material and relevant to the defense, and that it contains abundant information the government was required to produce pursuant to its constitutional obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and/or *Kyles v. Whitley*, 514 U.S. 419 (1995). Of course, counsel will provide ample detail in appropriately protected pleadings.

In addition, the government's actions have interfered with the defense counsel's ability to work on this case. Three defense counsel had planned to review documents throughout this week and for as long as necessary. Without this review, the defense is not able to move forward in any meaningful fashion. Moreover, any notion that counsel was under some duty to stop reading documents and return them to the government is unfounded. When counsel reads material that is indisputably covered by *Brady*, *Giglio*, and/or *Kyles*, and is material to assert Fourth Amendment protections against unreasonable search and electronic surveillance, he or she reasonably believes that the production of such material was a conscious decision government officials made consistent with their statutory and constitutional obligations under *Brady*, *Giglio*, and *Kyles*. This obligation exists with equal force for CLASSIFIED information as it does for ordinary exculpatory material. In addition, defense counsel would not and did not expect that the government produced seven boxes of CLASSIFIED documents to the defense in a case of this magnitude unless someone on the prosecution team of sufficient knowledge and responsibility had reviewed each document to ensure that the production was appropriate. That defense counsel operated under both of those beliefs is not only rational, but conforms with common sense and previous



**TO BE FILED UNDER SEAL**

The Honorable A. Joe Fish
Chief United States District Judge
Page 4
August 18, 2005

experience in federal criminal litigation, including cases involving CLASSIFIED material.

    The government's vague assertions of privilege and security concerns provide no basis for forcing the defense to surrender the (unspecified) documents. We request that the Court set a briefing schedule before any hearing and require the government, in its brief and through a privilege log, to (1) identify the documents in question, (2) state the classification level of each document, (3) identify any privilege the government claims applies to the document, (4) establish each element of any applicable privilege, (5) explain why the government's disclosure of the documents to the defense has not waived any such privilege, and (6) explain why the government is not obligated to produce the documents pursuant to *Brady, Giglio,* and/or *Kyles.* With the benefit of the government's brief and privilege log, the defense will be in a position to respond concretely to the government's claims.

    Moreover, to ensure that the matter can be presented to the Court with a full explanation of the facts and implications, such submissions should be prepared and filed, and any related proceedings should be conducted, pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C. App. III.

                Very truly yours,

                NANCY HOLLANDER, ESQ.
                FREEDMAN BOYD DANIELS
                  HOLLANDER & GOLDBERG, P.A.
                20 First Plaza, Suite 700
                Albuquerque, New Mexico 87102
                ATTORNEY FOR DEFENDANT
                SHUKRI ABU BAKER (02)

                JOHN W. BOYD, ESQ.
                 FREEDMAN BOYD DANIELS
                  HOLLANDER & GOLDBERG, P.A.
                20 First Plaza, Suite 700
                Albuquerque, New Mexico 87102
                Office: (505) 842-9960
                Fax: (505) 842-0861
                ATTORNEY FOR HOLY LAND FOUNDATION
                  FOR RELIEF AND DEVELOPMENT (01)

**TO BE FILED UNDER SEAL**

The Honorable A. Joe Fish
Chief United States District Judge
Page 5
August 18, 2005

          JOSHUA L. DRATEL, ESQ.
          LAW OFFICE OF JOSHUA L. DRATEL
          14 Wall Street
          28th Floor
          New York, New York 10005
          Office: (212) 732-0707
          E-mail: jdratel@joshuadratel.com
          ATTORNEY FOR DEFENDANT
          MOHAMMAD EL-MEZIAN (03)

          TIM EVANS, ESQ.
          EVANS, GANDY DANIEL & MOORE
          115 W. Second Street, Suite 202
          Fort Worth, Texas 76102
          Office: (817) 332-3822
          Fax: (817) 332-2763
          ATTORNEY FOR DEFENDANT
          GHASSAN ELASI (04)

          MARLO P. CADDEDDU, ESQ.
          LAW OFFICE OF MARLO P. CADEDDU, P.C.
          3232 McKinney Avenue, Suite 700
          Dallas, Texas 75204
          Office: (214) 220-9000
          Fax: (214) 744-3015
          ATTORNEY FOR DEFENDANT
          MUFID ABDULQADER (07)

          GREG WESTFALL, ESQ.
          WESTFALL, PLATT & CUTLER
          101 Summit Avenue, #910
          Fort Worth, Texas 76102
          Office: (817) 877-1700
          Fax: (817) 877-1710
          ATTORNEY FOR DEFENDANT
          ABDULRAHAM ODEH (08)

