early 1990s.)  In fact, I have reviewed bank records that illustrate Alkhatib provided money to SDT Marzook, SDT Salah, and the HLF during the same time period, between July 1992 and August 1992.

h.  Salah was interviewed after his January 1993 arrest, by an agent of the Israeli Security Agency (ISA).  At the time of his arrest, Salah was carrying $97,000 in cash.  According to an affidavit filed by the agent, Salah traveled to the Occupied Territories during August 1992, and delivered at least $100,000 to HAMAS operatives per Marzook's orders.  Further, according to the affidavit, Salah engaged in the disbursement of HAMAS funds, at the behest of Marzook, on other occasions during 1992 and 1993.  According to Salah's statement, Marzook and another associate, Ismail Elbarasse, transferred $300,000 to Salah, prior to Salah's January 1993 trip to the region.  Salah was promised a total of $650,000, and was informed by Marzook that the money would be used to organize military activity.  Salah stated that Marzook encouraged acts of terror and played a prominent role in overseeing the military aspects of HAMAS' operations.  This affidavit was introduced in Marzook's extradition proceedings. See Matter of Extradition of Marzook, 924 F.Supp. 565 (S.D.N.Y. 1996).

i.  I have reviewed bank records that reveal that Marzook wrote a check to Salah on August 08, 1992, in the amount of

17

Exhibit C (cont)

$5,000, from Marzook's joint account with Elbarasse, at First American Bank, account number 68168179. During this same time period, Marzook was sending money to the HLF from the same checking account. The $5,000 check to Salah bore check number 1137, while check number 1136 was made payable to the HLF by Marzook for $100,000.

### 1993 PHILADELPHIA MEETING

22. I believe the HLF's connection to HAMAS and its designed role in support of HAMAS was revealed during a meeting in Philadelphia in October 1993 (hereinafter 1993 Meeting). The FBI conducted physical and electronic surveillance of the 1993 Meeting, pursuant to authority granted under the Foreign Intelligence Surveillance Act, and I have reviewed reports and photographs from this surveillance. In attendance at the 1993 Meeting were several key HLF figures, to include: Ghassan Elashi (previously identified as HLF COB and Infocom Vice-President), Shukri Abu Baker (previously identified as HLF CEO), Haitham Maghawri (previously identified as HLF ED), and Abdel Jabar Hamdan (previously identified as an HLF religious worker). The meeting, which only included 20 to 25 people, was also attended by Abdel Haleem Hasan Ashqar, Omar Ahmad, Muin Shabib, Hassan Sabri, Ismail Elbarasse, and others.

23. The FBI captured a large portion of the 1993 Meeting on cassette tape. Most of the conversations were in Arabic, and the

tapes were translated by FBI language specialists, who prepared a detailed synopsis of the 1993 Meeting in English.  I have reviewed that synopsis.

24.  Based on the synopsis of the 1993 Meeting, I believe the purpose of the meeting was to provide a forum for the attendees to discuss how HAMAS should operate in the United States.  This belief is based, in part, on the fact that the attendees referred to themselves as the "Movement."  (In articles and letters it has published, HAMAS refers to itself as the "Movement," which is short for the "Islamic Resistance Movement.")  Further, attendees were cautious about mentioning the word "HAMAS;" for example, when an attendee used the word "HAMAS," he was instructed by another attendee to use the word "SAMAH," which is HAMAS spelled backwards.  The attendees also referred to themselves as "Islamists."

25.  HAMAS was not an FTO or SDT in 1993; however, as stated throughout this affidavit, HAMAS' goal is to eliminate Israel and defeat any peace efforts in the region.  As detailed in introductory paragraphs, HAMAS has pursued this goal by conducting violent activities that have resulted in the injury and death of hundreds of civilians, including American citizens. Based on my review of the 1993 Meeting synopsis, the attendees were cautious in their words and actions due to their familiarity with HAMAS' agenda and its violent actions, and based on their

19

desire to avoid being viewed as terrorists.

26.   In the following paragraphs, I outline pertinent discussions from the 1993 Meeting, compare the discussions to related HAMAS ideals and activities, and highlight the HLF activities that are consistent with the agenda of HAMAS and the 1993 Meeting.

## OPPOSITION TO THE 1993 PEACE ACCORD
## AND THE PALESTINIAN ADMINISTRATION

27.   According to the Department of State and various news publications, HAMAS openly denounced the 1993 peace accord.  An article published by HAMAS on www.palestine-info.com, stated, "Hamas believes that the most dangerous of all settlement projects are 'Gaza-Jericho First' that was concluded in Washington on September 13, 1993, between the Zionist entity (Israel) and the PLO leadership."

28.   Consistent with the above-noted position, the 1993 Meeting attendees convened to discuss their opposition to the 1993 Palestinian Authority-Israel peace accord and determine their course of action in the United States in support of their opposition.

