IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
<u>DALLAS DIVISION</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CR NO. 3:04-CR-240-G |
| | § | |
| HOLY LAND FOUNDATION | § | |
| FOR RELIEF AND DEVELOPMENT, | § | |
|     also known as the "HLF" (01) | § | |
| SHUKRI ABU BAKER,  (02) | § | **ECF** |
| MOHAMMED EL-MEZAIN, (03) | § | |
| GHASSAN ELASHI, (04) | § | |
| HAITHAM MAGHAWRI,  (05) | § | |
| AKRAM MISHAL,  (06) | § | |
| MUFID ABDULQADER,  (07) and | § | |
| ABDULRAHMAN ODEH  (08) | § | |

## <u>GOVERNMENT'S TRIAL BRIEF</u>

The United States submits this trial brief in support of the evidence and arguments relied upon in its case-in-chief.   The purpose of this submission is to provide the Court with an overview of the case, the scope of the conspiracy, and the different kinds of evidence that the government will seek to admit at trial and the evidentiary bases for the admission of that evidence.  The government is not detailing all of the evidence that it will present in its case-in-chief nor all of the evidence showing the existence of the alleged conspiracy and the statements made in furtherance of the conspiracy.  Instead, this trial brief will outline the law with respect to types of evidence the government will be seeking to admit and provide background to the Court for evaluating their admissibility.

In this manner, the government will establish to the Court the existence of the evidence available to complete the necessary foundation at trial and the role that evidence will play at trial.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     Procedural History    5

II.     Factual Background    6

    A.    The Rise of Hamas in the United States    7

    B.    Documents Seized from Co-conspirator Ismail Elbarasse    10

    C.    The Philadelphia Conference    11

    D.    Hamas' Designation as a Terrorist Organization    15

    E.    The Hamas International Fundraising Network    18

III.    Charges and elements    19

IV.    Evidentiary issues    22

    A.    Expert Testimony    22

        1.    The Government's Experts    22

        2.    Admissibility of Expert Testimony    24

    B.    Co-conspirator statements    27

        1.    General Principles of Conspiracy Law    27

        2.    Breadth of conspiracy    31

        3.    Co-conspirator statements made after latest date in the indictment    32

        4.    Documents and Materials Seized During the Search of the Home of Ismail Elbarasse, 4502 Whistler Court,

|  |  | Annandale, Va. on August 21, 2004. | 33 |
| C. | | Proving Overt Acts and Intent with Evidence Not Identified in the Indictment | 35 |
| D. | | Lay Person Opinion | 37 |
| E. | | Admissibility of records | 39 |
| | 1. | Domestic Records of Regularly Conducted Activity without the need for a Live Witness | 39 |
| | 2. | Foreign Bank Records Without a Live Witness | 41 |
| | 3. | Foreign Criminal Convictions | 44 |
| | 4. | Certified Domestic Public Documents | 44 |
| | 5. | Electronic Intercepts Captured Pursuant to FISA | 45 |
| | 6. | Documents Admissible Pursuant to Rule 807 Fed.R.Evid. | 47 |
| | | (a)  Foreign Bank Records from the Bank of Palestine | 49 |
| | | (b)  Records Seized Through Israeli Military Operations | 50 |
| F. | | Admissibility of Charts and Summaries | 54 |
| | 1. | Summary Charts - Fed. R. Evid. § 1006 | 54 |
| | 2. | Pedagogical Charts | 57 |
| G. | | Past Recollection Recorded | 58 |
| H. | | Defendants' Admission | 60 |
| V. | | Conclusion | 62 |
| | | Certificate of Service | 63 |

## I.  PROCEDURAL HISTORY

On July 26, 2004, a federal grand jury indicted the above-named defendants in a 42 count indictment.  The indictment charged the defendants with conspiracy to provide material support to a designated foreign terrorist organization; twelve counts of providing material support to a foreign terrorist organization; conspiracy to provide funds, goods and services to a Specially Designated Terrorist; twelve counts of providing funds, goods and services to a Specially Designated Terrorist; conspiracy to commit money laundering; twelve counts of money laundering; one count of conspiracy to impede the Internal Revenue Service and to file false tax returns; and three counts of filing false tax returns of an organization exempt from income tax.  The defendants Akram Mishal and Haitham Maghawri have not been arrested in this case and are fugitives.

The case was originally set for trial on the Court's four week docket beginning October 4, 2004.  On September 29, 2004, the Court entered an order finding that the case was a complex case as that term is used in the Speedy Trial Act, and continued the case from its October 2004 setting.  On January 6, 2005, the Court entered its order scheduling the trial of the case for February 6, 2006.  On November 30, 2005, a superseding indictment was returned in the case.  No new counts or charges were added nor were any new defendants added in the superseding indictment.  On January 6, 2006, a status conference was held after which the February 2006 trial date was vacated.  On February 23, 2006, the Court issued a new scheduling order setting the trial for its four week

docket beginning on February 5, 2007.  On November 2, 2006, pursuant to the

defendants' motion, the Court continued the trial until July 16, 2007.

## II.  FACTUAL BACKGROUND

As set forth in the indictment, Hamas is an international terrorist organization with

the stated objective of destroying the State of Israel and replacing it with an Islamic state

comprised of what is now Israel, the West Bank and the Gaza Strip.   Hamas is organized

into distinct wings, or bureaus, that perform different functions, but operate as a seamless

whole.  It includes a military wing, responsible for carrying out suicide bombings and

other terrorist attacks; a social wing, which operates much like a social welfare agency;

and a political wing, which sits above the military and social wings and is responsible for

setting policies and guidelines regarding Hamas' activities.  The defendant Holy Land

Foundation (HLF), sometimes called "the Fund," was an integral part of the Hamas social

infrastructure.  Not only did HLF operate to support the Hamas agenda, but it was created

for that very purpose.

On January 24, 1995, pursuant to Executive Order 12947, the Department of

Treasury, Office of Foreign Assets Control, designated Hamas as a Specially Designated

Terrorist organization.  This designation makes it illegal for any United States person or

entity to engage in any unlicensed transactions or dealings involving the property or

interests of Hamas.  Hamas' designation as a Specially Designated Terrorist organization

has remained in place since January 24, 1995.  On October 8, 1997, the Secretary of State,

pursuant to the laws of the United States, designated Hamas as a "Foreign Terrorist Organization."  As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to Hamas.

### A.  The Rise of Hamas in the United States

The conspiracy surrounding this case and involving these defendants began years before the enactment of the Executive Orders and material support statutes at issue.  In late 1987, violent confrontations between the Palestinians and Israelis sharply increased, and Palestinian demonstrations evolved into wide-spread physical resistence.  This grass-roots resistence to the Israeli presence in the West Bank and Gaza was labeled the First Intifada, an Arabic term translated as "uprising."

At the outbreak of the First Intifada, Sheik Ahmed Yassin, an Islamic cleric from Gaza, was the leader of the Palestinian branch of the Muslim Brotherhood.  The Muslim Brotherhood is an international Islamic fundamentalist movement, originally organized in Egypt in 1928, under the following of Islamic leader Sheik Hassan Al Banna.  Sheik Yassin and his followers, fueled by their resentment of Israel's existence and an Islamist ideology, were instrumental in the First Intifada.  While many Palestinians were satisfied to have a "two state solution" to the conflict, where Israel and Palestine exist side by side, each recognizing the others right to exist, this was not an acceptable compromise for

Sheik Yassin and his followers.  They advocated the destruction of the State of Israel and the taking back of what they believed belonged to the Palestinians.

In December 1987, Sheik Yassin, among others, founded *Harakat al-Muqawamah al-Ilamiyya*, Arabic for the "Islamic Resistance Movement" (known by its acronym, Hamas), to accomplish its mission of destroying Israel.  Hamas' founding charter makes clear that Hamas is, in fact, the Palestinian branch of the Muslim Brotherhood, and calls for the annihilation of Israel through *"jihad"* (holy war), and the creation of an Islamic state in its place.  Hamas defines *jihad* as including violent activities, with such violent activities being carried out by Hamas' military wing, commonly known as the Izz Al-Din Al-Qassam Brigades ("Al-Qassam Brigades").  The charter also calls for charity as means of securing the population's loyalty.  Through charitable support, the charter explains, "congeniality will deepen, cooperation and compassion will prevail, unity will firm up, and the ranks will be strengthened in the confrontation with the enemy."

Sheik Yassin designed Hamas on the model of the Muslim Brotherhood, which, in addition to armed, paramilitary action, builds its strength on providing for the needs of the people as a means of encouraging their acceptance of an Islamic fundamentalist way of life.  Through this grass-roots approach, (known as *dawa* - "preaching" or "calling"), Hamas achieves a number of goals.  Among other perceived benefits, it (1) assures popular support for the movement, and through its popular support improves its ability to compete with opposing political factions; (2) provides a base from which to indoctrinate and recruit

future activists, including military recruits, to carry out suicide bombings and other terrorist acts; (3) provides a benign cover through which millions of dollars can be transferred from overseas into Hamas operated or controlled institutions; and (4) since money is fungible, the overseas support for the *dawa* frees resources that can then be devoted to terrorist activity.

In order to raise the requisite funds to support its operations, including its social support network, Hamas looked outside of the Palestinian areas, to individuals, organizations and foreign governments sympathetic to its mission, including the United States. By the outbreak of the First Intifada, the Muslim Brotherhood in the United States was significant and well organized. In 1987, the body within the United States-based Muslim Brotherhood primarily responsible for organizing the Palestinian efforts was the Palestinian Committee, a sub-group comprised of active Muslim Brotherhood members of Palestinian origin.[1] The leader of the Palestinian Committee in the United States at that time was unindicted co-conspirator Mousa Abu Marzook. Marzook is now – and has been since 1995 – a Specially Designated Terrorist and Hamas leader. In fact, in the early 1990s, Marzook left his post as a leader of the United States-based Muslim Brotherhood and Palestinian Committee to take over as Hamas' Political Bureau Chief, the organization's highest official position.

