UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CRIMINAL ACTION NO. |
| VS. | ) | |
| | ) | 3:04-CR-240-G |
| HOLY LAND FOUNDATION FOR | ) | |
| RELIEF AND DEVELOPMENT (01), | ) | **ECF** |
| SHUKRI ABU BAKER (02), | ) | |
| MOHAMMAD EL-MEZAIN (03), | ) | |
| GHASSAN ELASHI (04), | ) | |
| MUFID ABDULQADER (07), and | ) | |
| ABDULRAHAM ODEH (08), | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the joint motion of the defendants Holy Land Foundation
for Relief and Development, Shukri Abu Baker, Mohammad El-Mezain, Ghassan
Elashi, Mufid Abdulqader, and Abdulrahman Odeh (collectively, "the defendants") to
exclude the government's proposed experts or, in the alternative, for a hearing under
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For the reasons
stated herein, the motion is granted in part and denied in part.

# I.  BACKGROUND

This case arose from the defendants' donations to various organizations alleged to be affiliated with or controlled by Hamas, a specially designated terrorist organization.  The instant motion stems from the government's notice of expert witness testimony [Doc. #160] ("Notice of Expert Testimony"), filed on May 31, 2005, and supplemental notice of expert witness testimony [Doc. #343] ("Supplemental Notice of Expert Testimony"), filed on July 28, 2006.  The notices name, among others, four individuals from whom the government seeks to elicit expert testimony:  Matthew A. Levitt ("Levitt"), Jonathan Fighel, Col. (Ret.) ("Fighel"), Daniel B. Olson ("Olson"), and an unnamed "Legal Advisor and counselor in the Counterterrorism Division of the Israeli Security Agency" ("the ISA agent").

## A.  Olson's Qualifications and Scope of Testimony

The government intends to offer the expert testimony of Olson regarding records recovered by the government during the course of the investigation of this case and the location and existence of codes and ciphers within those records.  Notice of Expert Testimony at 2.  Olson is presently the acting unit chief for the FBI's cryptanalysis and racketeering records unit; he has worked for the FBI in positions related to cryptanalysis since 1997.  See *Curriculum Vitae* of Daniel B. Olson, MS at 1, *attached to* Notice of Expert Testimony.  He also served as a signal intelligence analyst/cryptanalyst for four years in the United States Army.  *Id.* at 2.

### B.  Fighel's Qualifications and Scope of Testimony

The government proposes to offer the expert testimony of Fighel regarding how Hamas is structured, how it operates, the leaders of Hamas, and the goals and objectives of Hamas.  Notice of Expert Testimony at 1-2.  In addition, he will testify regarding fourteen specific Hamas affiliated zakat committees.  *See* Supplemental Notice of Expert Testimony at 4.  The testimony regarding the zakat committees is to include testimony that the committees are part of Hamas' financial infrastructure; this testimony is based on convictions of committee members for their affiliation with Hamas, financial records, and statements of other Hamas members.  *Id.* at 5.

Fighel is currently a senior researcher and director at the International Policy Institute for Counter Terrorism.  *Curriculum Vitae* of Col. (ret.) Jonathan Fighel - ICT Executive Deputy Director at 1, *attached to* Notice of Expert Testimony.  In 1996, Fighel was discharged from the Israeli Defense Forces with the rank of colonel following approximately 24 years of service, which included operational and field positions in the intelligence corps.  *Id.*

### C.  ISA Agent's Qualifications and Scope of Testimony

In the supplemental notice of expert testimony, the government indicated its intent to call an unnamed member of the Israeli Security Agency ("ISA") to testify as an expert in the area of Hamas financing.  Supplemental Notice of Expert Testimony at 1.  Specifically, this agent intends to testify regarding:  Hamas' global financial

structure and Hamas related charity funds located worldwide (including funds with relationships to the Holy Land Foundation); the theory and design behind Hamas' creation and how the charity/social wing of Hamas supports its military and political agenda; the families of individuals that have received financial support from the Holy Land Foundation as a result of said individuals' incarceration or death due to the individuals' association with Hamas; and "overseas speakers" who were affiliated with Hamas or another terrorist organization and who raised funds for the Holy Land Foundation in the United States. *Id.* at 2.

