IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | CRIM. NO. 3:04-CR-0240-P |
| HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT     also known as the "HLF", SHUKRI ABU BAKER, MOHAMMAD EL-MEZAIN, GHASSAN ELASHI, MUFID ABDULQADER and ABDULRAHAM ODEH, | § § § § § § § § § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is the Government's Amended Motion to Dismiss the Ungars' and Rubins' Ancillary Petitions, filed June 16, 2009. After careful consideration of the briefing and the applicable law, the Court hereby DENIES the Government's Motion (Docket # 1308).

This proceeding is an ancillary proceeding filed by the Rubin Petitioners, who have a property interest in funds belonging to Defendant Holy Land Foundation for Relief and Development ("HLF"). The Rubins have a civil judgment in their favor against the terrorist organization HAMAS. HLF has been adjudicated an instrumentality of HAMAS and therefore, the Rubins's judgment is enforceable against HLF.[1]

In this case, the Government indicted HLF on criminal charges and obtained a restraining

---

[1] This proceeding was originally filed by two groups of petitioners, the Ungar Petitioners and the Rubin Petitioners. On March 2, 2011, the Court learned the Ungar Petitioners' civil judgment against HAMAS was vacated by the Rhode Island District Court, in accordance with a settlement agreement entered into between the Ungar Petitioners and Defendants Palestinian Liberation Organization and the Palestinian Authority. (*See* Docket # 1472 Ex. A.) Therefore, this Order addresses only the Rubin Petitioners' right to HLF's funds.

1

order that forbade dissemination of HLF's property during the pendency of these criminal proceedings. HLF was ultimately convicted at trial and now, the Rubins seek to recover the HLF funds to which they believe they are entitled in accordance with their judgment. Accordingly, the Rubins filed the instant petition. The Government now moves to dismiss the petition on several bases.

### I.

The Rubin Petitioners are nine American citizens who were severely harmed by a triple suicide bombing carried out by HAMAS on September 4, 1997 at an outdoor pedestrian mall in Jerusalem, Israel. In May 2002, the Rubins brought a lawsuit against HAMAS under the civil provisions of the Antiterrorism Act of 1991, 18 U.S.C.A. § 2333 (2009) ("ATA") in the United States District Court for the District of Columbia.[2] HAMAS defaulted in the action. In September 2004, the court entered judgment for the Rubins in the amount of $214.5 million. *See Rubin v. HAMAS Islamic Resistance Movement*, Civ. A. No. 02-0975 (RMV), 2004 WL 2216489 (D.D.C. Sept. 27, 2004).

After learning that HLF's funds were kept in financial institutions located in several federal districts, the Rubins registered their judgment in the federal courts of New York, New Jersey, South Carolina, Illinois, and Washington and commenced execution proceedings against the HLF funds pursuant to TRIA. Federal courts in New York and Washington issued writs of execution on the Rubins' judgment against HLF in those districts.

Just prior to the date of the Rubins' judgment, on July 26, 2004, the Government filed its indictment against HLF in this Court, charging it with material support of a terrorist organization,

---

[2] The ATA provides a cause of action for any American injured by an act of "international terrorism."

2

tax evasion, and money laundering. The indictment also sought forfeiture of $12.4 million that HLF had illegally obtained as an instrumentality of HAMAS.

Shortly thereafter, the Government filed an *ex parte* application in this Court for a restraining order ("Restraining Order") pursuant to 21 U.S.C. § 853 ("the Criminal Forfeiture Statute") to block terrorism victim judgment creditors' enforcement proceedings and to preserve HLF's assets for the criminal forfeiture. (Docket # 84.) The Government argued that the Rubins are required to bring their claims in an ancillary proceeding in accordance with federal criminal forfeiture law: that is, following entry of a Preliminary Order of Forfeiture and notice to all interested parties. The Court issued the requested Restraining Order without giving any notice or a hearing. [85]

The Ungar Petitioners appealed the Restraining Order and a three-judge panel of the Fifth Circuit Court of Appeals vacated the Restraining Order on the ground that it was entered without providing the Ungar Petitioners adequate notice and a fair opportunity to be heard as required by Rule 65 of the Federal Rules of Civil Procedure. The Fifth Circuit denied the Ungar Petitioners' requests for summary disposition and for a directive that this Court not enter further orders that restrain HLF's interest in the bank accounts. *U.S. v. Holy Land Found. for Relief and Dev. et al. (Holy Land I)*, 445 F.3d 771 (5th Cir. 2006).