**TO BE FILED UNDER SEAL**

The Honorable A. Joe Fish
Chief United States District Judge
Page 6
August 18, 2005


cc via facsimile -
        James T. Jacks
        First Assistant United States Attorney

        Nathan Garrett
        Assistant United States Attorney

        Barry Jonas
        Assistant United States Attorney
        (214) 767-2898
        ATTORNEYS FOR THE GOVERNMENT

        Jack Molinard
        Senior Security Specialist
        (202) 307-2066

U.S. Department of Justice

United States Attorney
Northern District of Texas

---

*1100 Commerce St., 3rd Fl.*     *Telephone: 214.659.8600*
*Dallas, Texas 75242-1699*     *Fax: 214.767 2898*

**VIA FACSIMILE**

# Exhibit "B"

August 22, 2005

John W. Boyd and Nancy Hollander
Freedman Boyd Daniels Hollander & Goldberg
20 First Plaza, Suite 700
Albuquerque, NM 87102

Tim Evans
Evans Gandy Daniel & Moore
115 W Second St., Suite 202        **TO BE FILED UNDER SEAL**
Fort Worth, TX 76102

Joshua L Dratel
Law Office of Joshua L Dratel
14 Wall St, 28th Floor
New York, NY 10005

Marlo P. Cadeddu, P.C.
3232 McKinney Ave., Suite 700
Dallas, Texas 75204

Greg Westfall
101 Summit Ave., # 910
Fort Worth, TX. 76102

      Re:    United States v. Holy Land Foundation, et al.; 3:04-CR-240-G
             U.S. District Court, Northern District of Texas, Dallas Division

Dear Counsel:

     The purpose of this letter is to memorialize our previous demands for the return of
certain documents and once again seek your consent to their immediate return. As we
have previously advised you, you have had access to classified and privileged documents

which should not have been disclosed to you on April 5, 2005. As you know, on Monday, August 15, 2005, when the government became aware of the full scope of the inadvertent disclosure, in multiple telephone calls to defense counsel, the government demanded the return of these documents and those requests were refused.

As we have previously advised you and as we advised Judge Fish on August 16th, the documents to be returned are classified and privileged, some of which contain extraordinarily sensitive information, and no member of the defense team is entitled to access to them. While certain members of the defense team have received a "security clearance," the granting of a security clearance does not equate to the granting of "access" to classified and privileged documents that should not have been disclosed. Moreover, the determination of access is an entirely separate function from the granting of a clearance, and requires a separate "need to know" determination consistent with applicable Executive Orders. Indeed, as one court has stated, a security clearance does not entitle a member of the defense team to see "'all documents within that classification.'" *United States v. Bin Laden, et al*, 126 F.Supp.2d 264, 287 n. 27 (S.D.N.Y. 2000) (internal citation omitted).

In light of the concerns that you have raised, and in order to protect the defendants' attorney-client privilege and your work-product privilege, we suggest that a "taint team," consisting of agents, attorneys and their respective supervisors, which will be completely walled off from the prosecution team in this case, be responsible for reviewing the classified and privileged documents turned over to you. Any classified documents which should have been disclosed to the defense will be returned to the defense along with any defense notations that may be contained on those documents. Any classified and privileged documents, including notes and/or writings derived from those documents, that should not have been disclosed to the defense will be segregated and kept in the possession of the taint team pending further order of the Court. A log of these documents will be created by the taint team. If you continue to believe, as you assert in your August 18, 2005 letter to Judge Fish, that you are entitled to the classified and privileged documents which have been segregated, you may seek relief, in a classified pleading, consistent with the Protective Order entered by the Court in this case, and the government will respond to that pleading.

Among other things, there are several misstatements and mischaracterizations contained in your August 18, 2005 letter to Judge Fish. Needless to say, we do not share your view of the matter. We believe, however, that all of the relevant issues can be addressed by the Court, once the documents have been clearly identified and segregated. If you are agreeable to the procedures discussed above, please notify us in writing. If not, please so notify so we may proceed to the Court for relief.