29.   The attendees discussed how the environment had changed as a result of the signing of the accord, and that "anything" that happened after the signing of the accord would be considered terrorism.  One attendee asked the question of how, in this environment, can one fight a holy war?  The attendees decided to

20

struggle indefinitely, regardless of the circumstances, but they recognized the need for support from "Islamists" in America and the need to avoid being viewed as terrorists. The attendees of the 1993 Meeting agreed that the "Movement" in the United States would not adopt a public position against the peace accord in order to avoid the terrorist perception. Instead, the members of the "Movement" discussed methods they could employ to defeat the accord, without overtly opposing it. During the meeting, Abdel Haleem Ashqar stated that the "Movement's" overall goal was to defeat the peace accord. (Note: According to an article in The Wall Street Journal, dated February 27, 2002, "...Ashqar had been identified in 1991 by Israeli police as a top U.S. funding source for HAMAS." )

30. HAMAS not only opposed the peace accord, they also opposed the Palestinian Authority. An article published on HAMAS' website at www.palestine-info.com, stated, "Hamas believes that the [Palestinian]'Self-Rule Authority' is an outcome of the agreements of the co-existence with the Zionist enemy...Being hostage to the Oslo Agreements, the Authority serves as a legal cover for the occupation and its practices."

31. During the 1993 Meeting, much discussion was devoted to the attendees' opposition to the Palestinian "Self-Rule Authority," and how the "Movement" could deflect Palestinian support from the "Self-Rule Authority." The 1993 Meeting

21

attendees decided to attack the "Self-Rule Authority" by publically emphasizing the Authority's abuse of human rights.

32.    Consistently, articles published by HAMAS on www.palestine-info.com, refer to "the Authority's repressive practices and its human rights violations in the Self-Rule areas..."

### Fund-Raising Activities

33.    During the 1993 Meeting, Abdel Haleem Ashqar stated that the primary purpose of the meeting was to determine how the "Movement" would operate in America.

34.    Attendees noted that one of the activities of the "Movement" must be to raise money through contributions which should be dedicated to the construction of schools, medical clinics, orphan centers, and other entities in the Occupied Territories.    The attendees believed that this commitment would strengthen the presence of the "Movement."    These proposed activities are consistent with HAMAS' social agenda detailed in previous paragraphs.

35.    The attendees of the 1993 Meeting discussed the necessity of the HLF's fund-raising activities.    Shukri Abu Baker, the CEO of the HLF, was one of the speakers at the 1993 Meeting, and he informed the attendees that "last year" they collected $2,070,000.    Significantly, Baker commented that, due to the changing political environment, the charitable activities

22

in America must appear disconnected from politically charged issues, such as the peace accord, and appear unaffiliated with a particular group. However, Baker followed these comments with the statement that "we" can give the Islamists $100,000 and provide $5,000 to the others.

## TRAVELING SHEIKHS[2]

36.   In discussing their need to raise more money for their cause, attendees at the 1993 Meeting suggested that one method of increasing fund-raising was to bring guests from the Occupied Territories to deliver sermons on Fridays in the mosques and Islamic Centers.

37.   Consistently, my investigation has revealed that the OLF/HLF has paid for the travel of Sheikhs from overseas to the United States to deliver speeches in the mosques and elsewhere for the purpose of fund-raising before and after the 1993 Meeting.   OLF and HLF American Express records reveal charges for the travel of Sheikh Mohamed Seyam (Siam) on 17 occasions between 1992 and 1994.

38.   During the January 08, 2002 FBI interview of HLF employee Akram Ahmad (previously identified as Akram Mishal, cousin of HAMAS leader Khalid Mishal), Ahmad stated that Sheikh Mohamed Siam is a well-known HAMAS activist and Ahmad believed

---

[2]A Sheikh, in this context, is an elder religious leader, according to an FBI language specialist who referenced the Al-Mawrid Dictionary,13th Edition, May 2000.

Sheikh Siam was the HAMAS representative in Qatar. Additionally, former HLF employee Mohd Usman, who was interviewed by the FBI on March 13, 2002, acknowledged that Mohammed Siam was listed by the HLF as a traveling Sheikh for promotional purposes.

39. I have reviewed an article published in <u>Tehran IRNA in English</u>, dated December 26, 1998, wherein Sheikh Mohammad Siam was listed as the "Representative of Palestinian Islamic Resistance Movement (HAMAS) in Yemen."

40. I have reviewed American Express records for the OLF, which reveal that the OLF paid for Jamil Hamami's travel approximately 14 times in 1990 and 1991.

41. A Reuters World Service article, dated October 22, 1994, identified Sheikh Jamil Hamami as a "top Hamas figure," and quoted him as saying that Palestinian violence was a natural reaction to what he called tremendous suffering from Israel's repressive measures.

42. I have reviewed an Associated Press article, dated December 02, 1994, that discussed HAMAS video tapes that were designed to recruit the support of Palestinians. The article stated that one video featured Sheikh Jamil Hamami advocating violence and martyrdom. He was quoted as saying, "History is made through blood and the bullets of Izzedine al-Qassam [HAMAS' military wing], and it's not the weak and paralyzed history made at the table of negotiation."