---

[1]The Muslim Brotherhood, which has members and branches all around the world, including the United States, is a global Islamic movement with sub-groups divided along ethnic and nationalistic lines.

### B. Documents Seized from Co-Conspirator Ismail Elbarrasse

As evidenced by documents seized in 2004 from the Virginia home of unindicted co-conspirator and fellow Palestinian Committee member Ismail Elbarrasse, as well as other evidence, the Muslim Brotherhood directed its Palestinian Committees throughout the world, including the United States, to carry out the mandate of assisting Sheik Yassin's newly-formed Hamas. In accordance with that mandate, the Palestinian Committee in the United States, which included the defendants Elashi, Baker and El-Mezain, created a number of organizations charged with varying missions calculated to comprehensively address Hamas' needs. These organizations included the United Association for Studies and Research (UASR) ("think tank"), the Islamic Association of Palestine (IAP) (propaganda and information) and the Occupied Land Fund (OLF) (money), later to become the defendant HLF. The defendant Shukri Abu Baker was in charge of the HLF and, along with the defendants El-Mezain and Elashi, set out to establish what would become the highest grossing Islamic charity in the United States.

The UASR involved, among others, unindicted co-conspirators Mousa Abu Marzook (Hamas leader) and Yousef Saleh, and was designed for ideological research and development intended to promote a fundamentalist view of the Palestinian issue. The UASR was also involved in passing Hamas communiques to the United States-based Muslim Brotherhood community and relaying messages from that community back to Hamas. The IAP, which involved the defendant Ghassan Elashi as an original

incorporator and bank account signatory, was designed as a propaganda facility, responsible for Intifada festivals (involving the defendant HLF), pro-Hamas publications, and the general rallying of support within the American Palestinian community.  The IAP was the first organization to publish an English version of the Hamas charter, which, as previously explained, vows to replace Israel, the West Bank, and Gaza with an Islamic state.  Further, during their existence, unindicted co-conspirator and Hamas leader Mousa Abu Marzook funneled hundreds of thousands of dollars into the three organizations (UASR, IAP, OLF/HLF) during a time when he was an unemployed graduate student.

The defendant HLF's role was to subsidize Hamas' vital social recruitment and rewards program designed to win the hearts and minds of the Palestinian population and solidify loyalty to Hamas.   In order for Hamas to achieve its ultimate, charter-stated goal of annihilating Israel, it had to win the broad support of the Palestinian population.  The defendant HLF set out to do just that.  Moreover, the HLF did not embark on this mission alone.  Throughout the world, organizations similar to the HLF were being established to achieve the same of mission supporting Hamas.

### C.  The Philadelphia Conference

Although there are varying accounts as to the exact date at which the First Intifada officially ended, by most accounts, 1993 and the signing of the Oslo Accords, officially called the Declaration of Principles on Interim Self-Government Arrangements, signified the end.  The Oslo Accords were a dramatic and significant event in the Israeli-Palestinian

conflict   So, too, were the Accords significant in the United States, as President Clinton brokered the agreement and held a nationally televised signing in Washington, D.C. on September 13, 1993, between Yasser Arafat (PLO Chairman) and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.  The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority (PA), headed by PLO Chairman Yasser Arafat.  Under the plan, the PA would perform the services previously provided by Israel, including education, health, social welfare, taxation and tourism.  The agreement also included Letters of Mutual Recognition, whereby the Israeli government recognized the PA as the legitimate representative of the Palestinian people, while the PLO recognized the right of the Israel to exist and renounced terrorism, violence and the desire for the destruction of Israel.

The Oslo Accords were not, however, universally accepted.  Hamas rejected the agreement for its unacceptable condition of recognizing Israel's right to exist.  For Hamas, the Oslo Accords were a threat to its survival and in direct confrontation with its most valued tenet - the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

For Hamas' support network in the United States (the Palestinian Committee), the signing of the Oslo Accords and America's brokering of the agreement presented a difficult challenge.  The Oslo Accords had provided a degree of public expectation for a

peaceful resolution to the historic conflict.  In order for the Palestinian Committee to fulfill its mandate of assisting and strengthening Hamas, it would have to be much more cautious and organized in its efforts, so as to avoid overt alignment with a group now dedicated to undermining the American-backed peace process.

In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the Palestinian Committee gathered together in Philadelphia, Pennsylvania to discuss how best to proceed in light of the Olso Accords. The defendants Shukri Abu Baker, Ghassan Elashi and Mufid Abdulqader were present. Although invited, the defendant Muhammad El-Mezain was ill and unable to attend. The Federal Bureau of Investigation (FBI) was still in the early stages of its investigation of Hamas in the United States when the Palestinian Committee met in Philadelphia.  One of the initial Hamas cases investigated by the FBI involved unindicted co-conspirator Abdelhalem Ashqar, an Oxford, Mississippi-based Hamas activist.  The FBI learned of the Philadelphia meeting through the Ashqar investigation and, as a result, the FBI obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

During the meeting, the participants openly discussed the problems that the Oslo Accords posed for achieving their objectives.  The United States was fertile ground for fundraising and propaganda, offering the essential Constitutional protections which afforded the freedom to operate.  Since the United States had publicly positioned itself

behind the peace process, the attendees were concerned that disclosure of their true purpose would threaten their established infrastructure by aligning them with what they knew was a terrorist organization. Attendees were admonished not to mention "Hamas," but rather to refer to it as "Samah," which is Hamas spelled backwards. Attendees questioned how they could continue their quest to defeat the peace process without being viewed as "terrorists." They discussed their concern that the peace process would attract Palestinian support and further complicate their ultimate goal of creating an Islamic state throughout Israel. They agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting Hamas' vital social recruitment effort.

In order to facilitate their continued support of Hamas, the attendees discussed the method by which they could provide financial support without an overt alignment with Hamas. That method involved supporting institutions, organizations and programs in the West Bank and Gaza aligned with the Hamas movement. Attendees identified several organizations and zakat committees as "ours." The infiltration and control of social committees and organizations providing much needed relief in the West Bank and Gaza provided a perfect opportunity for Hamas to widen and strengthen its grip on the Palestinian population. Countless interviews and speeches by Hamas leaders have lauded its social apparatus as the bedrock of the organization, and the primary source of its

influence in the region.  This influence would continue to grow in the years to come, culminating in Hamas' rise to political power.

### D.  Hamas' Designation as a Terrorist Organization

By 1995, Hamas had made clear its intention to violently derail the peace process by undermining what was perceived as a corrupt and ineffective PA, and continuing its violent campaign of suicide bombings, kidnappings and other paramilitary actions.  The United States Government's realization of the significant impediment Islamic extremist organizations posed to the peace process led to President Clinton's issuance of Executive Order 12947 on January 23, 1995, which declared unlawful organizations and individuals committed to disrupting the Middle East peace process.  Hamas was listed on the original Order, and officially declared as a Specially Designated Terrorist; a designation status created by Executive Order 12947.  Subsequently, in 1996, Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA), which created the term "Foreign Terrorist Organization" and resulted in the codification of the material support statute of Title 18, United States Code, Section 2339B.  In October 1997, the State Department listed Hamas as a Foreign Terrorist Organization.

The new statutes and laws enacted by Executive Order 12947 and AEDPA prohibited the provision of any type of support to any component of the designated organization.  This broad prohibition recognized the vital role a terrorist group's social

infrastructure plays in strengthening the movement by exploiting the needs of the civilian population and providing radical indoctrination through its schools and social programs.

The defendants were well aware of Executive Order 12947 and AEDPA and expressed considerable concern over the laws' application. Wiretaps and search warrant material revealed significant exposure to and familiarity with the laws. Once again, the defendants were forced to adapt to a changing environment. The tone and language of the conferences, publications and speakers supported by the defendants began to change in order to avoid being publicly associated with Hamas and its agenda. Conference tapes possessed by and involving the defendants and the organizations of the Palestine Committee seized during search warrants reveal the contrast before and after the designations. These tapes reveal the true spirit and intent behind the defendants' activities and unveil the purpose and motive of their organizations.

In the years following the new anti-terrorism laws, the defendants continued providing support to the same organizations and institutions that they supported prior to the legislation; however, much more of the defendant HLF's money was being diverted to its own offices and/or representatives located throughout the West Bank and Gaza. The HLF's representatives in these locations included individuals jailed and convicted of Hamas related activity. Between 1995 and December 2001, the defendant HLF delivered hundreds of thousands of dollars into the West Bank and Gaza to construct schools, medical clinics, libraries and other community-based facilities, in addition to supporting

individuals and families of individuals arrested, detained or injured during violent confrontations with Israel. This aid continued to be distributed through an insular network of charity committees controlled by Hamas, including many of the same committees identified as "ours" in the 1993 Philadelphia Conference.

In September 2000, the violence between Israel and the Palestinians was reignited, and quickly escalated into what was labeled the Second Intifada. The Second Intifada resulted in numerous arrests, detentions, suicide bombings, and confrontation-related injuries and deaths. The defendant HLF was quick to respond and show its support for the uprising.