Little information is provided in the supplemental notice of expert testimony regarding the ISA agent's credentials; however, the government further expounds on his background and qualifications in its brief in support of the government's motion for measures to protect the identity of the ISA agent. *See* Government's Brief in Support of Motion for Measures to Protect the Identity of Foreign Witnesses and to Restrict Cross-examination to Non-classified Information [Doc. #388] ("Motion for Protective Measures") at 9-12. The motion for protective measures states that he has been a legal advisor to the ISA since 2000. *Id.* at 10. The ISA agent received a law degree from Tel Aviv University. *Id.* For the past six years, he has "work[ed] in the field of counterterrorism and has provided legal advice to ISA agents in matters concerning ISA activity against terrorist organizations and activists." *Id.* In that capacity, he has participated in professional training courses in the legal and

intelligence disciplines. *Id.* Furthermore, since 2000, the ISA agent has participated in the prosecution of "Hamas and Hamas-related fundraisers". *Id.* The motion for protective measures further indicates that his testimony will be based upon "*much* of the material that has been previously provided to the defense . . . as well as some of the documentation seized from the Holy Land Foundation's offices." *Id.* at 12 (emphasis added).

Citing legal restrictions and safety concerns, the government provided no further information regarding the agent's identity, background, or qualifications. In a prior order, the court granted the government's motion to protect the identify of this witness and to allow him to testify under a pseudonym. *See* Memorandum Opinion and Order [Doc. #628] ("Order Granting Protective Measures") at 11, May 4, 2007.

### D. Scope of Levitt's Testimony

The government proposes the use of expert testimony by Levitt "to educate the jury about Hamas, including its origins, its leaders and prominent members, and its structure, among other things." Government's Response in Opposition to Defendants' Joint Motion to Exclude the Government's Proposed Experts or, in the Alternative, for a Hearing under *Daubert* [Doc. #591] ("Response") at 2. The notice of Levitt's expert testimony provides a more detailed explanation of the testimony to be adduced. According to the notice, Levitt is to offer his expert testimony regarding: the history and formation of the Muslim brotherhood; how the Palestinian branch of

the Muslim Brotherhood became Hamas; the formation of Hamas, its charter, its history, how it is organized (including the political bureau, the military wing and the social wing); who the leaders of Hamas were and are; who some of the lesser known members are who have affiliations with the Holy Land Foundation; the structure of the social wing of Hamas (including zakat committees); the Muslim Brotherhood and Hamas in the United States (including organizations affiliated with the Holy Land Foundation); non-United States organizations affiliated with Hamas and how they are related to the Holy Land Foundation; the importance of family members in positions of trust in Hamas and the identity of family members of the defendants and the leadership roles these family members play in Hamas; the importance of conferences and fund-raisers which the Holy Land Foundation participated in and the means through which funds generated at these events are moved to Hamas; orphan applications seized from the Holy Land Foundation and the significance of the information contained within the applications identifying the relationship between the orphans and members of Hamas; individuals who were retained by the Holy Land Foundation to come to the United States to speak at various fundraisers on its behalf; and the significance and meaning of certain documents taken from the premises of the Holy Land Foundation. Notice of Expert Testimony at 2-4. In addition, the government intends for Levitt to testify regarding: the relationship between Hamas and Fatah; the Oslo Accords; the two Intifadas; and Hamas' tradecraft. Supplemental

Notice of Expert Testimony at 3.  The government indicated that much of Levitt's

testimony will be drawn from his book, HAMAS -- POLITICS, CHARITY, AND

TERRORISM IN THE SERVICE OF JIHAD (Yale University Press 2006).  *Id.*

Currently, Levitt is a senior fellow and director of terrorism studies for The

Washington Institute for Near East Policy; he is also a lecturer at Johns Hopkins

University, where he teaches two graduate courses related to the subject of terrorism.

*Curriculum Vitae* of Matthew A. Levitt, Ph.D. at 1, *attached to* Notice of Expert

Testimony.  Prior to that, he worked as an intelligence research specialist in the

international terrorism intelligence unit of the FBI.  *Id.*  In addition, Levitt has

authored several books and monographs related to the subject of terrorism and

published numerous lectures and journal articles regarding the same.  See *id.* at 2-8.