The Government then sought and obtained an *en banc* rehearing. *U.S. v. Holy Land Found. for Relief and Dev. et al. (Holy Land II)*, 493 F.3d 469 (5th Cir. 2007). Upon *en banc* reconsideration, the entire Court of Appeals ruled that (1) the notice and hearing requirements of Rule 65 that provide procedural safeguards to the "adverse party" when a district court issues an injunction or restraining order do not apply to this restraining order issued under the Criminal Forfeiture Statute (overruling *United States v. Thier*, 801 F.2d 1463 (5th Cir. 1986)); (2) in light of

3

the factors outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Ungar Petitioners, as judgment creditors without a perfected property interest in the HLF accounts, do not have any right either to request a hearing at this time or to appeal the district court's restraining order; (3) the Ungar Petitioners, as judgment creditors, could not bring third-party claims under the Criminal Forfeiture Statute at this time, but had to wait until after termination of the pending criminal case to assert their interest in HLF's property; and (4) the Ungar Petitioners' argument that TRIA "trumped" the Criminal Forfeiture Statute, having never been before a lower court, was not properly before the Court of Appeals.

On November 24, 2008, a federal jury convicted Defendants HLF, Ghassan Elashi, Shukri Abu Baker, Abdulrahman Odeh, and Mufid Abdulqader of all charges against them in the Superseding Indictment, including conspiracy to commit money laundering. (Docket # 1250.) On February 5, 2009, this Court entered a Preliminary Order of Forfeiture, directing that "subject to the provisions of 21 U.S.C. § 853(n)" HLF's bank accounts shall be "forfeited to the Government as specific property involved in or traceable to property involved in the commission of the offenses described in Count 22 of the Superseding Indictment [conspiracy to commit money laundering]." [1264 at 3.]

In accordance with the Criminal Forfeiture Statute, the U.S. Attorney's Office gave notice to the Rubin Petitioners of the Preliminary Order of Forfeiture and advised them to file a § 853(n) petition within thirty (30) days thereof. (Docket # 1279 Ex. A.) Accordingly, the Rubins filed the instant petition, wherein they contend they are entitled to enforce their judgment against HLF's bank accounts, notwithstanding the Government's forfeiture proceedings.

## II.

In *Holy Land II*, the Fifth Circuit held that the procedural provisions of the federal criminal forfeiture statute govern this case. The Court ruled that 21 U.S.C. § 853 requires Petitioners to wait until after termination of the criminal case to assert their interests in HLF's assets. *Holy Land II*, 493 F.3d at 477. Petitioners contend they are entitled to enforce their judgments against HLF because TRIA allows terrorism victims to collect their judgments against the blocked assets of the terrorist party. Petitioners contend they are entitled to collect their judgments from HLF's blocked assets irrespective of the Government's forfeiture proceedings because TRIA applies to this case "notwithstanding any other provision of law."

## III.

To understand the meaning of TRIA and its relationship with the Criminal Forfeiture Statute, it is helpful to understand TRIA's history. For many years, the Foreign Sovereign Immunities Act ("FSIA") did not permit suits against foreign states for state-sponsored crimes – including acts of terrorism – aainst U.S. citizens. In 1996, Congress amended the FSIA to allow American victims of terrorist acts to sue those countries designated by the U.S. State Department as sponsors of terrorism. *See* 28 U.S.C.A. § 1605(a)(7) (2006) (repealed 2008).[3] After one court found that this waiver of sovereign immunity did not itself create a cause of action,[4] Congress passed legislation

---

[3] This statute, enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA") states as follows, "A foreign state shall not be immune from jurisdiction of the courts of the United States or of the States in any case ... not otherwise covered by [the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency ..."

[4] *See Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998).

5

creating a cause of action and authorizing U.S. courts to award money damages. *See* Civil Liability for Acts of State Sponsored Terrorism (also known as the "Flatow Amendment"), Pub. L. No. 104-208, § 589, 110 Stat. 3009, 3009-172 (1996) (codified at 28 U.S.C.A § 1605 note (2006)). By passing this "State Sponsors of Terrorism" exception to sovereign immunity, Congress sought to achieve two primary purposes: to compensate American victims of terrorist acts and to make foreign states more reluctant to sponsor acts of terror against U.S. citizens by requiring them to pay huge sums of money to those who won judgments. *See* Jeewon Kim, *Making State Sponsors of Terrorism Pay: A Separation of Powers Discourse Under the Foreign Sovereign Immunities Act*, 22 Berkeley J. Int'l L. 513, 516-17 (2004).