- 2 -

Sincerely,

RICHARD B. ROPER
United States Attorney

JAMES T. JACKS
First Assistant United States Attorney

cc: via hand delivery

Hon. A. Joe Fish
Chief U.S. District Judge
Northern District of Texas

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

14 WALL STREET, 28TH FLOOR
NEW YORK, NEW YORK 10005
TEL (212) 732-0707
FAX (212) 571-6341
E-MAIL JDratel@joshuadratel.com

Exhibit "C"

JOSHUA L. DRATEL
———
ERIK B. LEVIN
KRISTIAN K. LARSEN

ELIZABETH BESOBRASOW
*Paralegal*
STEVEN WRIGHT
*Office Manager*

August 31, 2005

**BY FACSIMILE [(214) 767-2898]**

James T. Jacks
First Assistant United States Attorney
Northern District of Texas
1100 Commerce Street
Dallas, Texas 75242-1003

Re:  United States of America v. Holy Land Foundation for Relief and
     Development, et al., Cause No. 804-CR-240G

Dear Mr. Jacks:

This letter, submitted on behalf of all defense counsel in the above-entitled case, is in response to your August 22, 2005, correspondence. The government's demands, as set forth in your letter, put the cart before the horse. The defense is in possession of documents provided by the government in discovery. The government now seeks to execute the functional equivalent of a search of our law offices on the ground that certain discovery documents provided to us are privileged. As the party asserting a privilege, the government bears the burden of identifying each document for which it claims a privilege. *See United States v. Neill*, 952 F.Supp. 834, 842 (D.D.C. 1997). Naturally, the government must also identify which privilege it claims applies. *See United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) ("[a] party asserting a privilege exemption . . . bears the burden of demonstrating its applicability").

Thus, the first step in the process is for the government to memorialize its demands in a legally sufficient, CIPA-compliant manner. As I noted in our most recent telephone conversation, we believe that the correct procedure is for the government to provide a letter in CLASSIFIED format that identifies precisely those documents the government believes it has mistakenly or inadvertently produced. That letter should be in the form of a Privilege Log specifying the documents the government believes should be returned. Also, since your letter states that the documents for which the government seeks return are "classified and privileged," the letter should indicate which documents are CLASSIFIED, which are privileged, and what privilege applies to each within the latter category. Of course, such a log would be provided by the government consistent with the Protective Order that governs this case.

Once the government has provided the above information in the appropriate format,

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

James T. Jacks
First Assistant United States Attorney
Northern District of Texas
August 31, 2005
Page 2 of 3

defense counsel will respond to the government's specific claims of privilege in a CIPA-compliant submission, and will make every effort to do so expeditiously.[1] After such briefing, and argument, the Court will be in a position to rule on the government's claims of privilege. Only if the Court rules that the government is entitled to return of certain discovery documents will defense attorney-client privilege and work product issues even become relevant. Accordingly, your reference to a "taint team" review is premature.[2]

As noted in the August 18, 2005, letter from Nancy Hollander, Esq., to Judge Fish, it is inconceivable that the government did not prepare (and does not continue to maintain) a thorough and detailed inventory of exactly what CLASSIFIED material it was producing to the defense. The government's failure to discharge that responsibility cannot be transformed into some dereliction on the part of the defense by shifting the burden to the defense to filter discovery the government produces. In addition, as Ms. Hollander's letter states, defense counsel have not viewed any documents among the production that exceed the security levels granted counsel in this case. Moreover, *United States v. Bin Laden* is inapposite given that a considerable amount of the entire production constitutes exculpatory material that the government is constitutionally obliged to produce regardless whether the information or material is CLASSIFIED. *See United States v. Thomson*, 752 F.Supp. 75, 82-83 (W.D.N.Y. 1990).

It is inappropriate to provide production of documents, and then claim that some are too "sensitive" without identifying those documents specifically (from among a much larger volume

---

[1] From a procedural standpoint, defense counsel's ability to fashion a timely response in accordance with CIPA may be constrained by the need to find an alternative location in which counsel are permitted to draft classified pleadings (since we no longer have access to the exclusive place where we can generate such pleadings).

[2] Though discussion of the government's "taint team" proposal is premature at this juncture, in any event, defense counsel categorically reject the use of any government "taint team" to review the CLASSIFIED production. There are numerous serious and intractable problems associated with that proposal and "taint team" review is viewed with disfavor by the courts. *See United States v Stewart*, 2002 WL 1300059, *6 (S.D.N.Y. 2002) (unreported decision).

LAW OFFICES OF

JOSHUA L. DRATEL, P.C.

James T. Jacks
First Assistant United States Attorney
Northern District of Texas
August 31, 2005
Page 3 of 3

of material). Nor does it assist in resolving the issue. Moreover, as your letter points out, production of the material was made April 5, 2005; thus, defense counsel have been reading and reviewing the documents since that time, which completely vitiates any claim by the government that there is any urgency that cannot await the orderly processes of the Court.

Very truly yours,

Joshua L. Dratel

JLD/sw

cc: Hon. A. Joe Fish
United States District Judge
(By Facsimile)

John P. Molinard
Court Security Officer