24

43. A January 26, 1995 Houston Post article stated that Hamami predicted a "very negative impact" from President Clinton's decision to freeze assets of militant Muslim groups. Hamami was referencing Clinton's Executive Order (EO) 12947, one of the orders that prohibited individuals and/or entities within the United States from providing support to HAMAS. Hamami warned that Clinton's actions would "increase hostility against the American government."

44. According to an Associated Press article, dated February 27, 1995, Hamami was arrested that day for inciting followers to carry out suicide attacks against Israelis. According to an Associated press article, dated July 13, 1995, an Israeli military court sentenced Hamami to six months in prison based on those charges.

45. I believe that the HLF not only used Hamami to raise funds, but the HLF also raised funds and provided them to HAMAS through Hamami and his organization, the Islamic Science and Culture Society. This belief is based, in part, on the following:

a. The referenced January 26, 1995 Houston Post article stated that Hamami directed the Islamic Culture and Science Society (sic), which runs a kindergarten, an orphanage, and a health clinic in the West Bank. According to that article, Hamami stated that the Faith School and an orphanage run by his

Islamic Society were supported, in part, by money from the HLF.

b.  I have reviewed multiple HLF Grant Lists, that were seized during the September 05, 2001 search of Infocom, that document numerous money transfers, involving thousands of dollars, to Islamic Science and Culture in 1991, 1992, 1993, 1994, and 1996.  (HLF Grant Lists for the years 1997-2001 were not located in the items seized from Infocom; however, based on the HLF's practice of retaining these historical records, the HLF's continued operation, and common business practices, I believe that records related to more recent distributions will be discovered within the documentation seized from the HLF's offices.)

c.  I have reviewed a letter from Jamil Hamami to the HLF, wherein Hamami attached statements of sponsorship and payment receipts for the orphans HLF was sponsoring through the Islamic Science and Culture Committee from August 1995 through December 1995.

d.  I have also reviewed an HLF letter, dated October 23, 1997,  signed by "Shukri Abubaker," addressed to Islamic Science and Culture, Mr. Jamil Hamami, that documents a transfer of $85,845 from the HLF to Islamic Science and Culture on June 30, 1994.

## SUPPORT TO FAMILIES OF MARTYRS, PRISONERS, AND DEPORTEES

46.  According to a USA Today article, dated August 13,

26

2001, which cited dozens of interviews with former and current HAMAS members, HAMAS recruits its suicide bombers, in part, by promising to compensate their families in return for their martyrdom. This type of support is an example of how HAMAS' social agenda, which is supported by the HLF, plays an integral and essential role in the entire HAMAS movement.

47. Consistently, the 1993 Meeting attendees agreed that the "Movement" in America needed to support the families of the martyrs. For example, a speaker referred to only as "Abdul Rahman," stated that the most important thing they can offer at this stage is to support the Jihad, and that support could be given by concentrating their financial resources on those people who were directly connected to the Jihad, such as the injured, the martyrs, the prisoners, the deportees, and their families.

48. I have reviewed a letter written in Arabic that was seized pursuant to the search of Infocom on September 05, 2001, and translated by an FBI language specialist. The letter was dated August 13, 1992, on HLF letterhead, and signed by Haitham Maghawri. (Maghawri was previously identified as the HLF's Executive Director.) The translation was as follows: "Dear brother, please nominate a few names of the Martyr's children with a summary on each childs' situation and how cooperative they are."

49. I have reviewed an undated letter, written in Arabic,

27

on HLF letterhead.  The letter was seized during the Infocom
search and translated by an FBI language specialist.  The letter
stated, in part, "We asked you for 40 application forms for needy
families from several regions to be sent ASAP, families of the
martyrs, if possible would be good."  The letter was signed by
Ibrahim Khalil, who, based on HLF documents I have reviewed, is a
former HLF employee.

50.  After the September 05, 2001 search of Infocom, I
witnessed a media interview of Ghassan Elashi, the HLF's COB,
wherein Elashi denied that HLF distinguished orphans based on
their parents' behavior.  This statement is contradicted by the
aforementioned documentation.

51.  In the January 01, 1998 interview of Dr. Ibrahim Al-
Yazuri (alleged as one of the founders of HAMAS), referenced in
paragraph 13, and reported in the Filastin Al-Muslimah, Dr. Al-
Yazuri stated, "The Hamas movement provides...poor and needy
students and sons of martyrs in the first year of study with
school bags containing paper and other study essentials..."

52.  I have reviewed S.H.A.R.E., a periodic newsletter
published by the HLF, dated November 2000, which was seized
during the search of Infocom.  The periodical stated, "Over 4,000
students benefitted from your generosity receiving back packs,
schools supplies, and clothing."  The article is accompanied by a
picture of a back pack being distributed to a young student in

front of a poster containing the names of the Holy Land
Foundation and Al-Salah Islamic Association (a HAMAS affiliated
entity referenced *infra* at paragraphs 60-64).