Various operations and initiatives were conducted by Israel during the Second Intifada in an effort to diminish the rapidly growing use of suicide bombings, kidnappings and other violent techniques aimed at threatening Israel's civilian and military populations. Following the March 27, 2002 suicide attack inside a hotel during a holiday meal, Israel launched an operation entitled Operation Defensive Shield, which targeted the Hamas infrastructure, including certain Islamic charitable institutions in the West Bank. This effort, and others that followed, reflected Israel's increasing realization that Hamas' social network of institutions and programs was a significant contributor to Hamas' ability to execute terrorist operations. Israel believed the targeted institutions were providing employment and cover for Hamas operatives, in addition to creating an environment through its schools, clinics and worship centers that praised terrorist activities, facilitated

recruitment, and significantly perpetuated the violent confrontation.  The government

intends to use material taken from those operations in its case-in-chief as proof of the true

nature, character, and affiliation of the organizations.

Hamas used its leadership role in the Second Intifada and the loyalty it gained

through its provision of social services to catapult itself into Parliamentary control.  Hamas

is now the governing body of the PA.  While Hamas' suicide bombings and other violent

engagement with Israel are paramount in the public awareness, it is its social infrastructure

that Hamas credits with its rise to power.

### E.  The Hamas International Fundraising Network

Neither the HLF nor the U.S.-based Palestinian Committee worked in isolation on

behalf of Hamas.  HLF was a vital member of Hamas' international network of

organizations dedicated to financing the Hamas agenda, and worked in conjunction with

organizations in Europe and throughout the world to funnel money to the same closed

network of Hamas-controlled charity committees in the West Bank and Gaza.  These other

organizations -- including The Palestinian Relief and Development Fund (Interpal) in

Great Britain, the Al-Aqsa Foundation in Germany, Belgium and Holland, the Comite' de

Bienfaisance et de Secours aux Palestiniens (CBSP), in France, the Association de Secours

Palestinien (ASP) in Switzerland; the Palestinian Association in Austria (PVOE); and the

Palestinian Branch of the World Organization of Muslim Youth (WAMY) -- operated in

much the same way as HLF, sharing fundraising techniques, projects, close connections to

Hamas leaders, and close connections to each other.  Interpal, Al-Aqsa, CBSP, ASP and

PVOE  are all designated as terrorist organizations in the United States.

### III.  CHARGES AND ELEMENTS

The following chart shows the charges contained within the superseding indictment

and which defendants are named in which counts:

| DEF. | CT. | CHARGE |
|------|-----|--------|
| All | 1 | Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) |
| All | 2 - 12 | Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 |
| All | 13 | Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 |
| All | 14 - 25 | Providing Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 and 18 U.S.C. § 2 |
| All | 26 | Conspiracy to commit money laundering, 18 U.S.C. § 1956(h) |
| All | 27 - 38 | Money laundering, 18 U.S.C. § 1956(a)(2)(A) |
| Baker, Elashi | 39 | Conspiracy to impede and impair the Internal Revenue Service and to File False Return of Organization Exempt from Income Tax, 18 U.S.C. § 371 |
| Baker, Elashi | 40 - 42 | Filing false returns of Organization Exempt from Income Tax, 26 U.S.C. § 7206(1) |

The following chart shows the elements for each offense named in the superseding

indictment:

| CT. | CHARGE | ELEMENTS |
|---|---|---|
| 1 | Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) | <u>First</u>, that two or more persons agreed to provide material support or resources to a foreign terrorist organization; <br> <u>Second</u>, that the defendant knowingly became a member of the conspiracy with the intent to further its unlawful purpose; <br> <u>Third</u>, that the charged conspiracy existed on or after October 8, 1997, the date on which Hamas was designated a foreign terrorist designation, and that the defendant was a member of the conspiracy on or after that date. |
| 2 - 12 | Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 | <u>First</u>, that the defendant in question provided material support or resources to a foreign terrorist organization; <br> <u>Second</u>, that the defendant in question did so knowingly; and <br> <u>Third</u>, that this court has jurisdiction over the offense. |
| 13 | Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 | <u>First</u>: that two or more persons agreed to provide funds, goods or services to a Specially Designated Terrorist; <br> <u>Second</u>: that the defendant knew the purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and <br> <u>Third</u>: that one of the conspirators during the existence of the conspiracy knowingly committed at least one overt act in order to accomplish some object or purpose of the conspiracy. |

| 14 - 25 | Providing Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 and 18 U.S.C. § 2 | First: that the defendant himself or, by aiding and abetting another defendant or by being aided or abetted by another defendant, contributed funds, goods, or services to, or for the benefit of a Specially Designated Terrorist; Second: that such funds, goods or services were in the United States, or thereafter came within the United States, or thereafter came within the possession or control of United States persons; Third: that the defendant did so knowingly and willfully. |
| --- | --- | --- |
| 26 | Conspiracy to commit money laundering, 18 U.S.C. § 1956(h) | First: that two or more persons agreed to accomplish a common and unlawful plan to violate 18 U.S.C. Section 1956, as charged in the indictment; and Second, that the Defendant, knowing the unlawful purpose of the plan, willfully joined in it; |
| 27 - 38 | Money laundering, 18 U.S.C. § 1956(a)(2)(A) | First: that the Defendant knowingly transported transmitted, or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States or attempted to do so; and Second: that the Defendant engaged in the attempted transportation, transmission or transfer with the intent to promote the carrying on of "specified unlawful activity." |
| 39 | Conspiracy to impede and impair the Internal Revenue Service and to File False Return of Organization Exempt from Income Tax, 18 U.S.C. § 371 | First: two or more persons agreed to commit an offense against the United States or to defraud the United States; Second: the defendant's knowing and voluntary participation in the conspiracy; and Third: the commission of an overt act in furtherance of the conspiracy. |

| 40 - 42 | Filing false returns of Organization Exempt from Income Tax, 26 U.S.C. § 7206(1) | First: That the defendant signed an income tax return that contained a written declaration that it was made under penalties of perjury; Second: That in this return the defendant falsely stated that the payments shown were going to Program Services when in the fact the payments were going to Hamas; Third: That the defendant knew the statement was false; Fourth: That the false statement was material; and Fifth: That the defendant made the statement willfully, that is, with intent to violate a known legal duty. |
|---|---|---|

## IV.  EVIDENTIARY ISSUES

**A.      Expert Testimony**

**1.  The Government's Experts**

As the government's summary of the case reveals, this case presents unusual facts and is unlikely to be within the common experience or knowledge of an average juror. The jury must be educated about the nature and evolution of the key events and players that make up the context within which the evidence in this case can be understood, measured and judged.  Likewise, the jury must understand the structure and design of the Hamas movement and its employment of ostensibly charitable acts and institutions as the sustenance of the terrorist organization.  Lastly, the jury must understand the international closed community, and the defendant HLF's role within it, structured to provide financial

relief to the network of committees, organizations and programs dedicated to sustaining and advancing Hamas' agenda.

As noted in the government's expert notices and the response to the defendants' motion for extension of time to file expert reports (ecf # 412), Dr. Matthew Levitt will testify about the history and evolution of the Hamas organization, its structure, central cast, and the goals and objectives of the organization.  He will testify about the relationship between Hamas' military and social components, and the role of its "political" leadership in Damascus, Syria.  He will also describe the geography of the case and the American relevance to the Hamas movement.

Colonel Jonathan "Yoni" Fighel will testify that certain zakat committees in the West Bank and Gaza served as the physical manifestation of Hamas' social concept and the machinery behind its efforts to indoctrinate the Palestinian population and create a society beholden to its movement.  Colonel Fighel will testify that the social wing of Hamas is its most critical component; serving as the heart and mind of the organization. Colonel Fighel's testimony is critical to the jury's understanding of the internal structure, make-up and nature of the committees, in addition to the counterintuitive notion that "charitable" committees and ostensibly benevolent organizations could be so integral and important to a terrorist organization.

The ISA witness, who has studied in depth the international Hamas social infrastructure, will testify about Hamas' world-wide support structure, which the witness

will describe as a closed community of institutions and organizations dedicated to supporting Hamas.  The witness will further describe the relationship between this closed community of zakat committees and the international closed community, and how that relationship defines their activities.  As part of his testimony the witness will describe the characteristics common to the international network of funds supporting Hamas, including the use of "overseas speakers" and the support for martyrs and prisoners.   The witness will identify specific overseas speakers enlisted by the defendant HLF to raise funds, and their relationship to Hamas and other terrorist organizations, as well as identify particular individuals whose families were supported by the HLF.

## 2.  Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence allows the testimony of an expert witness when their technical, scientific or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue.  The expert's testimony must be based upon sufficient facts or data and be the product of reliable application of reliable principles and methods.  Fed. R. Evid. 702.  The determination of whether these factors are met, and whether the witness is properly qualified to express the opinion, belongs to the Court.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  Although *Daubert* sets forth specific factors to consider when judging the fitness of an expert, the Supreme Court noted that the factors were not exclusive nor dispositive of the expert question.  The District Court is the gatekeeper of expert testimony and may

exercise informed discretion regarding factually unique expert testimony and whether that testimony, delivered by a properly qualified expert, is helpful and instructive to a jury.  *See generally Kumho Tire Co. V. Carmichael*, 119 S.Ct. 1167 (1999).  The Court's determination in this regard will only be reversed for an abuse of discretion.  *See Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F. 3d 360, 366 (5th Cir. 2006);  *Watkins v. Telsmith, Inc.*, 121 F. 3d 984, 988 (5th Cir. 1997)("District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous.") (internal citations and quotations omitted).

Rule 703 of the Federal Rules of Evidence codified the commonly accepted principle that an expert's opinion may be based on otherwise inadmissible material, so long as it is of the type reasonably relied upon by other experts in the field.  *See United States v. Williams*, 447 F.2d 1285, 1290-91 (5th Cir. 1971) (*en banc*), *cert. denied*, 405 U.S. 954 (1972).  The proposed government experts will be available for cross-examination on their opinions and the bases of those opinions.  Additionally, the defense has announced its intention of calling experts presumably offered to challenge the conclusion of the government's experts.  Assuming the Court accepts the witnesses' qualifications and proposed testimony under the applicable rules, the competing testimony is a proper part of the adversarial process, entrusting the jury to assign weight and credibility to each witness.