## II.  ANALYSIS

In the instant motion, the defendants seek to exclude the proposed experts'

testimony on various grounds, including FED. R. EVID. 401-03, 702-03, and 705,

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and U.S. CONST.

amend VI.

### A.  Evidentiary Challenges Under *Daubert*

FED. R. EVID. 702 provides that a duly qualified individual may provide

opinion testimony as to "scientific, technical, or other specialized knowledge" if such

information "will assist the trier of fact to understand the evidence or to determine a

fact in issue." According to the rule, such evidence is limited to testimony that is both based upon sufficient facts or data and is the product of reliable principles and methods. FED. R. EVID. 702. Furthermore, the expert witness must have applied the principles and methods reliably to the facts of the case. *Id.* These prerequisites to the admissibility of expert testimony have been applied as a two-part test: reliability and "fit." See *Daubert*, 509 U.S. at 590-91; FED. R. EVID. 702 advisory committee's note. The burden of proof in satisfying these two elements rests with the proponent of the expert testimony who must demonstrate reliability and fit by a preponderance of the evidence. See *Mathis v. Exxon Corporation*, 302 F.3d 448, 459-60 (5th Cir. 2002).

Following the Supreme Court's decision in *Daubert*, it is the duty of the trial court to serve a gatekeeping function, excluding from the jury unreliable or irrelevant expert testimony. *Daubert*, 509 U.S. at 589. Courts are to apply this gatekeeping function to all expert testimony, not just science-based expert testimony. *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999). To aid in the exercise of this gatekeeping function, the Supreme Court set forth a non-exhaustive list of factors for trial courts to consider: (1) "whether [the theory or technique] can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the [theory or] technique's operation"; and

(5) whether the theory or technique has "general acceptance" within the scientific community. *Daubert*, 509 U.S. at 593-94; see also *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003).

Application of the *Daubert* factors and any other relevant factors used to determine the admissibility of expert testimony is left to the judgment of the trial court and reviewed only under an abuse of discretion standard. *Vargas*, 317 F.3d at 500-01. In determining the admissibility of expert testimony, the trial court is not to consider the conclusions generated by the expert witness, but only the principles and methodology used to reach those conclusions. *Daubert*, 509 U.S. at 595. When the principles and methodology are sufficient to allow the expert opinion to be presented to the jury, the party challenging the testimony must resort to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" as the means to attack "shaky but admissible evidence." *Id.* at 596.

B. <u>Admissibility of Olson's Testimony</u>

The defendants move to exclude the testimony of Olson on the sole ground that his testimony is irrelevant, *i.e.*, that his testimony will not assist the jury in understanding the evidence. The instant motion, which was filed on March 14, 2007, indicates that the defendants did not have the opportunity to review certain materials released by the government on February 28, 2007, including three reports from the FBI's cryptanalysis and racketeering unit. *See* Defendants' Joint Motion to

Exclude the Government's Proposed Experts or, in the Alternative, for a Hearing Under *Daubert* with Incorporated Memorandum of Law [Doc. #582] ("Motion to Exclude Expert Testimony") at 31-32.  In their reply to the government's response to the instant motion, the defendants indicated that they were seeking additional information from the government regarding the three reports and would supplement their motion to exclude expert testimony in the future.  *See* Defendants' Joint Reply to Government's Response to Motion to Exclude the Government's Propose Experts or, in the Alternative, for a Hearing under *Daubert* ("Reply") at 10-11.  To date, no additional information has been submitted by the defendants on this subject.  *See* Docket Sheet.

Little discussion is necessary for the disposition of the motion as it relates to Olson's testimony.  The court finds that the expert testimony of a witness versed in the skills of cryptanalysis to be exactly the type of "scientific, technical, or other specialized knowledge" envisioned by FED. R. EVID. 702.  The court can conceive of few other areas of testimony in which specialized knowledge would prove to be of more assistance, both to the court and to the jury, than is the case with Olson's anticipated testimony.  The court agrees with the government that "the relevance of [Olson's] testimony . . . is self-evident."  Response at 10.  In attempting to prove their case-in-chief, the government intends to introduce evidence demonstrating that the defendants used codes and ciphers to conceal their activities; the court finds that the

use of expert testimony would be of assistance to the jury and thus such testimony is relevant.  To the extent the instant motion seeks to exclude Olson's testimony, the motion is denied.