While most of the plaintiffs who brought suits under the terrorist exception to the FSIA easily won default judgments, they had difficulty collecting the money awarded to them. Recognizing this, Congress sought to amend the terrorist exception to help successful plaintiffs collect their judgments. *See id.* at 519. In Congress's first attempt to amend the statute, it included a provision that would allow successful plaintiffs to attach diplomatic and other blocked assets in the United States belonging to the defendant state. *See id* at 519. However, the executive branch resisted this attempt and took the positions that (1) the United States has international treaty obligations to protect all countries' diplomatic and consular properties, (2) the blocked assets of foreign states provide useful diplomatic leverage and should remain available for future use, (3) the attachment of the blocked assets by early claimants would mean that nothing would be left to compensate future claimants, and (4) the attachment of both kinds of assets would expose U.S. assets to reciprocal action in certain foreign states. *See* Jennifer K. Elsea, *Lawsuits Against State Supporters of Terrorism: An Overview*, Congressional Research Service - The Library of Congress, May 26, 2005.

Thus, the resulting legislation passed in 1998 specifically stated that frozen and diplomatic assets of foreign states could be attached to satisfy a judgment for a claim brought under the terrorism exception, but included a provision authorizing the president to waive the requirements "in the interest of national security." 28 U.S.C.A. 1610(f)(3); *See* Elsea, *supra,* at *3; Kim, *supra*, at 520. After the President signed the legislation, he invoked the waiver, and the frozen assets of the terrorist states were immunized from attachment.

In response to the President's action, Congress passed Section 2002 of the Victims of Trafficking and Violence Protection Act. Pub. L. No. 106-386, Sec. 2002, 114 Stat. 1464 (2000); *see* Elsea, *supra*, at *3. Because the President was unwilling to sign legislation that would have made all frozen assets of designated terrorist states vulnerable to attachment, the statute permitted only a few designated plaintiffs to receive payment for their claims against two specified nations. *See* Kim, *supra,* at 521; Elsea, *supra, at *3 .

Congress tried again in 2002 to compensate these victims with the Terrorism Risk Insurance Act of 2002 ("TRIA"). Pub. L. No. 107-297, 116 Stat. 2322 (2002) (codified at 28 U.S.C. § 1610 note).[5] "[T]he purpose of § 201 [of TRIA] was to provide justice to terrorist victims, to hold terrorist states accountable for their crimes, and to deter them from perpetrating acts of terrorism against American citizens in the future." *Hill v. Republic of Iran*, No. Civ. A. 1:99-CV-03346TP, 2003 WL 21057173, at *2. Section 201 subjects the blocked assets of any state sponsor of terrorism to attachment by anyone who has won a court judgment against them. *See* Marcia Coyle, *Iraq is*

---

[5] Section 201(a) states: "Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." *Id.* sec. 201(a).

*Already Under Attack - In U.S. Courts*, 26 Nat'l Law J. 25, Feb. 10, 2003, at A8. It also bars the president from waiving the attachments of all blocked assets in the interest of national security. Kim, *supra*, at 521. Instead, TRIA requires the president to make an asset-by-asset determination that a waiver is necessary in the interest of national security. Terrorism Risk Ins. Act § 201(b)(1); Kim, *supra*, at 521. Furthermore, even if invoked, the presidential waiver can only protect certain limited types of diplomatic property specifically subject to the Vienna Convention. All other types of blocked assets may be attached. *See id.*

Not surprisingly, the State Department strongly opposed permitting the attachment of blocked assets. Kim, *supra*, at 520. Opponents of the legislation argued that the statute fails to provide equitable and efficient compensation because it only permits suit against the seven countries designated by the State Department as state sponsors of terrorism (i.e. Sudan, Cuba, Iran, Iraq, North Korea, Syria and Libya). Victims of terrorism by other foreign states will have no recourse. *See* Kim, *supra*, at 520. Other difficulties with the statute are that the plaintiffs' damages awards are limited by the amount of blocked funds and the number of other plaintiffs who are seeking to attach and collect those funds. Opponents also were troubled by the fact that payments are made on a first-come, first-serve basis. The executive branch objected to the legislation because it believed the president's control over foreign assets is a vital component of a flexible and responsive foreign policy and that the loss of that control would seriously weaken the president's ability to deal with threats to national security. *See id.*

### IV.

The Government argues that Section 853(c) of the Criminal Forfeiture Statute vests HLF's property with the Government and therefore, it is not a blocked asset subject to attachment under

TRIA. See 21 U.S.C. § 853(n)(6). The Government argues that § 853(c) incorporates the relation-back doctrine and mandates that "[a]ll right, title and interest in [property subject to forfeiture] vests in the United States upon the commission of the act giving rise to forfeiture . . ." Thus, upon HLF's conviction, the United States's rights in the forfeited property were deemed to relate back to the time the predicate criminal acts were committed. See U.S. v. Martinez, 228 F.3d 587, 591 (5th Cir. 2001). Therefore, all right, title and interest in the forfeited property vested in the United States government when HLF committed its crimes "beginning from on or around January 25, 1995." (Superseding Indictment Ex. 2.) The Government reasons that because the assets were already vested in the United States by virtue of the relation-back doctrine when Petitioners' judgments were entered, they are not the blocked assets of a terrorist party. The property at issue are assets that have been seized and subject to forfeiture and therefore are not subject to attachment under TRIA. Petitioners maintain they "have never claimed to have had an interest in HLF's assets at the time that the crimes were committed or to be bona fide purchasers for value or to otherwise meet the conditions of 21 U.S.C. § 853(n)(6)." (Pets.' Br. at 4.)