53.  HAMAS places an emphasis on reaching children at a
young age.  According to the previously referenced USA Today
article, dated August 13, 2001, Sheikh Hasan Yosef, the senior
HAMAS leader in Ramallah, spoke about HAMAS' use of suicide
bombers, and was quoted as saying, "We like to grow them...from
kindergarten through college."  According to the article, Hamas-
run kindergartens have signs on the walls that read, "The
children of the kindergarten are the shaheeds (holy martyrs) of
tomorrow."  An 11-year-old student from a HAMAS-run Islamic
school in Gaza was quoted as saying, "I will make my body a bomb
that will blast the flesh of Zionists, the sons of pigs and
monkeys."

54.  I have reviewed additional documents that were seized
during the search of Infocom on September 05, 2001.  Documents on
HLF letterhead indicate that the HLF sponsored needy families
whose husbands, fathers and/or brothers had been arrested.  For
example, I have reviewed a folder labeled "1992 Needy Families
Islamic Relief Committee Project #239."  On August 19, 1992,
Ghassan Elashi, on behalf of the HLF, transferred $100,000 to the
Islamic Relief Agency for project number 239 in the region of the

29

"48 Territories,"[3] for 100 families in Gaza and the West Bank.
With the Project Summary Report were various documents entitled
"HLF Needy Families Sponsorships."  Most of those documents
listed the names of the needy families along with a statement
about the arrest/imprisonment status of one of the family
members.  Some of the documentation included a memorandum from
the Delegation of the International Committee of the Red Cross
(ICRC) in Jerusalem stating that the family member was detained
by the authorities for security/administrative reasons.  One of
the documents listed a needy family and stated, "Husband martyred
on 12/17/1991 and left family with no income..."  Attached to
that document was the man's death certificate.  Based on the
documentation I have reviewed, a majority of the families who
were sponsored under that project had a relative who had been
arrested, imprisoned, or martyred.

     55.  I have reviewed documentation that illustrates the HLF
provided support to approximately 400 individuals who were
deported by Israel to Lebanon in December 1992 for suspected
affiliations with HAMAS and other terrorist groups.
Specifically, an HLF Grant List showed that on December 21, 1992,
the HLF sent $15,000 to the "Deportees Aid," and on December 23,

---

     [3]"48 Territories" is believed to be a reference to the land
that was lost by the Palestinians in the 1948 war involving the
Egyptian Muslim Brotherhood, on behalf of Palestine, who resisted
the British Mandate and the Zionist Occupation.

1992, they sent $50,000 for the same purpose.  In 1993, the HLF sent $165,000 for aid to deportees and their families.

56.  I have reviewed an undated letter on HLF letterhead from Shukri Baker (previously identified as the HLF's CEO) that stated, "The HLF was the first American charity to come to the aid of the 416 Palestinian deportees in Southern Lebanon with a convoy of emergency supplies and an HLF envoy who was deployed to the camp within a day of the sad event."

57.  HAMAS openly admitted that the individuals deported by Israel were its members and admitted that they were deported in retaliation for HAMAS' military wing activities.  I have reviewed an article published on the HAMAS website at www.palestine-info.com, that discussed HAMAS' military wing activities and said, "The wing's activities against Zionist soldiers and settlers steadily increased and in December 1992, the movement's fighters carried out the operation of capturing the soldier Nassim Tolidano after which the Zionist authorities launched a hectic campaign of arrests against the movement's cadres and followers.  Former Israeli Prime Minister Ishaq Rabin ordered the deportation of 415 activists of our people..."

### SUPPORT TO HAMAS IN THE GAZA STRIP
### THROUGH VARIOUS ORGANIZATIONS

58.  Additional HAMAS activists attended the 1993 Meeting; for example, Muin Shabib was a speaker at the 1993 Meeting.

59.  During the January 08, 2002 FBI interview of HLF

employee Akram Ahmad (cousin of current HAMAS Political Bureau Chief Khalid Mishal), Ahmad stated that based on conversations he has had with Muin Shabib, he (Ahmad) believes that Shabib is a HAMAS activist.

60.  I have reviewed an article from the Amman <u>Al-Majd</u>, dated April 1, 1996, translated by FBIS, that discussed the security campaigns that were launched by the Jordanian Government to arrest suspected HAMAS members.  The article reported that one of the individuals arrested was "Mu'in Shabib."

61.  During the 1993 Meeting, Muin Shabib spoke and listed "our institutions" in the Gaza Strip to include:  The Islamic University and the Al-Salah Association, among others.

62.  I have reviewed HLF "Grant Lists" obtained pursuant to the Infocom search warrant that indicate the HLF has given money to the Islamic University Gaza (9/2/92 - $50,000); and the Alsalah Association (9/2/92 - $15,000; 4/18/93 - $50,000; 5/10/93 - $57,000; 6/21/93 - $4,000; 5/25/93 - $20,000; 3/29/94 - $55,000; 5/18/94 - $6,300; 5/20/94 - $13,500; 5/23/94 -$13,500).

63.  According to an article in <u>USA Today</u>, dated August 13, 2001, a sign on the wall at Gaza's Islamic University says, "Israel has nuclear bombs, we have human bombs."

64.  An article in the <u>Palestine report</u>, dated March 01, 1996, listed HAMAS members who had been arrested from the Gaza Strip, and among those arrested was the head of the Gaza Islamic

University student council, Sami Abu Zuhri.

65. Additionally, I have reviewed a document, seized from Infocom, that appears to be a legal document that was filed by the State of Israel in <u>Holy Land Society versus the Minister of Defense and the attorney general of the State of Israel-Ministry of Justice - Jerusalem</u>, File No. 2575196. That document identified M. Eid Hamed, the President of the Islamic University in Gaza, as a member of HAMAS. That document also identified Ahmed Harb Ahmad Al-Kurd, the Chairman of As-Salah Charitable Society in Gaza, as a HAMAS member who had been imprisoned.

## SUPPORT TO HAMAS IN THE WEST BANK THROUGH ZAKAT COMMITTEES AND OTHER INSTITUTIONS

66. At the 1993 Meeting, Muin Shabib listed some of the "Movement's" institutions in the West Bank to include the Zakat committees in Jenin and Ramallah.

67. "Zakat" is a form of alms giving incumbent on all Muslims. According to <u>Islam</u>, by Caesar E. Farah, Ph.D., the Quran recognizes that one of the categories for the distribution of Zakat is "arming the mujahidun (fighters) engaged in holy war (Jihad) against infidels." The previously discussed Arabic article (paragraph 13) published in the <u>Filastin Al-Muslimah</u>, dated January 14, 1998, entitled "Hamas Aide on Movement's Social Activities," translated by FBIS, cited an interview of HAMAS activist Dr. Ibrahim Al-Yazuri. Al-Yazuri stated that HAMAS provides financial assistance, material aid of food packages

during Ramadan, and gifts and clothes to poor and needy Palestinian families, without discrimination, by providing aid through the support and assistance of the Zakat committees.

68. I have reviewed HLF Grant Lists, that were seized during the Infocom search, which revealed that the HLF provided, at a minimum, thousands of dollars between 1992 and 1996, to each of the following institutions: Jenin Zakat Committee, Ramallah Zakat Committee, Qalqilia Zakat Committee, Tolkarem (Tulkarem) Zakat Committee, Halhul Zakat Committee, Hebron Zakat Committee, Nablus Zakat Committee, Women Muslim Society, and Patient Friends Society. (HLF Grant Lists from 1997 through 2001 were not included in the items seized from Infocom. As indicated in paragraph 46(b), the HLF retained and stored the historic Grant Lists at Infocom. Based on that retention, the HLF's continued operation, and common business practices, I believe that more current Grant Lists will be discovered in the HLF documents that were seized from HLF's offices.)

69. Many of the aforementioned Zakat committees were associated with HAMAS members. This statement is based on my review of an Israeli court document seized from Infocom (referenced *supra* at paragraph 64) that lists various charitable societies and individuals believed to be associated with HAMAS. The document contained, in part, the following information:

a. Omar Moh'd Ahmed Hamdan: Member of the Ramallah

34

Zakat Committee, was identified as a HAMAS member who was imprisoned;

b.  Ibrahim Mohammad Ibrahim Zahran:  Responsible for the Qaliqilia Zakat Committee, was identified as an active member of HAMAS who was imprisoned in 1996 by Palestinian Security Police;

c.  Hamed M. Qa'dan:  Head of Tulkarem Zakat Committee, was identified as a HAMAS member who was arrested in April 1996 by the Palestinian Authority;

d.  Ahmed A. Rahman A. Allah:  Head of Halhul Zakat Committee, was identified as a HAMAS member;

e.  M. Suleiman M. Baroud:  In charge of the Hebron Zakat Committee, was identified as a HAMAS member;

f.  A. Raheem M. Taha Hanbali:  Head of Nablus Zakat Committee, was identified as an active member of HAMAS.

g.  Fatima M. Yousef:  Head of Women Muslim Society, was identified as a HAMAS member;

h.  Dr. Hafiz A. Nabi Natsheh:  Head of Patient Friends' Society in Hebron, was identified as a HAMAS member.

70.  I have reviewed 1997 HLF bank records, which reveal that in 1997, the HLF wire transferred thousands of dollars to the Jenin, Ramallah, Nablus, Qalqiliya, Halhul, Tolkarem, and Hebron Zakats.  I have reviewed an HLF "Familiea List," seized

during the search of Infocom, that indicates the HLF continued to transfer funds to the Jenin Zakat, Tolkarem Zakat, Nablus Zakat, Ramallah Zakat, and other organizations in the year 2000. I have reviewed a bank account summary of the HLF for the years 2000 and 2001, which reveals over $3,000,000 in funds transferred to the West Bank and Gaza. (Note: According to HLF employee Mohd Usman, beginning in approximately the year 2000, a majority of the money forwarded to the West Bank and Gaza was sent through the HLF's offices in those territories. Those offices were responsible for submitting proposals to the Dallas office, where the requests would be processed and final decisions made regarding the allocation of funds. According to Usman, this process helped to bolster the regional HLF office's status within the Occupied Territories.)

### HLF OFFICE IN JERUSALEM

71. At the 1993 Meeting, Muin Shabib (previously identified as a HAMAS activist) also recommended opening institutions in Jerusalem.

72. I have reviewed an "Accord," dated June 03, 1994, wherein the HLF officially recognized the HLF Jerusalem office and authorized it to conduct business on HLF's behalf. The accord was signed by Shukri Baker, Executive Director of the HLF-USA, and Mohamed Anati, Executive Director of the HLF-Jerusalem.

73. According to various news articles, including an

36

article in the IMRA in English, dated February 01, 1998, Mohamed
Anati was arrested by the Israelis in 1997 for allegedly raising
funds for HAMAS.  An article in the Jerusalem Qol Yisra'el in
English, dated January 27, 1998, stated that the Lod Military
Court had charged Anati with overseeing the transfer of funds to
families identified with HAMAS.  An article in the Jerusalem Qol
Yisra'el in Hebrew, dated February 04, 1999, stated that the Lod
Military Court sentenced Anati to nine months in prison for his
conviction of membership in an unlawful association; namely of
having been director general of the HAMAS-affiliated Holy Land
Fund.

### THE CONSPIRACY TO PROVIDE SUPPORT TO HAMAS
### AND TO CONCEAL THOSE ACTIVITIES HAS CONTINUED

74.  I have reviewed documentation that reveals that the HLF
has continued to aspire to its goals set in the 1993 Meeting by
continuing to provide support to HAMAS until the HLF was closed
by OFAC on December 04, 2001.  This belief is based, in part, on
HLF Fund Transfer Notifications (FTNs) that were seized from
Infocom on September 05, 2001, in addition to the review of the
bank summaries described in paragraph 70 revealing over
$3,000,000 in transfers to the Occupied Territories.  One FTN
form, dated May 30, 2000, listed the beneficiary as HLF-Hebron,
and noted a total amount of the fund transfer as $49,401.50.
According to the form, the funds were distributed for orphan
sponsorships, students, and families.  An FTN, dated May 30,

2000, in the amount of $2,071.00, noted the beneficiary as Islamic Welfare, and further denoted the funds were distributed for orphan and family sponsorship. An FTN, dated May 30, 2000, in the amount of $29,034.50, noted the beneficiary as HLF-Gaza, and identified the purpose as orphan, family, and student sponsorship.

75. During the January 08, 2002 interview of former HLF employee Akram Ahmad, cousin of HAMAS leader Khalid Mishal, the HLF continued to operate until it was closed by OFAC on December 04, 2001.

76. According to Ahmad, the HLF's most important business relationship was with the Islamic Development Bank (IDB) in Jeddah, Saudi Arabia. Ahmad stated that the IDB had a budget to assist Palestinians and that he and HLF CEO Shukri Abu Baker traveled to the IDB in the Summer of 2001 in an attempt to obtain donations from the IDB. Ahmad denied that HLF received any funding from the IDB.

77. I have reviewed an email from HLF COB Ghassan Elashi to Mamoun Bader (possibly HLF board member M. Bader), dated September 04, 2001, wherein Ghassan Elashi stated, "...It was about a new scholarship fund available at Islamic Development Bank IDB in Jeddah Saudi Arabia for 6 million dollars to help Palestinian students. Shukri should follow up with IDB since we do have established a contact wit (sic) them and see if part of

38

this 6 million is implemented by the HLF."

78.    I have reviewed an Arabic article from the <u>London Al-Majallah</u>, dated August 05, 2001, that was translated by FBIS. The article featured an interview with HAMAS Political Bureau Chief Khalid Mishal, previously identified as Akram Ahmad's cousin and brother of HLF fund-raiser Mufid Abdelqader.  When Mishal was asked by the reporter about financial aid for the Palestinians, Mishal was quoted as saying, "Popular aid knows its way well to our people on the inside through private channels that guarantee that.  As for official aid, it was collected in two funds upon a Saudi suggestion...It was agreed that these funds will be spent through the Islamic Development Bank in Jeddah."

79.    During an Infocom trash cover on April 16, 2001, agents recovered emails and other correspondence, wherein Basman Elashi, brother of Ghassan Elahsi, was requesting assistance from an Infocom business partner, identified as Jamjoon Advanced Technology (JAT), located in Saudi Arabia.  In his request, Basman Elashi advised JAT to write to the Saudi Consulate in the United States and report that Shukri Baker and Akram Mishal (Ahmad) were "urgently" needed in Saudi Arabia for "important business" related to Infocom.  The documents characterized Baker and Mishal (Ahmad) as "employees" of Infocom.  According to Texas Workforce Commission records, neither Baker nor Mishal were

employees of Infocom, and there is no discovered information to suggest that they have ever been employed by Infocom. I believe evidence exists within the HLF documents explaining the apparent misrepresentation and detailing the IDB project and its relationship to the HLF.

80. My belief that the HLF has continued to support HAMAS is based, in part, on an interview of former HLF employee Mohd Moataz Usman on March 13, 2002. Usman worked at the HLF from November 1999, until approximately August 2001. Usman confirmed that the HLF conducted many fund-raising activities during that time period. Usman stated that one of the HLF's most successful fund-raisers, Mufid Abdelqader (brother of current HAMAS Political Bureau Chief Khalid Mishal), frequently traveled within the United States and to foreign countries to conduct HLF's fund-raising activities. On an HLF fund-raising trip to the country of Columbia, Mufid Abdelqader raised approximately $85,000 in cash during one weekend.

81. My belief that the HLF has continued to support HAMAS is also based, in part, on information from Internal Revenue Service SA Andrew Bishop, who advised me that the HLF reported its total contributions as follows: 1997 - $5,527,942; 1998 - $5,281,655; 1999 - $6,303,095; 2000 - $13,022,466.

82. The HLF's year 2000 IRS Form 990 listed M. Elmezain, S. Baker, G. Elashi, A. Agha, M. Bader, R. Almallah, R. Abdelkarim

40

as the officers.  The <u>Organization's Primary Exempt Purpose</u>
stated, "...To establish, operate and/or contribute to a relief
fund for refugees and the indigent needy.  To sponsor charitable
activities benefitting and/or to make contributions or
distributions to other qualifying tax exempt organizations."

83.  I have reviewed a summary of select HLF wire
transactions based on financial information obtained from the
Federal Reserve Board.  The summary revealed that, in the years
2000-2001, HLF received thousands of dollars via wire transfer
from bank accounts in Kuwait, Saudi Arabia, Bahrain, United Arab
Emirates, Germany, Egypt, and other foreign countries.  The
summary also revealed that the HLF wire transferred hundreds of
thousands of dollars to various organizations in Gaza, Hebron,
Ramallah, Lebanon, Turkey, Jordan, and Saudi Arabia, including
the Islamic Welfare Association, Human Appeal, Dar El Salam
Hospital, Sanabil Association for Relief and Development, and
others.

84.  Additionally, there is no available evidence suggesting
that the HLF changed its methods and practices.  To the contrary,
evidence detailed in previous paragraphs suggests the HLF
continued to fulfill its support role for HAMAS by providing
financial aid and assistance to the HAMAS infrastructure in the
Occupied Territories.  Many of the documents described in this
affidavit providing the detail of beneficiaries and associations

were recovered from the search of Infocom, as the HLF apparently stored some of its historical documentation at that location. Although recent bank records and other obtainable information has confirmed the HLF's continued operation, said information is not as extensive and telling as the HLF documents recovered from Infocom. Due to the significance of the information recovered from Infocom, coupled with HLF's continued operation, I believe investigators will discover additional probative evidence related to the more recent criminal activity articulated in this affidavit during a search of the HLF's property seized by OFAC.

## SUMMARY OF PROBABLE CAUSE

85. Based on the foregoing, I assert that probable cause exists to believe that the HLF was funded by HAMAS leaders and supporters; operated and controlled by individuals associated with HAMAS; and designed to support HAMAS' critical social programs concentrated in the West Bank, Gaza, Jerusalem, and elsewhere, through Zakat and other charitable committees. These actions served to promote HAMAS' goal of annihilating Israel and replacing it with an Islamic Palestinian state, through acts of violence and terror that have resulted in the death of hundreds of civilians, including United States citizens.

## EVIDENCE

86. Based on information from the FBI and OFAC, the HLF was in operation at all four identified locations until OFAC's

42

blocking action on December 04, 2001. Based on information from OFAC, former HLF employees, and documentary information obtained pursuant to the search of Infocom, I believe that the HLF maintained business records related to its fund-raising activities, its charitable contributions, and its various projects, until OFAC seized those records and placed them into the referenced storage facilities.

87. I have reviewed OFAC Blocked Property Inventories for the four HLF locations referenced herein. Those inventories indicate that OFAC seized various materials from the four HLF locations, to include the following: desks, files, books, binders, computers, telephones, fax machines, miscellaneous documents, and various other items that the HLF used to facilitate its activities. As noted, the HLF's primary office was located in Richardson, Texas, and the other offices targeted by OFAC and subject to this affidavit performed regional responsibilities related to fund-raising and propaganda distribution.

88. Based on the information in this affidavit, I respectfully submit that there is probable cause to believe the HLF, its officers and employees, have been engaged in illegal activity. Specifically, the HLF, its officers and employees have violated: 18 U.S.C. §2339B, providing material support to a Foreign Terrorist Organization; 50 U.S.C. §1701, *et seq.* and 31

43

C.F.R. §595.201, *et seq.*, willfully dealing in the property of an SDT/SDGT and/or providing contributions or services to said SDT/SDGT; 18 U.S.C. §§1956-1957, money laundering; and 18 U.S.C. §371, conspiracy. Furthermore, I submit that there is probable cause to believe that evidence thereof currently exists at the storage facilities referenced herein.

89. Accordingly, I hereby request the issuance of a search warrant for the foregoing storage locations, pursuant to the nationwide authority granted under the Patriot Act of 2001, to include all rooms, offices, cabinets, credenzas, desks, bookshelves, tables, safes, and any and all other furnishings associated with HLF property. I also request all computer equipment capable of containing incriminating information, including hardware, software and computer records and communications, be seized and retained for a reasonable period of time to be examined, analyzed and tested for evidence of the commission of the crimes described herein. The types of documents and materials sought include, but are not limited to, the following:

a. Files, charts, ledgers, checks, check records, receipts, business contracts, correspondence, notes, credit card receipts, wire transfers, and other written documents used for maintaining records and recording data associated with HLF's contributors, beneficiaries, business partners, donors, entities and

organizations, including Zakat committees and other charitable organizations, with whom HLF has an association.

b.   Contracts, bank statements, cancelled checks, undeposited checks and money orders, entries in cash disbursement journals, ledgers and check registers, records in accounts receivable and accounts payable, records of wire transfers, deposit and withdrawal slips, correspondence, invoices, shipping records, letters of credit, fund analyses, grant lists, and other notes and papers reflecting financial deposits or disbursements that relate to payments, loans, other financial transfers or business dealings between or among individuals identified in this affidavit and others unknown.

c.   Any documents, video or audio material reflecting membership, support and/or association with HAMAS, the Muslim Brotherhood, and/or any other designated terrorist groups or state sponsors of terrorism as defined by the Department of State, by or with the HLF, its officers, employees, associates, partners, or the entities and/or individuals with whom the HLF has had business and/or financial dealings.

d.   Any documents, video or audio material relating to individuals associated with HAMAS, or other terrorist groups, including individuals deported from Israel, Jordan and/or other countries in the Middle East for suspected affiliation with HAMAS and/or other terrorist groups.

45

## COMPUTER DATA

90.  Based upon my knowledge, training and consultations with computer specialists, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, ensure the accuracy and completeness of such data, and prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  This is true because:

a.  <u>Volume of evidence</u>:  Computer storage devices (such as hard disks, diskettes, tapes, laser disks, Bernoulli drives, etc.) can store the equivalent of thousands of pages of information.  Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names.  Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis on-site.

46

b.  Technical requirements:  Analyzing computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data.  No matter which system is used, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction, both from external sources and from destructive codes embedded in the system as a "booby trap," a controlled environment is essential to the complete and accurate analysis of the information.

91.  A high volume of data and the technical requirements set forth above, often require that the above-referenced equipment, software, data and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  It may be the case, under appropriate circumstances, that some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus

47

eliminating the need for its removal from the premises.  One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes instrumentality of an offense, and is thus subject to immediate seizure as such, or whether it serves as a mere repository for evidence of a criminal offense.  Another determining factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus, less intrusively analyzed off-site, with due consideration given to preserving the integrity of the evidence.  This, in turn, is often dependent upon the amount of data and number of discrete files or file areas that must be analyzed, and is frequently dependent upon the particular type of computer hardware involved.

92.  Based upon my knowledge, training and experience, and the experience of other law enforcement personnel and computer specialists with whom I have spoken, I am aware that searches and seizures of computer evidence taken from the subject premises commonly require agents to seize most or all of a computer system's input/output peripheral devices, in order for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment.  Therefore, in those instances where computers are removed from the subject premises, and in order to fully retrieve data from a computer system, investigators must seize all magnetic and

optical/mechanical storage devices, as well as the central
processing units (CPUs) and applicable keyboards and monitors
which are an integral part of the processing unit.  If, after
inspecting the input/output devices, system software and
pertinent computer-related documentation, it becomes apparent
that these items are no longer necessary to retrieve and preserve
the data evidence, such materials and/or equipment will be
returned as quickly as possible.

    93.  The analysis of electronically stored data, whether
performed on-site or in a laboratory or other controlled
environment, may entail any or all of several different
techniques.  Such techniques may include, but shall not be
limited to, surveying various file directories and the individual
files they contain (analogous to looking at the outside of a file
cabinet for the marking it contains and opening a drawer capable
of containing pertinent files, in order to locate the evidence
and instrumentalities authorized for seizure by the warrant);
opening or reading the first few pages of such files in order to
determine their precise contents; scanning storage areas to
discover and possibly recover recently deleted data; scanning
storage areas for deliberately hidden files; or performing
electronic "key-word" searches through all electronic storage
areas to determine whether occurrences of language contained in
such storage areas exist that are intimately related to the

subject matter of the investigation.  Again, many items of
evidentiary value may be contained in deceptive and unexpected
areas within the computer structure.


SA Lara L. Burns, FBI


Subscribed and sworn before me this 10 day of April, 2002.

Paul Stickney
United States Magistrate Judge

50