In addition, the government will present videos, posters and pictures through the testimony of its expert witnesses to assist the jury in evaluating their testimony. These are items that the experts have reasonably relied upon to reach their opinions and which will aid the jury in understanding their testimony. Although the government will seek to admit into evidence many of the same items through the witnesses from the Government of Israel, pursuant to Fed. R. Evid. 703, the Court should find that the probative value of these items in assisting the jury to evaluate the experts' opinions substantially outweighs any prejudicial effect. *See* Fed. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."); *United States v. Gonzalez*, 307 F.3d 906 (9th Cir. 2002).

Lastly, Rule 704 of the Federal Rules of Evidence formally dismisses the retired notion that an expert may not opine on an ultimate issue to be decided by the jury. This historic principle was based on the idea that the expert should not usurp the province of the jury. The notes to Rule 704 aptly state that such a rule was unduly restrictive and deprived the trier of fact of useful information. Fed. R. Evid. 704 (Committee Notes*)*.

The facts and nature of this case are complex and requiring of special and unique context for reliable and informed determinations. The jury cannot possibly, on its own, sort through the facts of this case without expert guidance and instruction on the myriad of

issues set out in the summary of the case.  It is ultimately up to the jury to decide whether the defendants knowingly provided material support to Hamas, but without the benefit of expert testimony, the jury will be unable to arrive at a point where they can make an educated and responsible decision.

**B.      Co-Conspirator Statements**

**1.      General Principles of Conspiracy Law**

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is offered against a party" and "is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  Fed.R.Evid. 801(d)(2)(E).

The admission of a coconspirator statement against a defendant is proper where the government establishes, by a preponderance of the evidence; (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy."  *United States v. Ruiz*, 987 F.2d 243, 247 (5th Cir. 1993) (citation omitted*).*

The trial court's decision to admit a statement as a coconspirator's statement is reviewed by the appellate court under the abuse of discretion standard.  *United States v. Manzella*, 782 F.2d 533, 544-46 (5th Cir. 1986).  All findings of fact made by the trial court in its determination regarding the coconspirator exception are to be accepted by the appellate court unless clearly erroneous.

In determining the admissibility of a coconspirator's statement, the court may consider the coconspirator's statement itself to decide whether a conspiracy existed and whether the defendant participated in it. *United States v. Broussard*, 80 F.3d 1025, 1038 (5th Cir. 1996) *citing Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

In rejecting a *per se* rule against considering these statements when ruling on their admissibility, the Supreme Court has reasoned that presumptively unreliable hearsay may become probative if the statements are considered in light of other evidence in the case.

Chief Justice Rehnquist, writing for the Court in *Bourjaily*, explained:

> First, out-of-court statements are only *presumed* unreliable. The presumption may be rebutted by appropriate proof . . .. Second, individual pieces of evidence, insufficient in themselves to prove a point, may in accumulation prove it . . .. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary fact-finding is not therefore required. Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case. Courts often act as fact-finders, and there is no reason to believe that courts are any less able to properly recognize the probative value of evidence in this particular area.

107 S.Ct. at 2781 (emphasis in original).   As the italicized segment of the above excerpt demonstrates, the heart of the Chief Justice's reasoning is that while out-of-court statements are only *presumed* unreliable, they may nevertheless become quite probative when corroborated by *other evidence, id.* at 2781, and therefore may be considered along with the other evidence in ruling on the admissibility of the hearsay statement.

Some of the documents that the government intends to offer into evidence will not always identify the speaker or author of a document.  The lack of such information does not prevent the admission of such evidence.

There will be instances during the trial when the government will seek to introduce evidence as the acts or statements of a coconspirator or joint venturer, which acts were committed, or statements made, prior to the time that one of the defendants has been shown to be a member of a conspiracy or joint venture.  The government submits that such acts or statements will become admissible against any defendant who is shown to have joined the conspiracy or joint venture in question at a later time.  The rationale behind the admissibility of such evidence against a defendant is the well-established rule that one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators made after the formation and in furtherance of the conspiracy.  *United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir. 1992).

In addition to establishing the existence of the conspiracy and the defendant's and co-conspirator's membership in the conspiracy, Fed. R. Evid. 801(d)(2)(E) also requires that a statement be made in furtherance of the conspiracy.  *United States v. Solis*, 299 F.3d 420, 443 (5th Cir.) *cert. denied*, 537 U.S. 1060, 123 S.Ct. 640, 154 L.Ed.2d 543 *and cert denied*, 537 U.S. 1094, 123 S.Ct. 705, 154 L.Ed.2d 642 (2002).  A trial court's finding that a statement was made in furtherance of a conspiracy is a factual finding, which may be

reversed only if clearly erroneous. *United States v. Green*, 180 F.3d 216, 222 (5th Cir. 1999).

A statement is not in furtherance of a conspiracy unless it advances the ultimate objects of the conspiracy. *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999) (internal citation omitted). "Mere idle chatter" is not admissible under Rule 801(d)(2)(E). *Id*. The courts have consistently held, however, that the "in furtherance" requirement is not to be construed too strictly; otherwise, the purpose of the exception would be defeated. *United States v. Burton*, 126 F.3d 666, 674 (5th Cir. 1997). Accordingly, the following types of statements have been found to be "in furtherance of" a conspiracy:

a statement that identifies the role of one co-conspirator to another (*United States v. Magee,* 821 F.2d 234, 244 (5th Cir.1987)); statements conveying information that could have been intended to affect future dealings between the parties (*United States v. Patton,* 594 F.2d 444, 447 (5th Cir.1979)); puffing, boasts, and other conversation when used by the declarant to obtain the confidence of one involved in the conspiracy ( *[United States v.] Miller,* 664 F.2d [94,] 98 [ (5th Cir.1981) ] ); statements which are puffing or boasts, but which are used to obtain the confidence of the person toward whom the statement is directed (*United States v. Johnson,* 872 F.2d 612, 623 (5th Cir.1989)).*Burton,* 126 F.3d at 675 (internal quotation marks, brackets, and ellipses omitted). *See also United States v. Flores*, 63 F.3d at 1377 (statements made

to inform conspirators of progress of conspiracy or made "in order to encourage loyalty and obedience among the conspirators" are in furtherance of the conspiracy).

### 2.    Breadth of Conspiracy

As explained in the summary of the case, the focal point of this case is the designated terrorist group Hamas, also known as the Islamic Resistance Movement or sometimes simply referred to by its followers as "the Movement."  Although the indictment in this case charges the seven named individual defendants and the Holy Land Foundation for Relief and Development, it will be obvious that the defendants were not acting alone.  As noted in the case summary, the defendants were operating in concert with a host of individuals and organizations dedicated to sustaining and furthering the Hamas movement.  Several of the individuals who hold leading roles in the operation of Hamas are referenced by name in the indictment.  A list of unindicted coconspirators is attached to this trial brief.  (Attachment A).

The object of the conspiracy was to support Hamas.  The support will be shown to have taken several forms, including raising money, propaganda, proselytizing, recruiting, as well as many other type of actions intended to continue to promote and move forward Hamas's agenda of the destruction of the State of Israel and establishment of an Islamic state in its place.

In terms of the organizations comprising the conspiracy, the following non-inclusive collection of organizations are within the conspiracy:   The International Muslim

Brotherhood (the parent organization of Hamas); Hamas and its international support network; the United States-based Muslim Brotherhood and its sub-group the Palestinian Committee); organizations established by the Palestinian Committee, such as the defendant Holy Land Foundation (HLF), the Islamic Association for Palestine (IAP), and the United Association for Studies and Research (UASR), as well as other organizations. *See* Superceding Indictment, pp. 6-7. Each of the above organizations, as well as its members, representatives and supporters were participants in the same joint venture or conspiracy -- the conspiracy to support Hamas.

While the breadth of the conspiracy is no doubt large, it is finite and definable. Hamas is, as defined, an illegal organization under the laws of the United States, and due to its physical location, size and significance, has a broad domestic and international network of individuals and organizations working together to support its operation.

### 3. Co-conspirator statements made after the latest date in the indictment.

The dates of the actions alleged in the indictment are not controlling for determining the duration of a conspiracy. The indictment, in fact, alleges that the conspiracy at issue continued until the date of the return of the indictment. The Supreme Court addressed the issue of the duration of a conspiracy in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957). The Court stated, "[T]he crucial question . . . is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may

properly be regarded as in furtherance of the conspiracy.  *Id*. at 970.  "Even a unilateral act

by a single coconspirator, if in furtherance of the purposes of the agreement, is sufficient

under the terms of § 371" to extend the duration of the conspiracy.  *United States v.

Girard*, 744 F.2d 1170, 1174 (5th Cir. 1984) (citations omitted).

>    4.    **Documents and Materials Seized During the Search of the Home
>          of Ismael Elbarasse, 4502 Whistler Court, Annandale, Va., on
>          August 21, 2004**

On August 21, 2004, agents of the FBI executed a search warrant at 4502 Whistler

Ct., Annandale, Virginia, the residence of Ismail Elbarasse.  Elbarasse was an associate

and joint bank account holder of unindicted co-conspirator Mousa Abu Marzook.  The

government intends to offer into evidence selected documents and other items seized

during the above search, such as audio and video tapes.  The audio cassette tapes contain

the recorded statements of co-conspirators to the defendants in this case.

The government intends to offer evidence of documents and items seized during the

search that were created prior to January 25, 1995, the date that Hamas was first

designated as a terrorist organization.  As to those documents or items, Rule 801(d)(2)(E)

authorizes the admission of statements of persons who were members of a joint venture as

well as a criminal conspiracy.

Case law makes clear that a "conspiracy" under FRE 801(d)(2)(E) includes any

joint venture, including lawful ones.  The government expects to introduce into evidence

statements made by persons who, along with the defendants, were participants in a joint

venture to support before and after its designations. Regardless of whether the actions of these individuals were legal prior to 1995, the statements made by other members of the joint venture – the support of Hamas – are admissible against the defendants if it is shown that the defendants were also members of the joint venture at the time the statements were made.

In *United States v. Saimiento-Rozo*, 676 F.2d 146, 149-150 (5th Cir. 1982), the Fifth Circuit addressed this specific issue, stating that, "it is not necessary that the conspiracy upon which the admissibility of [the] statements is predicated be the conspiracy charged. * * * Nor need the conspiracy or agreement be criminal in nature; it may be in the form of a joint venture". *Saimiento-Rozo*, 676 F.2d at 149-50 (internal citations omitted.) .

In *United States v. Postal*, 589 F.2d 862, 886 (5th Cir. 1979), cert. denied 444 U.S. 832, 100 S.Ct. 61, 61 L.Ed.2d 40 (1979), the trial court had admitted a logbook found on a ship which was boarded by the U.S. Coast Guard and found to be carrying a load of marijuana. On appeal, the court of appeals upheld the admission of the logbook as containing entries that were the declarations of a co-conspirator. The defendants argued that, unless and until they reached U.S. territorial waters, there could be no conspiracy because no U.S. laws were broken. The court pointed out that it did not matter whether the charged conspiracy existed before admitting the logbook. The court stated that it was not even necessary that the conspiracy upon which the admissibility of the statement is predicated be the conspiracy charged in the indictment. Nor did the agreement need to be

criminal in nature.  In discussing the legislative history of Rule 801(d)(2)(E), the court

quoted the committee's statement that "the rule was meant to carry forward the universally

accepted doctrine that a joint venturer is considered a coconspirator for the purposes of

this rule even though no conspiracy has been charged."  *Id*.

        In *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979), the Seventh Circuit

pointed out that what must be proved to invoke the hearsay exception and what must be

proved to convict a person of the crime of conspiracy are entirely different.  The court

stated: "The co-conspirator exception to the hearsay rule . . . is merely a rule of evidence

founded, to some extent, on concepts of agency law.  It may be applied in both civil and

criminal cases . . .  Its rationale is the common sense appreciation that a person who has

authorized another to speak or to act to some joint end will be held responsible for what is

later said or done by his agent, whether in his presence or not.  *Id*; *see also United States v.*

*Layton,* 855 F.2d 1388 (9th Cir.1988), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103

L.Ed.2d 244 (1989).  In *Layton*, the court held that "statements made by a party to a

agreement were admissible under Rule 801(d)(2)(E), notwithstanding the fact the venture

could not be prosecuted as a criminal conspiracy because it had a lawful objective."  *Id,*

489 U.S. at 1400.

**C.     Proving Overt Acts and Intent with Evidence Not Identified in
         Indictment**

        As set forth in the chart above, the defendants have been charged with a total of 42

counts, including three conspiracies and 39 substantive counts which flow from the

respective conspiracies - all centering around the financial support provided by the defendants to Hamas.  Each conspiracy lists multiple financial transactions as overt acts conducted in furtherance of the conspiracy and each substantive count consists of a financial transaction.  The indictment, of course, only lists a sampling of the financial transactions between the defendants and Hamas.  The government will present evidence of a much larger number of financial transactions, primarily to the same entities listed in the indictment, but possibly some additional ones which the defendants have been notified of through the government's expert witness reports.

It is a long established rule in this and other circuits that the government can prove overt acts not listed in the indictment.  "We have held that the government is not limited to overt acts pleaded in proving a conspiracy.  It may show other acts of the conspirators occurring during the life of the conspiracy."  *United States v. Perez*, 489 F.2d 51, 70 (5th Cir. 1973); *United States v. Elliott,* 571 F.2d 880, 911 (5th Cir. 1978); *Reese v. United States*, 353 F.2d 732, 734 (5th Cir. 1965); *United States v. Ayres*, 434 F.2d 60, 62 (5th Cir. 1971); *United States v. Quesada*, 512 F.2d 1043,1046 (5th Cir. 1975); *United States v. Carlock*, 806 F.2d 535, 550 (5th Cir. 1986); *United States v. Frank,* 156 F.3d 332, 337-38 (2nd Cir. 1998); and *United States v. Salmonese*, 352 F.2d 608, 619 (2nd Cir. 2003) ("Thus, as long as defendant is given notice of the core of criminality to be proven at trial, this court has afforded the prosecution significant flexibility to prove the conspiracy's operation through both unalleged and alleged overt acts.").

### D.     Lay Person Opinion

The government anticipates asking some witnesses their opinion on individuals or entities located in the West Bank and Gaza, and the relationship of those individuals or entities to Hamas.  The individuals or entities are those with which the defendants had a relationship, including financial, through the defendant Holy Land Foundation.  The testimony will address one of the primary issues at trial, which will be whether the recipients of the HLF's funds were affiliated with Hamas.  The witnesses' answers will be based upon their life experiences, first hand observations and interactions with the specific entity or individual, and will be helpful to the jury in resolving the issue.  The opinion testimony of a lay person based upon this foundation is perfectly proper.

Rule 701 of the Federal Rules of Evidence states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

"Rule 701 of the Federal Rules of Evidence permits a lay witness to offer an opinion or inference that is rationally based on the witness's perceptions and that is helpful to the development of the evidence at trial.  The rule is a sensible elaboration of Rule 602, which requires that a lay witness's testimony be based on personal knowledge.  All knowledge is inferential, and the combined effects of Rules 602 and 702 is to recognize

this epistemological verity but at the same time to prevent the piling of inferences upon inference to the point where the testimony ceases to be reliable." *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990).

Rule 602 of the Federal Rules of Evidence states:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

"We have long recognized that a trial court has some latitude in permitting a witness on direct examination to testify as to his conclusions, based on common knowledge or experience." *United States v. Luna*, 264 F.3d 1142, XX (5th Cir. 2001) (not selected for publication); *United States v. Mandujano*, 499 F.2d 370, 379 (5th Cir. 1974). "While the ordinary rule confines the testimony of a lay witness to concrete facts within his knowledge or observation, the court may rightly exercise a certain amount of latitude in permitting a witness to state his conclusions based upon common knowledge or experience." *United States v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003) citing *United States v. Oliver* , 908 F.2d 260, 264 (8th Cir. 1990).

It is further expected that witnesses may also offer their interpretation of conversations they personally participated in with high ranking members of Hamas. The conversations centered around providing financial support to Hamas and the HLF's role as a licensed organization in the United States set up to provide such support. The witness will be able to testify about statements he made and what he meant, and responding

statements by the other participant in the conversation and his opinion as to the meaning

behind those statements.  "Where a witness' testimony is based upon his perceptions of the

conversation...the accuracy of those perceptions is a question for the jury.  A witness may

clarify conversations that are abbreviated, composed with unfinished sentences and

punctuated with ambiguous references to events that were clear only to the defendant and

the witness." *United States v. Awan*, 966 F.2d 1415, 1430 (11th Cir. 1992)(citations

omitted).  "A witness may also testify about his subjective interpretation of a conversation

in which he was participating as long as his opinion is rationally based on his perception

and is helpful either to an understanding of his testimony or to the determination of a fact

in issue." *United States v. Lizardo*, 445 F.3d 73, 83 (1st Cir. 2006) (citations omitted).

### E.    Admissibility of Records

#### 1.    Domestic Records of Regularly Conducted Activity Without the Need for a Live Witness

The government will offer into evidence records from multiple bank accounts

obtained from a number of domestic banks, as well as phone records, American Express

records of the HLF, and hotel records from Marriott Courtyard in Philadelphia, PA.  The

government will seek admission of the records based upon a certification of a proper

officer from each business pursuant to Rule 902(11) of the Federal Rules of Evidence.

The certification will be used to authenticate the records as well as meet the criteria for the

business records exception of Rule 803(6) of the Federal Rules of Evidence.  This

alleviates the need to call a live witness to testify at trial, thus speeding up the trial and saving the court, the jury and the parties valuable time.

As the Seventh Circuit recently stated in *United States v. Ellis*, 460  F.3d 920 (7th Cir. 2006), in addressing whether business certifications are testimonial, and therefore inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004), "we do not find controlling the fact that a certification of authenticity under 902(11) is made in anticipation of litigation.  What is compelling is that *Crawford* expressly identified business records as nontestimonial evidence.  Given the records themselves do not fall within the constitutional guarantee provided by the Confrontation Clause, it would be odd to hold that the foundational evidence authenticating the records do."  *Ellis*, 460  F.3d at 926-27.

The bank records will be used to establish the financial payments between the defendant HLF and the zakat committees, and other organizations and individuals that the government alleges are affiliated with Hamas.  It is through these payments that the government will establish the foundation for the financial support provided by the HLF to Hamas.

The phone records will be used to establish telephonic contact between the defendants and other co-conspirators, including former and current leaders of Hamas.

The hotel records and the American Express records will aid in establishing the defendants' presence at the "Philadelphia Conference," the 1993 meeting discussed in the

government's summary of the case.  The American Express records will also prove travel payments made by the HLF on behalf of "overseas speakers" - Hamas members and other radical speakers who were brought to the United States to raise funds for the HLF.

## 2.      Foreign Bank Records Without a Live Witness

The government will offer into evidence records from up to seventy-two bank accounts from twelve banks, spanning seven different countries.

The records were obtained from the foreign banks through either: a Mutual Legal Assistance Treaty request; a Bank of Nova Scotia grand jury subpoena; an administrative subpoena issued pursuant to 31 U.S.C. § 5318(k)(3) (commonly referred to as a Patriot Act subpoena)[2]; and a request and voluntary compliance by the bank.

18 U.S.C. § 3505(a)(1) provides that, in a criminal proceeding, a foreign record of regularly conducted activity shall not be excluded as evidence by the hearsay rule if a certification is attached which comports to the requirements of the business records

---

[2]   A Bank of Nova Scotia grand jury subpoena is issued to a foreign bank that has a branch in the United States.  *In re Grand Jury Proceedings the Bank of Nova Scotia*, 740 F.2d 817 (11th Cir. 1984). The subpoena is served upon the branch or a bank representative and requires the bank to obtain records from other bank branches located outside the United States.  A Patriot Act subpoena is not a grand jury subpoena but is an administrative subpoena authorized by the Attorney General or the Secretary of the Treasury.  It is designed to be used in situations where the foreign bank does not have a branch in the United States but instead has a correspondent account.  Correspondent accounts are bank accounts held under the foreign bank's name at a United States bank that allow the foreign bank to avail itself of the United States banking system.  As with a Bank of Nova Scotia subpoena, the Patriot Act subpoena requires the bank to obtain the records from whichever bank branch worldwide possesses them.

Bank of Nova Scotia and Patriot Act subpoenas are generally used in situations where the United States does not have a treaty with the country, where the bank branch possessing the needed records is located abroad, or where the government has exhausted all other avenues to obtain the records from that country.  In this case, the government used these tools (or the possibility of these tools) to obtain bank records from the West Bank, Gaza and Lebanon.

exception of the hearsay rule.  § 3505(a)(2) states that the certification shall also serve to authenticate the documents.  § 3505(b) requires the party intending to offer the foreign documents to serve notice upon the opposing party.  If the opposing party wishes to object to the admissibility of the documents, they must do so by motion prior to the trial.  Failure to object via motion prior to trial, constitutes wavier of the objection (although the court can grant relief of the waiver for good cause shown).

On December 5, 2005, the government filed a § 3505 notice with the Court and defense counsel, which set forth the government's intent to offer into evidence records of regularly conducted activity of the aforementioned foreign bank accounts.  The notice went on to list out the country, the bank, the account holder and the account number. Although many of the records were obtained through a compulsory process, the government was able to obtain the proper certifications from all but one of the banks.   The certifications were provided to the defense on October 17, 2006, after they were compiled by the government.  To date, the defendants have not objected to the admissibility of the foreign bank records described in the § 3505 notice.

Similar to the domestic bank records, the government intends to offer the documents into evidence through the § 3505 notice and the foreign certifications.  In an extensive analysis of § 3505, the Fifth Circuit in *United States v. Garcia Abrego*, 141 F.3d 142, 176-80 (5th Cir. 1998), found that § 3505 was intended not to add any roadblocks to the admission of foreign bank records, but to streamline their admissibility.  In short, the

appellate court found that, "to the extent § 3505 largely mirrors the business records exception, we are confident that records admissible under the statute are at least as reliable as evidence admitted under a firmly rooted hearsay exception." *Id*. at 17.

As with the domestic records of regularly conducted activity, the foreign bank records do not violate *Crawford*. *See United States v. Hagege*, 437 F.3d 943, 957-58 (9th Cir. 2006) ("We conclude therefrom that foreign business records admitted under § 3505 are not subject to the *Crawford* requirement of confrontation."); *United States v. Jawara*, 474 F.3d 565, 584 (9th Cir. 2007).

As with the domestic bank records, the foreign bank records will establish payments made by the HLF to the various zakat committees named in the indictment, as well as to HLF accounts held overseas.  With regard to the committee accounts, some of the bank records show the committees' distribution of the funds to Hamas activists. Additionally, the opening account documentation identifies some of the representatives of the committees. This will relate to the testimony of the government's expert witness who will identify particular committee members as Hamas.

### 3.      Foreign Criminal Convictions

In order to effectively establish the allegation that the defendants provided material support to Hamas, the government must naturally prove that the recipients of HLF's

money, either the zakat committees or others, were part of Hamas.  The government will prove this through several means.  One such way will be to show that members of the zakat committees have been convicted in Israeli military courts for being members of Hamas.  This evidence will be brought out through the testimony of Jonathan Fighel, the government's expert, and through the admission of certified criminal records of some of the committee members, and in some instances a certified copy of the indictment.

The indictments and criminal histories are admissible as public records pursuant to Fed. R. Evid. 803(8) (Public Documents), *United States v. Cantu*, 167 F.3d 198 (5th Cir. 1999); and 902(3) (Self-Authenticating foreign public document), *United States v. Perlmuter*, 693 F.2d 1290, 1293 (9th Cir. 1982)(criminal records of defendant held by Israeli National Police would have been admitted if government had filed the proper certification under 803(8) and 902(3)).

### 4.    Certified Domestic Public Documents

The government anticipates offering into evidence certified copies of Internal Revenue Service records, including tax returns of the HLF, a form 1023 application to obtain tax exempt status and an Internal Revenue Service determination letter to the HLF granting their tax exempt status request.  These documents pertain to counts 38 through 42.  The government will also offer into evidence certified records from immigration files of the defendants and others, which will prove family relationships between the defendants

and other Hamas members.  Such records are self-authenticating and admissible pursuant to Fed. R. Evid., Rules 902(4) and 803(6).

### 5.      Electronic Intercepts Captured Pursuant to FISA

The government anticipates offering into evidence telephonic calls and documents sent by facsimile, involving the defendants and each other or third parties, that were intercepted by the government pursuant to legally authorized Foreign Intelligence Surveillance Court ("FISC") orders.  The intercepted calls and faxes came from the phone lines or fax lines of the defendants Holy Land Foundation, Shukri Abu Baker, Mohammed El-Mezain, Mufid Abdulqader and co-conspirators Abdelrahem Ashqar and Muin Shabib. The government will present two witnesses to authenticate the FISA-derived evidence.

The general procedure for FISA collection is as follows:  At the time of collection, an FBI agent ensures that the intercepts are coming from the phone or fax lines targeted by the FISC's orders.  After a call or fax is intercepted, a language specialist reviews the collection to determine whether it is pertinent to the intelligence investigation at issue.  If so, the language specialist creates an English summary.  In this case, the intercepted calls and faxes were recorded, initially on reel-to-reel tapes, and then on computerized disks. For purposes of trial, the calls and faxes were downloaded from the reel-to-reel tapes and computerized disks, onto individual computer disks, one per call.  On the majority of the reel-to-reel and computerized disks, the phone numbers, date and time of the intercept is recorded in addition to the content of the call or fax.

In order to authenticate the recordings, "the Government must demonstrate: 1) the operator's competency; 2) the fidelity of the recording equipment, 3) the absence of material alterations; and 4) the identification of relevant sounds or voices." *United States v. Green*, 324 F. 3d 375, 379 (5th Cir. 2003), *citing United States v. Biggins*, 551 F. 2d 64, 66 (5th Cir. 1977). "Although compliance with the *Biggins* requirements is the preferred method of proceeding, strict compliance is not required." *United States v. Buchanan*, 70 F.3d 818, 827 (5th Cir. 1996). In *Green*, the government presented the testimony of the case agent and an expert witness. Although the case agent was unaware of the specific workings of the equipment and the operator's competency, he was aware of the reliability of the intercepted calls through his familiarity with the defendant's voice and the corroboration of the defendant's conversations with his actions. The Fifth Circuit found this to be sufficient to authenticate the recordings. The Court held that "the party seeking to establish authenticity need not meet all the factors set out in *Biggins* if, upon independent examination, the district court is convinced that the recording accurately reproduces the auditory experience." *Id.*, citing *United States v. Buchanan*, 70 F. 3d 818, 827 (5th Cir. 1995).

The government will offer the testimony of a FBI agent who is familiar with the retention and storage of FISA intercepts and who has personally overseen the gathering of all the relevant FISA reel-to-reels and computerized disks in Dallas. The agent has been personally involved in creating the individual disks of the calls from the original media,

and has reviewed the source phone number of the calls to ensure that they came from the proper phone lines that were authorized to be intercepted by the FISC.

In addition to the technical agent, the government will also present the testimony of a language specialist who through his years of reviewing and translating a large number of the intercepted communications obtained through the HLF, Shukri Abu Baker and Mufid Abdulqader, has become familiar with the defendants, the co-conspirators and their voices. The language specialist has reviewed all of the intercepted FISA calls the government anticipates offering into evidence and has been able to identify the voices of the defendants as well as other co-conspirators. The testimony of the technical agent and the language specialist are sufficient to authenticate the recordings and allow for their admission into evidence.

### 6.    Documents Admissible Pursuant To Rule 807 of the Fed. R. Evid.

Rule 807 states[3]:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a

---

[3] Rule 807 was formerly codified as Rule 803(24) and 804(b)(5).  The same requirements for admitting evidence apply to Rule 807 as previously applied to Rule 803(24) and 804(b)(5).  *United States v. Ochoa*, 229 F. 3d 631, 638 (7th Cir. 2000).

fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

In order for evidence to be admitted pursuant to Rule 803(24) - now Rule 807, five conditions must be met.  These are:

(1) The proponent of the evidence must give the adverse party the notice specified in the rule.

(2) The statement must have circumstantial guarantees of trustworthiness equivalent to the 23 specified exceptions listed in Rule 803.

(3) The statement must be offered as evidence of a material fact.

(4) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts.

(5) The general purpose of the Federal Rules and the interests of justice must best be served by admission of the statement into evidence.

*United States v. Mathis*, 559 F.2d 294, 298 (5th Cir. 1977).

"To satisfy the dictates of the Confrontation Clause, the evidence must be sufficiently reliable, that is, it must be supported by a showing of particularized guarantees of trustworthiness.  These particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the making of the statement, but they cannot stem from other corroborating evidence."  *United States v. Ismoila*, 100 F.3d 380, 393 (5th Cir. 1997) (citations omitted).  "The lodestar of the residual hearsay exception analysis is

whether there exist equivalent circumstantial guarantees of trustworthiness." *United States v. Walker*, 410 F. 3d 754, 758 (5th Cir. 2005).

On April 9, 2007, the government provided the defendants with Notice Of Intent To Introduce Evidence Pursuant To Rule 807 Of The Federal Rules Of Evidence.  The notice identified two categories of documents that the government may seek admission of under this rule - foreign bank records from the Bank of Palestine and documents seized by the Government of Israel during military operations.

### (a) Foreign Bank Records from the Bank of Palestine

As discussed above, records from the Bank of Palestine were obtained through a Patriot Act subpoena, and no certification could be obtained from the current government, through, for example, a multi-lateral treaty process.  Ordinarily, certified foreign bank records are fully admissible. *See supra* at 38-39.  Because the United States Government does not have any diplomatic relationship with the Palestinian Authority, however, and because the current party that is in charge of the Palestinian Authority - Hamas - is the very terrorist organization that the defendants are accused of supporting, the prosecution has no way of obtaining the certifications that would normally accompany these types of documents if obtained via a treaty request.  Nor does the government have any means of securing a witness from the PA who can identify the documents and discuss the contents with first-hand knowledge.  It is this scenario that Rule 807 was designed to address. Because these documents contain "equivalent circumstantial guarantees of

trustworthiness," *United States v. Walker*, 410 F. 3d 754, 758 (5th Cir. 2005), they should be admitted into evidence under the residual hearsay exception.

### (b) Records Seized Through Israeli Military Operations

On several occasions during the past several years, the Israeli Defensive Forces ("IDF") conducted military operations in the West Bank.  In some of these operations, including "Operation Defensive Shield," (discussed above), the Israeli military entered into the offices of certain zakat committees, including those supported by the defendants, and seized documents demonstrating these committees' connections to Hamas[4].  During some of these operations, the IDF also entered the offices of the Palestinian Authority and seized official reports, memoranda and other documents of the PA.

The documents seized from the zakat committees include: videos of school and camp ceremonies during which the children act out violent acts in support of Hamas and praise Hamas suicide bombers; posters of Hamas suicide bombers; Hamas pamphlets and leaflets, as well as other inflammatory literature unlikely to be found in the offices of a neutral charity; lists of suicide bombers and martyrs; and other similar documents.  These items are not hearsay, as they are not being offered for the truth of their content, but instead to support the government's allegation that the particular committees are part of Hamas, and are not independent charitable organizations.  To the extent that there is any

---

[4]  Contrary to the defendants' repeated allegations, at no point did the IDF or any other component of the Israeli government, ever carry out a military or any other operation, at the request of the prosecution.

hearsay contained within the documents, the government would offer them into evidence under Rule 807 or as co-conspirator statements.

The documents seized from the offices of the Palestinian Authority ("PA") are being offered for the truth of their content and are hearsay.  This material includes: internal memoranda identifying the financial sources of Hamas, including the HLF; PA intelligence documents discussing how Hamas uses schools to recruit Palestinian youth; lists of Hamas institutions closed by the PA, including zakat committees supported by the defendants; and other similar documents.  The government will seek admission of these items into evidence under Rule 807.

The government will seek to present a witness from the IDF who will testify to the authenticity of the documents - ie., that the military went into particular locations, that they placed the records from each location into boxes marked with the location, in accordance with his instructions; and that the boxes were transported to a warehouse and kept under his supervision.  While some of the documents were signed out of the warehouse, the witness will testify that he retrieved those documents for purposes of the trial.  The testimony of the IDF witness regarding the circumstances in finding the documents, as well as a witness from the Israeli Security Agency ("ISA") who received some of the documents prior to their reaching the warehouse, in addition to the distinctive characteristics of the documents themselves, is sufficient to authenticate them.  *United States v. Dumeisi*, 424 F.3d 566, 574-76 (7th Cir. 2005); *United States v. Elkins*, 885 F.2d

775, 785-86 (11th Cir. 1989); *United States v. Arce*, 997 F. 2d 1123, 1128 (5th Cir. 1993)("The government may authenticate a document with circumstantial evidence...including the document's own distinctive characteristics and the circumstances surrounding its discovery.").

The documents are trustworthy because it was in the interest of Yassir Arafat and Fatah, who operated the PA at the time the PA documents were created, to accurately report the movements and activities of an organization that was trying to undermine their authority.  *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000)("In order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth when the statement was made.").  As discussed above, Hamas' agenda was not only to eliminate Israel, but also to sabotage the Oslo Accords and to replace the secular PA regime with an Islamist government that would control all of Israel, the West Bank and Gaza.

The materiality of the records is self-evident.  It will not be sufficient for the government to prove the defendants' own affiliation with Hamas; the government must also prove that they provided support to Hamas.  This is a complex task, as the committees that received the HLF's money were located outside the United States, and in a part of the world that is inhospitable to the United States Government.  To meet the government's burden, the government will present the testimony of experts who will testify that the

identified zakat committees are part of Hamas' infrastructure.[5]  In addition, however, the seized PA documents will demonstrate that the PA also understood that the zakat committees at issue were affiliated with Hamas.

Therefore, in order to corroborate the government's expert testimony, rebut the defendants' experts, and independently establish that the recipients of the HLF funds were part of Hamas with documents that the jury can see, read (with translations), feel and, in some cases, hear, the government will seek to admit the documents seized from certain zakat committees in the West Bank and Gaza, and from the PA.

Again, because the United States Government does not have any diplomatic relationship with the Palestinian Authority, and because the current party in charge of the Palestinian Authority is the very terrorist organization that the defendants are accused of supporting, the prosecution cannot obtain these records from another source, and cannot obtain any certification that would normally accompany these types of documents if obtained via a formal request.  Nor does the government have any way to secure a witness from the PA who can identify the documents and discuss the contents with first hand

---

[5]The government fully expects the defendants to attack the credibility of Israeli witnesses.  The defendants, through their Joint Reply to Government's Response to Defendants' Joint Motion For, and Memorandum in Support of, Discovery of USAID, Dept. of State and Dept. of Treasury Documents, Pursuant to Fed. R. Crim. P. 16, and accompanying declaration of John Boyd (ecf #548), have already stated that "[a] key substantive element of the defense in this case will entail showing the jury that the only persons who consider the committees were at any material time controlled by Hamas are the government's proposed experts in this case..." Declaration of John Boyd, page 2, paragraph 5.  The government's evidence, however, will amply rebut this erroneous contention.

knowledge.  In short, these documents fall squarely within the intent and spirit of Rule 807, and it is in the interest of justice that these items be admitted into evidence.

### F.  Admissibility of Charts and Summaries

#### 1.  Summary Charts - Fed. R. Evid. § 1006

As discussed above, the government anticipates introducing into evidence thousands of pages of bank records.  The records will reflect transactions from the HLF in Dallas to accounts of the HLF in the West Bank and Gaza, or to accounts of the Hamas-affiliated zakat committees.  In addition to the bank records themselves, internal records of the HLF seized by the government shed light on the purpose behind some of the transactions (for example, where a transfer to an HLF account in Gaza was to be earmarked for a particular project), as well as who at the HLF was involved in particular transactions.  Due to the large volume of material, the records cannot be conveniently examined in court and there is no way for the jury to be able to piece together the transactions on their own.  Therefore, in order to aid the jury, pursuant to Fed. R. Evid. 1006, the government will offer into evidence summary charts of the transactions through the testimony of an IRS revenue agent who created the charts and examined the underlying documentation.  The government will offer one chart per recipient.  Each chart will identify the transactions, including the date, amount, individuals involved, bank accounts, and all documents which support the transaction.  Pursuant to the requirements of Rule 1006, as well as the government's discovery obligations, the government has already

provided copies of all of the documents to the defendants during the course of discovery. For reasons discussed throughout this trial brief, the government will seek to admit the supporting documentation.

"Admission of evidence, including summaries and summary testimony, is reviewed for an abuse of discretion." *United States v. Harms*, 442 F.3d 367, 375 (5th Cir. 2006). The use of charts to summarize voluminous evidence that cannot be conveniently examined in court is a standard and accepted practice in this circuit. *United States v. Stephens*, 779 F.2d 232, 238-39 (5th Cir. 1985); *United States v. Winn*, 948 F.2d 145, 157-59 (5th Cir. 1991); *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001)("Summary charts in particular are admissible when (1) they are based on competent evidence already before the jury, (2) the primary evidence used to construct the charts is available to the other side for comparison so that the correctness of the summary may be tested, (3) the chart preparer is available for cross-examination, and (4) the jury is properly instructed concerning the use of charts."). The charts themselves are evidence and can go back to the jury during deliberations. *United States v. Williams*, 264 F.3d 561, 574-75 (5th Cir. 2001); *United States v. Smyth*, 556 F.2d 1179, 1184 (5th Cir. 1977) . The government's use of financial summary charts pursuant to Rule 1006 is appropriate in this case, which involves hundreds of financial transactions and thousands of pages of documents.

In addition to the summary charts presented through an IRS witness, the government will also present summary charts through the testimony of FBI Special Agent

Lara Burns, who was the primary case agent during the investigation.  Through her

testimony and charts, Agent Burns will summarize and provide an analysis of the

voluminous amount of documents taken from the HLF, as well as other documents seized

during the course of other search warrants.  Agent Burns will also summarize documents

reflecting financial transactions between co-conspirators.  This testimony is proper

summary testimony under Rule 1006:

> All of the information referred to in his testimony was before the jury in the
> form of documentary exhibits and/or testimony of other witnesses pertaining
> to specific events. Appellants are acutely aware that the documentary
> evidence in this case was voluminous. We have already noted that they were
> provided with complete access to all the documents prior to trial. If the
> evidence was already introduced, then it was certainly "produced in court."
> In fact, during the course of the trial the appellants were furnished with
> copies of critical documents upon request. The record also establishes that
> the court properly charged the jury that the charts and summaries were not
> evidence, and their purpose was merely explanatory. The jury was instructed
> to disregard any summaries not comporting with the evidence. There was no
> error in the procedure followed. Rule 803(8), Federal Rules of Evidence, on
> which appellants rely, is wholly inapplicable.  Rather, his testimony was
> admissible pursuant to Rule 1006, Federal Rules of Evidence, which
> provides that summaries of voluminous documents may be presented,
> provided that the documents themselves are made available to opposing
> parties. *United States v. Smyth*, 556 F.2d 1179, 1184-85 (5th Cir. 1977);
> *Gordon v. United States*, supra, 438 F.2d at 876-77 (citations therein). See
> *McDaniel v. United States*, 343 F.2d 785, 788-89 (5th Cir.), cert. denied, 382
> U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); *New Amsterdam Gas Co. v.
> W.D. Felder Co., Inc.*, 214 F.2d 825, 828-29 (5th Cir. 1954).

*United States v. Evans*, 572 F.2d 455 (5th Cir. 1978)

## 2.  Pedagogical Charts

In addition to § 1006 summary charts, the government will also present demonstrative, pedagogical summaries, such as timelines, charts, posters, videos, pictures and other diagrams, to aid the jury in understanding the myriad testimony and documents the government will present.  For example, the jury will be hearing many names which are unfamiliar to them and may be difficult to remember.  The government will present picture books, created as the evidence is admitted, of individuals with their pictures organized by the relationship between that individual and the defendants.  The government will also present time-lines for significant events that are discussed by witnesses.

Pedagogical charts are charts, summaries or diagrams that accurately summarize testimony or documents previously admitted into evidence and are used to assist the jury in understanding the documents or testimony.  The charts, summaries or diagrams are not used to summarize voluminous evidence which cannot be readily examined in court (like the § 1006 charts) but are more of a demonstrative aid to clarify or amplify admitted evidence.  *United States v. Buck*, 324 F.3d 786,  790 (5th Cir. 2003). Pedagogical charts are not admitted into evidence, as opposed to summary charts under § 1006, and do not go back into the jury room during deliberations.  *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000).  The court is required to specifically instruct the jury as to the nature and purpose of pedagogical charts, and that they are not to be

considered as evidence but only as an aid to understand evidence.  *Buck*. 324 F.3d at

791; *see also United States v. Harms*, 442 F.3d 367, 375-76 (5th Cir. 2006.).

Due to the complex nature of the case and the unfamiliarity the jurors may have

with the facts, circumstances and individuals whose names may be mentioned, the

government's use of pedagogical aids will greatly assist the jury in understanding the

government's case.

### G.      Past Recollection Recorded

The government may call a witness who was provided the phone number of a major

Hamas leader by a third party in order to allow the witness to contact the leader.

Shortly after receiving the phone number the witness reported the number to an FBI

agent.  The agent, contemporaneously with receiving the number, wrote it down on a

piece of paper.[6]

Today, the witness cannot remember the number.  He recalls receiving it; he recalls

giving it to the FBI agent; and he recalls the agent writing it down, but he cannot recall

the actual number.  The witness did not review the number when written down by the

agent.  The government plans to call the FBI agent to testify as to the Hamas leader's

telephone number that he was provided by the witness.

Rule 803(5) Recorded Recollection states:

---

[6]The same telephone number was intercepted by the government from the FISA intercepts of one
of the defendants, when he was called by this Hamas leader to discuss a meeting.

**GOVERNMENT'S TRIAL BRIEF (U.S. v. HLF, et al) - Page 58**

A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect the knowledge correctly.  If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

In *United States v. Hernandez*, 333 F.3d 1168 (10th Cir. 2003), a witness read the serial number of a gun to her friend, over the phone, which the friend wrote down.  At a later point, the witness also provided the serial number to a second friend over the phone, after having the initial friend read it to the witness over the phone, because, at that point, the witness no longer possessed the gun.  The second friend also wrote the serial number down.  The witness never saw the pieces of paper on which either friend wrote the phone number down. The appellate court approved the district court's ruling, under Rule 803(5), allowing both friends to read into evidence the serial number from the notes they took.  The 10th Circuit, in a detailed analysis of Rule 803(5) in the context of when one person memorializes information provided by another, stated "[w]e hold that a recorded recollection compiled through the efforts of more than one witness is admissible under Rule 803(5), where, as here, each participant in the chain testifies at trial as to the accuracy of his or her piece of the chain."  *Id.* at 1179.

"Where a person perceives an event and reports it to another person who records the statement, both must ordinarily testify to establish that the statement is a past recollection recorded under Rule 803(5).  The person who witnesses the event must testify to the accuracy of his oral report to the person who recorded the statement.  The

recorder must also testify to the accuracy of his transcription." *United States v. Williams*, 951 F.2d 853, 858 (7th Cir. 1992).  In *United States v. Booz*, 451 F.2d 719, 724-25 (3rd Cir. 1971), a situation similar to the one before this Court, the witness could not recall the license plate number he had told to the FBI.  The Court held that, "[i]f Agent Bass can verify the accuracy of his transcription and if Kulp can testify he related an accurate recollection of the number to Agent Bass, we believe that, even though Kulp may not have read the report, sufficient indicia of its accuracy exist to let the evidence go to the jury." *Id*. at 725.  *See also, United States v. Mornan*, 413 F.3d 372, 377-78 (3rd Cir. 2005); *United States v. Lewis*, 954 F.2d 1386, 1392-95 (7th Cir. 1992); and *United States v. Schoenborn*, 4 F.3d 1424, 1426-29 (7th Cir. 1993).

As stated above, the government will present the testimony of the witness who will testify that he accurately reported the telephone number he had received to the FBI agent.  The agent will then testify that he accurately recorded the telephone number on a piece of paper at the time the number was provided to him and he will read that telephone number into the record.  The government will not seek to admit the actual piece of paper.

## H.     Defendants' Admissions

Throughout the life of the HLF, the defendants made public comments to the media and the courts regarding various matters pertaining to the organization, including affiliation or support for Hamas.  In 2002, the HLF filed a civil lawsuit challenging

HLF's designation as a Specially Designated Terrorist.   As part of the lawsuit, the defendant Shukri Abu Baker filed a declaration wherein he addressed the allegation that HLF supported Hamas.  Defendants Baker and El-Mezain were also deposed in a separate civil lawsuit brought against HLF for providing financial support to Hamas. The government contends that the defendants made false statements in both the declaration and the depositions, and intends to demonstrate at trial that the statements were false.

The statements at issue in the declaration and depositions are admissions of a party opponent defendant under Fed. R. Evid. Rule 801(d)(2)(A) and are not hearsay.  The government will seek their admission to prove that the defendants took steps to conceal their support for Hamas.  *United States v. Ballard*, 779 F.2d 287, 291 (5th Cir. 1986) ("The trial court did not abuse its discretion in admitting the civil deposition.  Extra-judicial admissions, voluntarily made, are admissible in evidence.  Their admissibility is not altered by their utterance under oath during the course of the civil proceeding.").

## V.  CONCLUSION

The above is an outline of the evidence that the government intends to introduce at trial and the bases for admission.  To the extent additional evidentiary issues arise that merit the Court's attention, the government will supplement this submission as appropriate.

Dated:      May 29, 2007                    Respectfully submitted,

RICHARD ROPER
United States Attorney
Northern District of Texas

By: */s/ James T. Jacks*
    James T. Jacks
    Assistant United States Attorney
    1100 Commerce St., Third Floor
    Dallas, Texas 75242
    214.659.8600
    214.767.2898  (facsimile)
    Texas State Bar No. 10449500
    jim.jacks@usdoj.gov

    */s/ Elizabeth J. Shapiro*
    Elizabeth J. Shapiro
    Department of Justice Attorney
    Civil Division
    Federal Programs Branch
    Special Asst. United States Attorney
    D.C. Bar No. 418925
    elizabeth.shapiro@usdoj.gov

    */s/ Nathan F. Garrett*
    Nathan F. Garrett
    Assistant United States Attorney
    Missouri State Bar No. 45600
    nathan.garrett@usdoj.gov

    */s/ Barry Jonas*
    Barry Jonas
    Department of Justice Attorney
    National Security Division
    Counterterrorism Section
    New York State Bar No.
    barry.jonas@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Nancy Hollander
Freedman Boyd Daniels Hollander
Goldberg & Ives
20 First Plaza, Suite 700
Albuquerque, NM 87102

Joshua L Dratel
Law Office of Joshua L Dratel
2 Wall St, 3rd Floor
New York, NY 10005

John W. Boyd
Freedman Boyd Daniels Hollander
Goldberg & Ives
20 First Plaza, Suite 700
Albuquerque, NM 87102

Marlo P Cadeddu
Law Office of Marlo P Cadeddu
3232 McKinney Ave, Suite 700
Dallas, TX 75204

Linda Moreno
Law Office of Linda Moreno
2403 N. Washington Ave., # 320
Dallas, TX. 75204

Greg Westfall
Westfall Platt & Cutrer
Mallick Tower
One Summit Ave, Suite 910
Fort Worth, TX 76102


/s/ *James T. Jacks*

JAMES T. JACKS
Assistant United States Attorney