## C.  Admissibility of Fighel's Testimony

The defendants challenge Fighel's testimony on two grounds.  First, they argue that his testimony is based solely on inadmissible hearsay because some of the statements upon which he relies in formulating his opinion *may* have been obtained through the use of torture.  Second, the defendants aver that his testimony should be excluded because some of the statements upon which he relies were the product of police interrogations and to admit such hearsay statements would violate *Crawford v. Washington*, 541 U.S. 36 (2004).

### 1.  *Inadmissible hearsay argument*

FED. R. EVID. 703 mandates that if the facts or data are of a type reasonably relied upon by experts in that particular filed, then the "facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.  Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."  The purpose of Rule 703 is not to limit the evidence upon which the expert may rely; rather it is designed to limit the portions of

the facts or data relied upon that can be disclosed to the jury.  *See* FED. R. EVID. 703, advisory committee's note ("The amendment governs only the disclosure to the jury of information that is reasonably relied on by an expert, when that information is not admissible for substantive purposes.  It is not intended to affect the admissibility of an expert's testimony. Nor does the amendment prevent an expert from relying on information that is inadmissible for substantive purposes."); see also *First National Bank of Louisville v. Lustig*, 96 F.3d 1554, 1576 (5th Cir. 1996) ("Experts may rely on hearsay evidence in forming their opinions.").

The defendants argue that certain hearsay statements should not be used by Fighel in forming his expert opinion because some of these statements may have been obtained through the use of torture and as such the statements are not of a type reasonably relied upon by expert's in Fighel's field.[1]  While the defendants offer a colorable attack on the reliability of any statement made under the duress of torture, they fail to adduce any evidence (or to make any argument) that even a single statement relied upon by Fighel was *actually* a product of torture.  To exclude Fighel's testimony based on the argument that some of the statements relied upon by Fighel *may* have been the product of torture would be to require the government, in this and

---

[1]        Though the defendants do not expressly articulate their argument as such, it is the only argument that can be gleaned from the motion.  Surely the defendants are not arguing that an expert is prohibited from relying on hearsay evidence in forming his opinion.  Thus, the only logical argument that can be raised by the defendants on this point is that the alleged use of torture renders this particular evidence of a type not reasonably relied upon.

all future cases, to prove a negative.  That is, adopting the defendants' argument would require the government to demonstrate that none of the data or facts relied upon by an expert witness were the product of torture.  The issue of whether the statements relied upon by Fighel were the result of torture may prove a fertile ground for impeachment of his testimony, but the defendants' speculation, without more, is insufficient for the court to find the hearsay statements, if any, relied upon by Fighel render his expert opinion unreliable.

In response to the specific challenges raised by the defendants, the court is satisfied that the statements relied upon by Fighel in forming his expert opinion are the type of evidence that an expert in his field would reasonably rely upon.  While it may not be reasonable for an expert to rely upon statements procured through torture, the court is confronted with nothing but the defendants' bald assertion that some statements may have been made as a result of torture.  Accordingly, to the extent that the defendants seek to exclude Fighel's testimony on the grounds that it is based on unreliable facts or data, the motion is denied.

## 2.  *Confrontation Clause argument*

The Confrontation Clause provides a criminal defendant with the right to confront and cross-examine witnesses against him.  See *Pointer v. Texas*, 380 U.S. 400, 400-01 (1965).  In *Crawford*, the Court clarified that the right to confrontation extends to both in-court testimony and out-of-court testimonial evidence.  See

*Crawford*, 541 U.S. at 50-51.  While declining to craft a precise definition of what constitutes "testimonial" evidence, the Court in *Crawford* itself stated, "Whatever else the term covers, it applies at a minimum to . . . police interrogations."  *Id.* at 68.

Here, the defendants argue that Fighel's testimony violates the Confrontation Clause because some of the hearsay statements upon which he relies are the product of police interrogation.  According to the defendants, because these statements constitute testimonial evidence, the opinion testimony of Fighel must be excluded.  Though there is little case law on the subject, the defendants direct the court to the unpublished case of *United States v. Buonsignore*, 131 Fed. App'x 252 (11th Cir.), *cert. denied*, __ U.S. __, 126 S.Ct. 270 (2005), for the proposition that an expert's opinion is inadmissible when the opinion is based on testimonial hearsay evidence.  Motion to Exclude Expert Testimony at 30 (citing *Buonsignore*, 131 Fed. App'x at 257).  In *Buonsignore*, the Eleventh Circuit held that the testimony of the government's expert regarding the valuation of drugs was inadmissible under *Crawford* because the expert's testimony was based on information from an unidentified individual at the Drug Enforcement Administration.  *Buonsignore*, 131 Fed. App'x at 257.

In the subsequently unpublished case of *United States v. Springer*, 165 Fed. App'x 709 (11th Cir. 2006), the Eleventh Circuit clarified its holding from *Buonsignore*.  The Eleventh Circuit in *Springer* stated that the *Crawford* violation from *Buonsignore* was due to the fact that "the expert . . . was not offering his own expert

- 14 -

opinion -- he was offering the expert opinion of an unidentified individual in Washington D.C., which means that the wrong expert was on the stand." *Springer*, 165 Fed. App'x at 716. The expert testimony from *Buonsignore* was distinguished from the expert testimony in *Springer* by explaining that the *Springer* testimony was based on the expert's education, training, knowledge and personal experience in consultation with books and records in addition to consultation with an individual from the National Tracing Center. *Id.* Because the *Springer* expert's testimony was based on more than the testimonial hearsay evidence, the court found that the admission of that expert's testimony to be proper and not in violation of *Crawford*. *Id.*

The court is in partial agreement with the defendants on their Confrontation Clause challenge. To the extent that Fighel's opinion may be a mere recitation of testimonial hearsay statements, allowing such testimony would constitute a violation of the Confrontation Clause. That is, to allow Fighel to transmit to the jury otherwise inadmissible testimonial hearsay under the guise of expert testimony would deprive the defendants of their right to confront and cross-examine the out-of-court speakers. However, the court disagrees with the defendants to the extent that they argue Fighel's entire testimony must be excluded. While the record is presently unclear as to what facts and data Fighel relies on, it would be imprudent to rule at this time that his entire testimony is inadmissible. Rather, the court grants the

defendants' motion for a hearing prior to the presentation of Fighel's testimony to the jury.  At that hearing, the defendants will have the opportunity to demonstrate to the court that Fighel's opinion is based solely on testimonial hearsay.  If after such examination the court is satisfied that Fighel's testimony is sufficiently supported by facts and data upon which an expert in his field would reasonably rely and that the facts and data include more than testimonial hearsay, then the court will permit his testimony to be introduced to the jury.

## C.  Admissibility of the ISA Agent's Testimony

The defendants state that they are challenging the proposed expert testimony of the ISA agent on the grounds of relevance and reliability.  However, the portion of their motion that relates to the ISA agent in large part merely rehashes their earlier argument in opposition to the government's motion to provide protective measures to ensure the safety of the ISA agent.  The court will not revisit its earlier ruling on the subject.  *See* Order Granting Protective Measures at 11.

Rather than pursuing their challenge on the grounds stated, the defendants instead focus on their need for adequate discovery to effectively prepare for the cross-examination of the ISA agent.  On this point, the court is in partial agreement with the defendants.  While FED. R. EVID. 705 does not require the expert or offering party to disclose to the fact finder the underlying facts or data supporting his opinion, the rule presupposes that the opposing party has advance knowledge of the underlying

- 16 -

facts and data sufficient to mount an effective cross-examination.  *See* FED. R. EVID.

705, advisory committee's note.  In the unusual circumstances presented by the ISA

agent's proposed expert testimony, the court agrees that to conduct a sufficient cross-

examination, the defendants should have access to the underlying facts and data upon

which the ISA agent relied in forming his opinion.

      The government indicated that *much* of the ISA agent's testimony will be based

on evidence previously disclosed to the defendants.  *See* Motion for Protective

Measures at 12.  However, the government has not made clear whether the ISA agent

may be relying on information beyond what has been disclosed previously.  The court

also notes that the government repeatedly stated that the ISA agent's opinion does

not rely on classified information in reaching his opinions.  See  *id.*; Supplemental

Notice of Expert Testimony at 2 ("[The ISA agent's] opinion will not be based upon

any classified information.").  Accordingly, the government shall provide the

defendants with all *tangible* underlying facts and data, not previously produced, upon

which the ISA agent relies in reaching his opinion.

      To the extent that the defendants challenge the reliability of the ISA agent's

testimony under FED. R. EVID. 702 and request a hearing under *Daubert* to determine

the reliability of such testimony, the motion is granted.  With the additional

protective measures allowed by the court comes a heightened need to assure that

procedural safeguards are satisfied with regard to this witness.  A *Daubert* hearing will be held before this witness is allowed to give testimony in front of the jury.

### E.  Admissibility of Levitt's Testimony

The defendants object to Levitt's proposed expert testimony on three grounds. First, they argue that Levitt's methodology lacks the reliability necessary to qualify his opinion under *Daubert*.  Second, the defendants claim that Levitt's testimony is nothing more than hearsay in disguise.  Finally, they aver that his expert testimony runs afoul of the Confrontation Clause.

### 1.  *Reliability argument*

Within their reliability challenge, the defendants essentially assert two independent challenges.  First, the defendants argue that Levitt lacks the credentials necessary to qualify him as an expert.[2]  There is no question that Levitt has an extensive history of publishing books, monographs, lectures, and articles.  See *Curriculum Vitae* of Matthew A. Levitt, Ph.D. at 2-8.  The defendants argue that the vast majority of these publications must be disregarded for the purposes of a *Daubert* inquiry because the publications were not subjected to peer review prior to their

---

[2]       The defendants do not expressly classify their reliability challenge as falling into two categories.  However, logic dictates that the reliability challenge based on Levitt's prior publications must go to his qualifications as an expert and not to Levitt's testimony in this case.  The government has provided no indication that Levitt's testimony will simply be derived from his prior publications.  Accordingly, any challenge as to the integrity or methodology employed in these prior publications must be an attack on Levitt's credentials, not on the reliability of his opinion in the instant case.

publication.  According to the defendants, once the court excludes these publications, Levitt lacks the qualifications to be an expert in this case.  The court finds this initial challenge unpersuasive and misguided.  The defendants mount an excruciatingly detailed analysis of the *Daubert* "peer review and publication" factor as it relates to prior publications by Levitt.  That the prior writings of Levitt may not have been subject to pre-publication peer review is not an issue as it relates to his qualifications as an expert.  Levitt's professional experience and education alone may be sufficient to evince his field of expertise.  *See* FED. R. EVID. 702 advisory committee's note ("Nothing in this amendment is intended to suggest that experience alone -- or experience in conjunction with other knowledge, skill, training or education -- may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.").  That he published articles, lectures, books, and monographs which were not subject to peer review prior to their publication does not discount his expertise and specialized knowledge in his field.

In their second reliability challenge, the defendants aver that Levitt's expert opinion, as it specifically relates to this case, is unreliable.  The government has stated that Levitt's testimony will track the information and opinion provided in his book HAMAS -- POLITICS, CHARITY, AND TERRORISM IN THE SERVICE OF JIHAD (Yale University Press 2006).  *See* Supplemental Notice of Expert Testimony at 3.  In the

motion to exclude Levitt's testimony, the defendants challenge the methodology employed by Levitt in his book.  Specifically, the defendants dissect the authorities to which Levitt cites and, through the declaration of Professor Charles D. Smith, attempt to demonstrate that Levitt's methodologies used in his book do not meet the intellectual rigor necessary for the book to be considered a scholarly publication.

While the court is not wholly convinced by the defendants' reasoning when it comes to the integrity of Levitt's methodology, the government's response requires further inquiry by the court on this point.  In defense of Levitt's testimony, the government provides the court with little more than the unsubstantiated and unverified assertion that HAMAS -- POLITICS, CHARITY, AND TERRORISM IN THE SERVICE OF JIHAD (Yale University Press 2006) was subjected to peer review before acceptance by the publisher and that if called upon Levitt is prepared to "explain how he has applied the same degree of intellectual rigor in this case as he has throughout his professional experience in this field." *See* Response at 4.  These statements alone are insufficient for the government to carry its burden of proving by a preponderance of the evidence that Levitt's methodology is reliable.

Accordingly, the court orders that prior to any testimony offered by Levitt in this case the government must establish the reliability thereof in a hearing outside the presence of the jury.

2.  *Inadmissible hearsay argument*

In the defendants' second challenge to Levitt's testimony, they argue that his testimony amounts to "nothing more than an effort by the government to introduce otherwise inadmissible hearsay." Motion to Exclude Expert Testimony at 24.  The government, in response to this argument, notes the difficulty in resolving this challenge in the abstract and stipulates that it will not disclose to the jury any hearsay evidence upon which Levitt relied without first informing the court and defense counsel of its intent to do so.  *See* Response at 7.

As noted above, FED. R. EVID. 703 is not designed to limit the type of information upon which an expert may rely, and experts may rely on facts and data that would be inadmissible for substantive purposes.  FED. R. EVID. 703, advisory committee's note.  However, the proponent of the expert testimony may not disclose such inadmissible facts and data to the jury "unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."  FED. R. EVID. 703.

The defendants' motion is unclear as to what relief they actually seek on this ground.[3]  To the extent that the defendants seek to exclude Levitt's testimony

---

[3]    The motion reads as though the defendants only seek to restrict Levitt from disclosing to the jury the hearsay statements upon which he relies.  To the extent that the defendants may be attempting to argue that his entire testimony should be excluded because an expert in Levitt's field would not reasonably rely on such hearsay statements, such an argument is not apparent on the face of the motion.

- 21 -

because he relied on inadmissible hearsay, the motion is denied.  To the extent that the defendants move to prohibit Levitt from disclosing the inadmissible hearsay to the jury, the motion at present is denied.  Due to the government's stipulation and the fact that in the abstract the court cannot determine whether the value in assisting the jury outweighs the prejudicial effect of such evidence, the court will rule on individual challenges to the disclosure of such hearsay evidence as the need arises during trial.

### 3.  *Confrontation Clause argument*

As with the defendants' challenge to the testimony of Fighel, here too they argue that Levitt's testimony is inadmissible because his opinion is based on testimonial hearsay evidence and thus runs afoul of *Crawford*.  However, unlike with their challenge to Fighel's testimony, the defendants fail to indicate whether there is any testimonial hearsay included in the facts and data upon which Levitt relies.[4]  As a result, the defendants' argument on this point amounts to nothing more than unsupported speculation.  The motion to exclude Levitt's testimony on this Confrontation Clause argument is therefore denied.

---

[4]      Furthermore, as with Fighel, there is no indication that Levitt's opinion or any portion thereof is based solely on testimonial hearsay.

III.  <u>CONCLUSION</u>

For the reasons stated above, the defendants' motion is **GRANTED** in part and **DENIED** in part.  To the extent the defendants move to exclude the testimony of Olson, the motion is **DENIED**.  As the motion relates to the testimony of Fighel, the motion is **DENIED**, but prior to his testimony, a hearing will be held outside the presence of the jury to assure that his expert opinion is based on more than testimonial hearsay evidence.  With regard to the ISA agent, the motion to exclude his testimony is **DENIED**, and the motion for a *Daubert* hearing is **GRANTED**. Furthermore, the government is **ORDERED** to provide to the defendants all tangible facts and data not previously produced, if any, upon which the ISA agent relied in forming his opinion.  Finally, the motion to exclude the testimony of Levitt is **DENIED**, but the motion for a hearing to determine the reliability of his testimony is **GRANTED**.  Prior to introducing Levitt's testimony, the government shall demonstrate to the court, outside the presence of the jury, that his opinion is based on reliable methodology.

**SO ORDERED**.

July 16, 2007.

_____
A. JOE FISH
CHIEF JUDGE

- 23 -