V.

TRIA § 201(a) reads as follows: "Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party" . . . the blocked assets of a "terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." Pub.L. 107-297, 116 Stat. 2332 at 2337.

"The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." Cong. Rec. – House 8728 (daily ed. Nov. 13, 2002). "It is the intent of the [legislature] that Section 201 establish that such judgments are to be enforced. Section 201 builds upon and extends the principles in section 1610(f)(1) of the [FSIA] [waiver of sovereign immunity], authorizes the enforcement of judgment against terrorist organizations, and eliminates the effect of any Presidential waiver . . . thereby making it clear that *all* such judgments are enforceable against any assets or property under any authorities referenced in [28 U.S.C.] Section 1610(f)(1)." *Id.* (emphasis added).

Congress broadened the language of this statute to allow victims to attach the blocked assets of "terrorist part[ies]," which includes terrorist states and terrorist organizations like HAMAS. During the passage of this legislation, the bill's proponents touted the bill as the way for American victims of terrorism to be compensated by their perpetrators once and for all. Cong. Rec. - House 6134-37 (daily ed. Sept. 11, 2002). Congress was well-aware of the executive branch's objections to this legislation and, in an effort to ensure that this statute would fulfill its purpose, included the language "notwithstanding any other provision of law". *See* Cong. Rec. – Senate 5510 (June 13, 2002).

To adopt the argument that HLF's assets are not the "blocked assets of a terrorist party" by virtue of the relation-back doctrine would not further the purposes of federal criminal forfeiture law or TRIA. The rationale for the relation-back doctrine is to prevent improper transfers of forfeitable property. (Docket # 1308 at 10.) Allowing terrorist victims to seize the terrorists' assets will in fact, further the purpose of the relation-back doctrine by ensuring the terrorist organization's property is

in the hands of the victims themselves instead of the hands of the criminal. Similarly, allowing the government to seize HLF's property instead of using it to compensate HLF's victims frustrates the purpose of TRIA, which was enacted to provide compensation for victims from terrorists' assets. Additionally, HLF's property was "blocked" as a matter of law upon its designation as a terrorist organization in December 2001. The Government, defendants, and other non-government organizations, treated and considered the property "blocked" until the time HLF was convicted. For these reasons, the Court considers the Government's assets "blocked" at the time the court entered judgment for the Rubins, in September 2004.

The TRIA phrase "notwithstanding any other provision of law" or a variation thereof means exactly that; it is unambiguous and effectively supersedes all conflicting laws. *See, e.g., Hill*, 2003 WL 21057173, at *2; *Burlington Northern & Santa Fe Ry. Co. v. Consolidated Fibers, Inc.*, 7 F.Supp.2d 822, 827 (N.D. Tex. 1998) (Cummings, J.). One example of a conflicting law is one that provides immunity from attachment to terrorist states with blocked assets in the United States. Certainly, TRIA is intended to override any immunity from attachment that the terrorist state's blocked assets might otherwise have enjoyed, thereby making it available and accessible to victims. Yet TRIA also uses this broad and sweeping "notwithstanding" language with terrorist organizations whose assets would not otherwise be entitled to immunity. Their assets are subject to attachment by plaintiffs with judgments "notwithstanding any other provision of law," such as criminal forfeiture law. TRIA further provides that the blocked assets of terrorist organizations are subject to execution "in every case in which a person has obtained a judgment against a terrorist party . . . ." The plain language of TRIA allows those blocked assets to be used to satisfy the Rubins's judgment "notwithstanding any other provision of law." Therefore, TRIA overrides any protection

from execution the blocked HLF property might have due to criminal forfeiture law.

### VII.

For these reasons, the Court hereby DENIES the Government's motion to dismiss the Rubin Petition. The Ungar's Petition is hereby DENIED as MOOT. The Court hereby VACATES the Preliminary Order of Forfeiture (Docket # 1263). This Order hereby disposes of Docket #s 1269, 1279, 1307, and 1308.

It is SO ORDERED, this 27th day of April 2011.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE